Ryan B. Abbott (SBN 281641)
 ryan@bnsklaw.com
Kete P. Barnes (SBN 302037)
 kete@bnsklaw.com
**BROWN NERI SMITH & KHAN LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890

Attorneys for Plaintiff,
Boris Antl

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BORIS ANTL, an individual;<br><br>      Plaintiff,<br><br>v.<br><br>AGA SERVICE COMPANY, a Virginia Corporation; JEFFERSON INSURANCE COMPANY, a Virginia Corporation, and DOES 1-10, inclusive,<br><br>      Defendants. | Case No. 2:22-cv-00504-KJM-AC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Hearing Date: December 8, 2023<br>Time: 10:00 a.m.<br>Courtroom: 3 |

1

**TABLE OF CONTENTS**

I.    **INTRODUCTION**.................................................................................................................1

II.   **PERTINENT FACTS**.......................................................................................................2

       **a.**  **The Policy and The Emergency Medical Care Coverage/Assistance**........................2

       **b.**  **Mr. Antl's Heart Attack and AGA's Breaches**...............................................................2

       **c.**  **Mr. Antl's Diligence and Delayed Discovery of Harm**...............................................4

III.   **STANDARD**.......................................................................................................................5

IV.   **ARGUMENT**....................................................................................................................6

       **a.**  **Mr. Antl Did Not Discover the Harm He Incurred as a Result of the Delay
Until September 2021 and Defendants Can Point to No Evidence Otherwise**..........6

       **b.**  **After Experiencing his Heart Attack, the Medication that Mr. Antl Received
Did Not Fully Restore Blood Flow, the Harm Was On-Going, and Continued to
Compound as Defendants Voluntarily Delayed in Approving Payment for Mr.
Antl's Required Surgery**.............................................................................................8

          *i.*   *The Initial Care that Plaintiff Received is Immaterial and Irrelevant because
Mr. Antl Was Harmed After He Received the Medication Defendants' Claim
Treated His Heart Attack*.......................................................................................9

         *ii.*  *A Blood Thinner Does Not Fully Restore Blood Flow and Plaintiff's Expert
Evidence Demonstrates that Mr. Antl's Harm Occurred as a Result of the
Delay in Receiving his Catheter*............................................................................9

        *iii.*  *The Claim That There is No Evidence of Defendants' Delay is Another
Egregious Misrepresentation*...............................................................................10

       **c.**  **Defendants Neither Timely Provided Assistance nor Approved Payment for the
Emergency Medical Treatment That Mr. Antl Needed Which is an Express
Obligation in the Policy**...........................................................................................12

       **d.**  **Delaying Payment is a Breach of the Implied Covenant of Good Faith and Fair
Dealing**....................................................................................................................14

       **e.**  **The Evidence Supports Mr. Antl's Claims for Intentional and Negligent
Infliction of Emotional Distress to Proceed to the Jury**.........................................16

         *i.*   *It is Extreme and Outrageous to Voluntarily Delay Approval of Emergency
Medical Treatment When There is a Likely Chance of Death*...............................16

         *ii.*  *Mr. Antl is Suffering from Severe Emotional Distress Knowing That He Has
Lost Years of His Life*.........................................................................................17

       **f.**  **Plaintiff is Entitled to Recover Attorneys' Fees for Having to Remedy the Harm
that He Incurred as a Result of Defendants' Bad Faith**.........................................18

       **g.**  **Plaintiff Is Entitled to Punitive Damages**...............................................................19

V.    **CONCLUSION**..............................................................................................................20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)............................................................................................................5

*Archdale v. Am. Internat. Specialty Lines Ins. Co.*,
154 Cal. App. 4th 449 (2007) ...........................................................................................18

*Avila v. Willits Environmental Remediation Trust*,
633 F.3d 828 (9th Cir. 2011) ..............................................................................................9

*Ayala v. Infinity Ins. Co.*,
713 F. Supp. 2d 984 (C.D. Cal. 2010) .............................................................................15

*Bangkok Broad. & T.V. Co. v. IPTV Corp.*,
742 F. Supp. 2d 1101 (C.D. Cal. 2010) .............................................................................5

*Berkley v. Dowds*,
152 Cal.App.4th 518 (2007) .............................................................................................16

*Brant v. Superior Court*,
37 Cal.3d 813 (1985) ........................................................................................................15

*Brehm v. 21st Century Ins. Co.*,
166 Cal. App. 4th 1225 (2008) .........................................................................................14

*Cassim v. Allstate Ins. Co.*,
33 Cal.4th 780 (2004) .......................................................................................................18

*Clark v. Cnty. of Tulare*,
755 F. Supp. 2d 1075 (E.D. Cal. 2010).............................................................................16

*Cottle v. Superior Court*,
5 Cal.Rptr.2d 882 (1992) ....................................................................................................8

*Crisci v. Security Ins. Co. of New Haven, Conn.*,
66 Cal.2d 425 (1967) ........................................................................................................12

*Deerpoint Grp., Inc. v. Agrigenix, LLC*,
345 F. Supp. 3d 1207 (E.D. Cal. 2018).............................................................................12

*Duitch v. Travelers Ins. Co.*,
No. CV16-5625 PSG JCX, 2017 WL 3579695 (C.D. Cal. Aug. 1, 2017) ........................15

*eOnline Glob., Inc. v. Google LLC*,
387 F. Supp. 3d 980 (N.D. Cal. 2019) ..............................................................................12

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal.4th 797 (2005) .........................................................................................................6

*Gutierrez v. Mofid*,
39 Cal.3d 892 (1985) ..........................................................................................................7

*Hergenroeder v. Travelers Prop. Cas. Ins. Co.*,

249 F.R.D. 595 (E.D. Cal. 2008) .............................................................................. 17

*Hughes v. Blue Cross of N. California*,
   215 Cal. App. 3d 832 (Ct. App. 1989) ................................................................ 14

*Jordan v. Allstate Ins. Co.*,
   148 Cal. App. 4th 1062 (2007) .......................................................................... 19

*Kaiser Cement Corp. v. Fischbach & Moore, Inc.*,
   793 F.2d 1100 (9th Cir. 1986) .............................................................................. 5

*KOVR-TV, Inc. v. Superior Ct.*,
   31 Cal. App. 4th 1023 (1995) ............................................................................ 16

*Lee v. West Coast Life Ins. Co.*,
   688 F.3d 1004 (9th Cir. 2012) ............................................................................ 15

*Mazik v. Geico Gen. Ins. Co.*,
   35 Cal. App. 5th 455 (2019) .............................................................................. 19

*Molien v. Kaiser Found. Hosps.*,
   27 Cal. 3d 916 (1980) ........................................................................................ 17

*Nasiri v. Allstate Indem. Co.*,
   41 F. App'x 76 (9th Cir. 2002) .......................................................................... 15

*Nat'l Lab. Rels. Bd. v. Ampersand Publ'g, LLC*,
   43 F.4th 1233 (9th Cir. 2022) ............................................................................ 18

*Rutherford v. Owens-Illinois, Inc.*,
   16 Cal. 4th 953 (1997) ......................................................................................... 8

*Salasguevara v. Wyeth Lab'ys, Inc.*,
   222 Cal. App. 3d 379 (Ct. App. 1990) ................................................................ 9

*Sanchez v. South Hoover Hospital*,
   18 Cal.3d 93 (1976) ............................................................................................. 6

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
   950 F. Supp. 981 (C.D. Cal. 1996) ..................................................................... 8

*Waller v. Truck Ins. Exch., Inc.*,
   11 Cal. 4th 1, 900 P.2d 619 (1995) ................................................................... 14

**Statutes**

Cal. Civ. Code § 1549 ........................................................................................... 12

Cal. Civil Code § 3300 .......................................................................................... 13

**Rules**

FRCP 56(a) ............................................................................................................. 5

TABLE OF AUTHORITIES

## I.  INTRODUCTION

On December 7, 2014, Mr. Antl suffered a heart attack while traveling through Chile. Prior to his trip, he had contracted with Defendant AGA Services Company and purchased a travel insurance policy that included *emergency* medical coverage. This coverage applied when "you have to pay for emergency medical…care for" the covered reasons. Mr. Antl had a heart attack and immediately sought treatment at a local clinic. He was taken to a hospital, and Mr. Antl called AGA on the way to inform them of his heart attack. Early the next morning, on December 8, Mr. Antl's hospital physician confirmed the heart attack to AGA, and that he needed a procedure called a cardiac catheterization. AGA also knew that delaying this treatment could cause permanent injury or sudden death. They still took days to provide a guarantee of payment to the hospital which delayed Mr. Antl receiving treatment. Unfortunately, this delay caused permanent damage to Mr. Antl's heart and reduced his life expectancy by years.

AGA's motion argues their eventual payment of Mr. Antl's hospital bills, but this is irrelevant. AGA unreasonably *delayed* in guaranteeing Mr. Antl's hospital bills, and that the *delay* caused him serious damage. AGA's arguments remove any meaning from the term "emergency" from their policy and that anyone purchasing the policy should have known that payment could be approved after an insured is dead. No reasonable person would understand emergency medical treatment coverage to apply this way.

AGA disputes that the delay caused damage, but elects to focus solely on the opinion of their expert witness to the exclusion of Mr. Antl's expert witness. But ignoring evidence AGA finds inconvenient is fatal to a motion for summary judgment. Mr. Antl's expert witness, Dr. Raney, an experienced interventional cardiologist, opines that to a reasonable degree of medical certainty that the delay caused the majority of damage to Mr. Antl's heart and that this has shortened his lifespan by approximately five years.

Finally, Mr. Antl was not aware until September 2021 that he suffered harm because of AGA's delay. While AGA criticizes his diligence, the undisputed facts are that Mr. Antl promptly saw cardiologists and physicians following his discharge from the hospital in Chile, and always strictly adhered to their recommendations. Despite informing these physicians of the facts surrounding his heart attack, no one informed him of the damage caused by the delay until September 2021. Mr. Antl

MEMORANDUM OF POINTS AND AUTHORITIES
1

1    promptly initiated his lawsuit soon after. Defendants cannot produce any evidence to contradict these
2    facts.
3         Unable to dispute the relevant facts, Defendants conflate, exaggerate, and misrepresent facts in
4    their MSJ. Defendants also have raised the same issues that were rejected in their motions to dismiss as
5    to the delayed discovery rule, even though the facts remain exactly as alleged. Defendants have either
6    failed to present facts to grant their motion, Mr. Antl's facts presented establish issues in favor of Mr.
7    Antl, or at the very least, all issues have disputed material facts resulting in denial of Defendants' MSJ.
8         There is no basis to grant summary judgment for any claim. Mr. Antl respectfully requests the
9    Court deny Defendants' motion entirely.

10   **II.   PERTINENT FACTS**

11   **a.   The Policy and The Emergency Medical Care Coverage/Assistance**

12   In September 2014, Mr. Antl purchased a "Classic Plan" travel insurance policy (the "Policy") from
13   AGA that was underwritten by Jefferson Insurance Company. (Undisputed Facts ("UF") 1.) The policy
14   included both insurance coverage and assistance services, agents that were available 24 hours a day to
15   help with assistance, Emergency Medical/Dental Coverage that applied when an insured had a "sudden,
16   expected illness or injury during [their] trip that's either life threatening or could cause serious and
17   irreparable harm if it is isn't treated," that coverage was available for "reasonable and customary costs
18   for supplies and services from a doctor, dentist, hospital, or other licensed provided," that "if you need
19   to be admitted to a hospital as an inpatient for longer than 24 hours, we can guarantee or advance
20   payments up to the limit of your emergency medical/dental coverage," that "if you're hospitalized, our
21   medical staff will stay in contact with you and the doctor caring for you," and that with respect to the
22   assistance services, "our goal is to help you with your problem no matter where you're traveling." (UF
23   218.)

24   **b.   Mr. Antl's Heart Attack and AGA's Breaches**

25   On December 7, 2014, Mr. Antl began to experience a heart attack while he was in the village of
26   Hornopiren. (UF 2) He immediately went to the local medical facility. (*Id.*) That facility was unable to
27   properly treat him, so the doctor drove him to Hospital de Puerto Montt (the nearest hospital). (UF 3.)
28   On the way to the hospital Mr. Antl and/or the treating doctor contacted AGA, informing them of the

situation. (UF 5.) The call got disconnected, AGA tried to contact the various hospitals in the area, but did not try to redial Mr. Antl. (UF 219.) Around 12:33 a.m. [December 8, 2014] (AGA time, 2:30 a.m. Chile time), AGA was contacted by Mr. Antl's treating doctor. (UF 220.) They informed him that Mr. Antl was in stable condition at the time, but that he would need to be transported to another hospital to receive treatment. (*Id*.) AGA was also told (at that same time) that the next hospital would not accept Mr. Antl without a guarantee of payment provided. (*Id*.) Within the next hour, AGA was informed that Mr. Antl would need cardiac catheterization, a procedure that involves inserting a stent into a heart vessel to restore blood flow. (UF 221.)

   Later that morning [December 8, 2014], AGA spoke with someone at Hospital Clinca Los Andes. (UF 225.) At that same time [10:31 a.m. (AGA time; 12:31 p.m. Chile time)], AGA was also informed by the receiving hospital that they will need to provide a letter of guarantee before Mr. Antl is admitted. (*Id*.) Internally, at 1:38 p.m. (AGA time; 3:38 p.m. Chile time) time (three hours later), Defendants' medical group approved Mr. Antl's transfer, ICU admission, and cardiac catheterization. (UF 226.) This approved ground transport to the second hospital, payment for the one day stay at the first hospital, and one day of treatment at the second hospital. (*Id*.) Another 90 minutes later, AGA's case manager approves the guarantee letters and they are provided by AGA to their local agent (who locally guaranteed payment). (UF 227.) The next morning Mr. Antl contacts AGA and they learn that he is still at the first hospital. UF 229). AGA confirmed that the guarantee letter was placed with the hospital, but did not confirm that Mr. Antl was transported that day. (UF 228) Mr. Antl is finally transported to the second hospital at 10:13 a.m. [11:13 a.m. Chile time] on December 9, 2014. (UF 229.)

   Later that morning, Mr. Antl is informed by the doctor that he will be in the hospital at least three days, but up to five. (UF 230.) AGA is also aware of this and records it in their case notes at the same time. (*Id*.) Mr. Antl's diagnosis and proposed treatment has not changed at this point. (UF 241.) Instead of approving Mr. Antl's stay for the remainder of time needed – or even the minimum expected three days – AGA requests a medical report from their local agent. (UF 231.) At 8:45 p.m. on December 9, AGA receives the medical report in Spanish that indicates an estimated cost at "5,268.666-8600 USD." (UF 232.) AGA requests translation of that report on a non-urgent basis, and does not attempt to

translate it otherwise even though its staff had previously used google translate for another report. (*Id.*) AGA does nothing overnight. (UF 234.)

On December 10, at 3:23 p.m. (AGA time; 4:23 Chile time), AGA's nurse recommends and approves Mr. Antl's hospital stay for December 9-11. (UF 235.) AGA sends the guarantee letter more than two hours later, but does not reach out to its local agent or the hospital to confirm receipt or whether Mr. Antl will be treated immediately. (UF 236.) Approximately two and a half hours later AGA receives an email from Mr. Antl's treating doctor that states that he has a "high risk of new hearth (*sic*) attack," that "if the blood vessel is not completily (*sic*) open (*sic*) suffer a new lesion he probably will die," that "I hope you understand how serious is the situation," and "in case of emergency (pain and new myocardial infarction) I will call the cardiologist for an emergency procedure." (UF 237.) Mr. Antl forwards this same email to AGA a few minutes later. (*Id.*) AGA's case manager forwards the email to its nurse and the nurse reviews it at 8:16 p.m. (UF 238.) AGA does nothing for the next 12 hours. (*Id.*) At 8:53 a.m. the next morning [December 11], another AGA nurse reviews the email from the treating doctor and notes "concern regards sub [Mr. Antl] treatment." (UF 239.) AGA then goes back and forth with its local agent for the next couple of hours to determine whether the guarantee letters were provided to the hospital. (*Id.*) AGA's local agent also – for the first time in this transaction and contrary to its prior actions doing to the opposite – asks if AGA will be paying directly or if it will pay and obtain reimbursement from AGA. (*Id.*) Finally, at 10:48 a.m. (AGA time, 11:48 a.m. Chile time), AGA has confirmed that the hospital received the guarantee letter for Mr. Antl to receive the catheter surgery. (UF 240.) The hospital informs AGA that Mr. Antl will receive the surgery that afternoon and he does. (*Id.*) Mr. Antl's diagnosis and proposed treatment never once changed from the entire time when he first called AGA to inform them of his heart attack to the time that he received the surgery. (UF 241)

### c.   Mr. Antl's Diligence and Delayed Discovery of Harm

After Mr. Antl was discharged from the hospital he returned to his residence in Prague, Czech Republic. (UF 244) Within a few weeks of his discharge he had seen his cardiologist as a follow up after the heart attack and catheter surgery. (*Id.*) Throughout the next seven years, Mr. Antl regularly saw his physicians and numerous cardiologists regarding his health. (UF 245) Those cardiologists told Mr. Antl that he would not be able to do some of the same activities that he had regularly done before, that he

1   would have to monitor his heart rate during exercise, and that the heart attack had caused harm to him,

2   as is normal with any heart attack. (UF 246.) None of those doctors told him that the delay in receiving

3   treatment caused him more harm than he would have incurred had the delay not occurred. (UF 247.)

4         On or around September 2021, Mr. Antl's cardiologist in Prague, Dr. Camek, told Mr. Antl for

5   the first time, that the delay in receiving treatment reduced his expected lifespan. (*Id*.) This was the first

6   time that Mr. Antl became aware that the delay resulted in additional damage that he would not have

7   incurred otherwise. (*Id*.)

8         After learning that the delay in treatment likely diminished his lifespan, Mr. Antl has suffered

9   from severe emotional distress, including depression, anxiety, and insomnia. (UF 248.) Mr. Antl

10   experiences these symptoms on a regular basis. On March 17, 2022, Mr. Antl filed suit against

11   Defendants. (ECF 1.)

12   **III.    STANDARD**

13         Summary judgment is proper only if the "the movant shows that there is no genuine dispute as to

14   any material fact[.]" FRCP 56(a). "[S]ummary judgment will not lie if the dispute about a material fact

15   is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the

16   nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "'The initial burden of

17   showing the absence of material factual issues rests on the proponent of a summary judgment motion.

18   Once that burden is met, however, the opponent must counter with specific factual allegations revealing

19   a genuine dispute of fact in order to preclude summary judgment.' A party opposing summary judgment

20   does not have to file any countervailing materials when the movant's papers are insufficient on their face

21   to demonstrate the lack of any material issue of fact." *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*,

22   793 F.2d 1100, 1103–04 (9th Cir. 1986) (citations omitted).

23         "In determining whether a genuine issue of material fact exists, the court must not make

24   credibility determinations or weigh conflicting evidence. Rather, the court must view the evidence in the

25   light most favorable to the non-moving party, drawing all "justifiable inferences" in its favor." *Bangkok*

26   *Broad. & T.V. Co. v. IPTV Corp*., 742 F. Supp. 2d 1101, 1109 (C.D. Cal. 2010) (citing *Anderson*, *supra*,

27   477 U.S. at 255).

28

## IV.   ARGUMENT

### a. Mr. Antl Did Not Discover the Harm He Incurred as a Result of the Delay Until September 2021 and Defendants Can Point to No Evidence Otherwise

Mr. Antl diligently obtained treatment from multiple doctors and cardiologists following his heart attack. (UF 244-247.) Mr. Antl informed them of the circumstances of his heart attack, including the delay in receiving catheterization. (UF 247.) Mr. Antl was fully compliant with the treatment recommendations of his providers. (UF 246.) Defendants do not dispute any of this.

Up until September 2021, none of Mr. Antl's providers had informed him that that the delay in receiving treatment caused additional and unnecessary harm that could have been avoided.[1] Defendants again point to no evidence to contradict this. "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.'" *Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806. "An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." *Id.* Until 2021, Mr. Antl had no reason to suspect any additional harm had occurred as a result of Defendants' delay, despite extensive diligence his end. (UF 247.)

Defendants nevertheless argue that Mr. Antl should have known about the damage caused by the delay, but purely based on the assumption that a layperson should have highly specialized expert knowledge. This assumption is contrary to the law. "[T]he patient is fully entitled to rely upon the physician's professional skill and judgment while under his care, and has little choice but to do so. It follows, accordingly, that during the continuance of this professional relationship, which is fiduciary in nature, the degree of diligence required of a patient in ferreting out and learning of the negligent causes of his condition is diminished." *Sanchez v. South Hoover Hospital*, 18 Cal.3d 93, 102 (1976). "In many cases, the harm caused by medical malpractice is not immediately apparent. The best medical treatment sometimes fails, or requires long and difficult recuperation, or produces bad side effects. Thus, even if a

---

[1] While Defendants may dispute the sufficiency of Mr. Antl's efforts investigating the harm following his heart attack, claiming that "Mr. Antl admits that he did nothing to investigate whether he suffered any damage to his heart as a result of the defendants' alleged delay[,]" (ECF 36 at 6:6-8.) is an egregious misrepresentation of the facts.

patient is unhappy with his condition, he may not suspect he has been wronged. Lacking medical knowledge, he may reasonably rely upon his negligent physician's soothing disclaimers." *Gutierrez v. Mofid*, 39 Cal.3d 892, 899 (1985). Ironically, Defendants' own 30(b)(6) witness, a physician, declined to answer questions about cardiac care stating it was outside of her specialty. (Barnes Decl. ¶ 4, Ex. C [Castro Depo.] at 57:4-7.)

Contrary to Defendants' misrepresentation, Mr. Antl *did* investigate the harm that occurred to him through a significant number of doctor and cardiologist visits after he was discharged to the present. (UF 244-247.) Defendants admit that Mr. Antl did this, while at the same time contradictorily claiming that he did no investigation: "He conducted no investigation, even though he spoke with numerous physicians about the purported delay." Defendants never manage to articulate just what they claim Mr. Antl should have done other than seek guidance from his cardiologists to learn about the damage caused by the delay.

Defendants' argument that Mr. Antl "was in no way prevented from investigating the issue of whether he was damaged by the purported delay," (ECF 36 at p.7:17-18) puts the burden on Mr. Antl to already have specialized medical knowledge. Defendants' conclusion that "there is no excuse for his lack of investigation," makes no argument as to what Mr. Antl was expected to do differently. Ultimately, Defendants' misrepresentations that Mr. Antl did nothing to investigate are just that – misrepresentations.

While the statutes of limitations that Defendants cite list the correct timeline for those specific causes of action, the date from when any limitations period began to run for Mr. Antl was September 2021. His claims are timely. These are the same exact arguments that Defendants made in moving to dismiss Mr. Antl's claims. Post-discovery, despite Defendants' attempts to find evidence to contradict Mr. Antl's allegations, they have found no such evidence. As the evidence has not changed through discovery Defendants' arguments still fail.

Defendants now attempt to confuse the issue by arguing that the heart attack caused damage regardless of the delay, but that is not the issue. Mr. Antl is not suing Defendants for having a heart attack. Mr. Antl is also not suing Defendants for failing to pay for his treatment. Mr. Antl is suing the

Defendants for unnecessarily delaying coverage which caused him additional harm that could have been avoided.

Defendants also argue that Mr. Antl knew early on that Defendants took days to approve his procedure, which is true.  But again, this is not the issue. Mr. Antl did not know until 2021 that this delay had caused unnecessary and irreversible damage to his heart.

All of the evidence demonstrates that Mr. Antl did not discover harm until September 2021. Mr. Antl respectfully requests the Court overrule Defendants' motion for summary judgment as to the statute of limitations argument.

> **b. After Experiencing his Heart Attack, the Medication that Mr. Antl Received Did Not Fully Restore Blood Flow, the Harm Was On-Going, and Continued to Compound as Defendants Voluntarily Delayed in Approving Payment for Mr. Antl's Required Surgery**

Mr. Antl only incurred the additional harm because Defendants did not promptly guarantee payment for his procedure/surgery even though they knew that he needed it by December 8, 2014. "In California, causation must be founded upon expert testimony and cannot be inferred from the jury's consideration of the totality of the circumstances unless those circumstances include the requisite testimony on causation." *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 985 (C.D. Cal. 1996) (citing *Cottle v. Superior Court*, 5 Cal.Rptr.2d 882, 892). In order to prove that a defendant's conduct was the cause in fact of [the] injuries, a plaintiff must establish that such conduct was 'a substantial factor in bringing about the injury.'" *Id. See also Rutherford v. Owens-Illinois, Inc.,* 16 Cal. 4th 953, 968–69, 941 (1997) (citations omitted) ("California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury. The substantial factor standard generally produces the same results as does the "but for" rule of causation which states that a defendant's conduct is a cause of the injury if the injury would not have occurred "but for" that conduct."). "To withstand summary judgment as to a defendant, then, plaintiff must present evidence from which a rational jury could find such a reasonable medical probability as to that defendant's conduct." *Sanderson*, *supra*, at 985.

While Defendants argue that Mr. Antl cannot prove causation, they have not set forth any standard as to what is required for causation. Instead, Defendants only rely on their expert's testimony that is limited to the events before Defendants' delay, and misrepresent the evidence (again) that clearly demonstrates the repeated and admitted unnecessary delay caused harm. The harm that Mr. Antl incurred because of the delay is set forth with reasonable medical certainty from his expert witness Dr. Aiden Raney. Competing opinions, set forth with reasonable medical certainty, at most create disputed issues of fact as to whether Defendants caused the harm and what harm Mr. Antl suffered from the delay.

i.   *The Initial Care that Plaintiff Received is Immaterial and Irrelevant because Mr. Antl Was Harmed After He Received the Medication Defendants' Claim Treated His Heart Attack*

The fact that Mr. Antl may have incurred heart damage before he arrived to the hospital does not preclude him from incurring additional harm while waiting for the treatment that he required. While Defendants argue that Mr. Antl incurred all harm from his heart attack before he reached Hospital Puerto Montt, Mr. Antl's expert opines otherwise. (UF 18.) Defendants' argument and conclusion rests on the premise that the medication Mr. Antl received fully restored the restricted blood flow that occurred. Dr. Raney's expert report contradicts this, and states that the majority of damage was caused by the delay between the time he received his medication and his catheterization. (UF 17 and 18.) While Defendants are free to dispute the opinions of Mr. Antl's expert at trial, this indisputably creates an issue of fact defeating this aspect of their motion for summary judgment.

ii.  *A Blood Thinner Does Not Fully Restore Blood Flow and Plaintiff's Expert Evidence Demonstrates that Mr. Antl's Harm Occurred as a Result of the Delay in Receiving his Catheter*

Whether Mr. Antl experienced harm as a result of the delay is an issue of fact. "[M]edical causation can only be determined by expert medical testimony." *Salasguevara v. Wyeth Lab'ys, Inc*., 222 Cal. App. 3d 379, 385 (Ct. App. 1990); *see also Avila v. Willits Environmental Remediation Trust*, 633 F.3d 828 (9th Cir. 2011) ["in a personal injury action, causation must be proven with reasonable medical probability based upon competent expert testimony."]

Mr. Antl's expert witness opines that "the majority of the permanent damage caused to Mr. Antl's heart was caused by the delay from the 10th to the 11th." (UF 18.) While Defendants' expert opines that the administration of the drug Tenecteplase stopped any further injury and all injury occurred to Mr. Antl before Tenecteplase was administered" (ECF 36 at 10:11-22), this opinion is contested by Mr. Antl's expert. Mr. Antl's expert opines that "in Mr. Antl's case, the medication [Tenecteplase] played an important role in partially restoring blood flow to his heart muscle, but until the surgery his blood flow remaining insufficient and thus ongoing damage was occurring based on the serial changes to his EKGs[.]". (UF 17) Mr. Antl's expert further opines that "his [Mr. Antl's] EKGs then showed evidence of ongoing ischemia, in particularly on December 10th and 11th." Dr. Raney's opinions are expressed to a reasonable degree of medical certainty. (UF 18)

In ruling on this motion for summary judgment, the Court must view all the evidence submitted and draw all reasonable inferences in Mr. Antl's favor. Mr. Antl's expert, an experienced interventional cardiologist, has submitted competent testimony that establishes with a reasonable medical certainty that Mr. Antl suffered harm as a result of Defendants' delay in approving his treatment. Because there are competing opinions of the causation of Mr. Antl's harm, there is an issue of fact whether Defendants were the proximate cause of his harm. Defendants' MSJ on these grounds should be denied.

### iii.   The Claim That There is No Evidence of Defendants' Delay is Another Egregious Misrepresentation

AGA knew from the day after Mr. Antl called them that he needed a catheterization, but continued to piecemeal payment for his treatment instead of approving full treatment from the beginning. To claim that Plaintiff has no evidence that Clinica los Andes would have performed the surgery sooner ignores AGA's own call notes and testimony from its agents.

First, Both Hospital Puerto Montt and Clinica los Andes informed AGA that they would not perform the surgery that Mr. Antl required until there was a guarantee of payment for the surgery. AGA was told this within the first hour of their first conversation with Mr. Antl's treating physician – in the second communication following Mr. Antl's initial call to them on December 7, 2014. Defendants also knew that Mr. Antl needed surgery to insert a cardiac catheter on December 8, 2014. Defendant AGA's

Rule 30(b)(6) witness from its medical staff testified their knowledge of the heart attack on December 8, 2014 was sufficient to accept the diagnosis. That individual also testified that she could not think of an instance where someone's treating physician had recommended a stent/catheter and where they did not accept that recommendation. The individual also testified that AGA approved the transport to Clinica los Andes, as well as the procedure that Mr. Antl needed by noon on December 8, 2014.

Instead of guaranteeing payment for any treatment Mr. Antl would need at the second hospital, AGA piecemealed the guarantees. They first guaranteed payment for the first hospital and transfer to the second hospital, and only one extra day in the hospital, when Mr. Antl would have been there longer under any circumstance. (UF 227 and 230) They then guaranteed two more days of treatment in the hospital and would extend further when another update was received.  (UF 236).

It was not until 3 days after AGA's knew that Mr. Antl needed surgery that Mr. Antl received the procedure. This was only because AGA's case management staff did not immediately send out the guarantee of payment letter or attempt to immediately get a guarantee of payment to Clinica los Andes. And when it finally approved the guarantee letter, its agents signed off for the night – except for one nurse, who reviewed the email from Mr. Antl's treating doctor, pleading for them to provide the guarantee of payment so that the procedure could be performed immediately, to avoid the possibility of Mr. Antl suffering yet another heart attack and dying that night. After reading that email, AGA's nurse did nothing. AGA let it sit for another 8 hours before coming back to Mr. Antl's case the next morning.

In that three-day span, AGA requested two separate medical reports. They sat through two nights of Mr. Antl waiting at the hospital, where they did nothing at all, even though their staff was available 24 hours a day. AGA also represented in the Policy that if the hospital stay is intended to take more than 24 hours, that they can guarantee payment for the full amount of coverage available. (UF 218.) They never did this, knowing that Mr. Antl's stay would be longer than 24 hours. There is more than ample evidence that Clinica los Andes did not perform the surgery sooner because AGA delayed payment for no justifiable reason at all. (UF 8.)

While Mr. Antl was told by his doctor that he would be treated if his conditioned suddenly worsened thereby placing his life at greater risk, that fact does not negate AGA's failure to approve the

guarantee of payment and the fact this delayed treatment. The claim that Mr. Antl had the ability to pay

for his necessary treatment is contrary to the evidence. (UF 11.)

Viewing the evidence submitted in Mr. Antl's favor demonstrates that Defendants caused the

harm he suffered. Their motion for summary judgment must be denied.

    **c.**    **Defendants Neither Timely Provided Assistance nor Approved Payment for the Emergency Medical Treatment That Mr. Antl Needed Which is an Express Obligation in the Policy**

Failing to approve payment or provide assistance in the emergency situation that was required

and promised, constitutes a breach of the Policy. "A contact is an agreement to do or not to do a certain

thing." Cal. Civ. Code § 1549. A contract is to be interpreted to give effect to the mutual intention of the

parties at the time the contract was made." *Deerpoint Grp., Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d

1207, 1228 (E.D. Cal. 2018). By purchasing an insurance policy, the insured seeks to "protect

[themselves] against the risks of accidental loss, including the mental distress which might follow from

the losses. Among the considerations in purchasing liability insurance, as insurers are well aware, is the

peace of mind and security it will provide in the event of an accidental loss, and the recovery of damages

for mental suffering has been permitted for breaches of contracts which directly concern the comfort,

happiness, or personal esteem of one of the parties." *Crisci v. Security Ins. Co. of New Haven, Conn.*, 66

Cal.2d 425, 434. Further, "[A] breach of the implied covenant is necessarily a breach of contract."

*eOnline Glob., Inc. v. Google LLC*, 387 F. Supp. 3d 980, 989 (N.D. Cal. 2019).

Defendants many arguments for the claim that they did not breach the contract are meritless.

Generally, Defendants believe that because they eventually guaranteed payment and paid the amounts

required for Mr. Antl's hospital treatment, that they fulfilled all of their obligations. (ECF 36 at 13:5-12;

14:2-3.) This ignores the fact that the Policy provided coverage for *emergency* medical treatment.

Defendants' interpretation renders the word emergency meaningless. Defendants continue this

argument, characterizing their efforts as "not perfect" and as "reasonable," to claim that prudent

attention to Mr. Antl's case and the recognition and necessity to address things urgently was "beyond

defendants' control." (ECF 36 at 14:9-17.) Defendants also argue – based on the subjective

interpretation by their agent – that numerous aspects of the Policy are to have no effect. They claim –

without any support – that the insurance and their obligations are limited to paying for costs incurred after the fact. (ECF 36 at 13:13-23.)

Defendants had to address Mr. Antl's need for emergency medical treatment on an emergency basis. The Policy states that "Emergency medical/dental coverage" is available when "you have a sudden unexpected illness or injury during your trip that's either life threatening or could cause serious and irreparable harm if it isn't treated." (UF 218).) The Policy also indicates that "Emergency medical/dental" coverage, applies when "You have to pay for emergency medical or dental care." (*Id.*) In addition to the payment coverage, Defendants also represented that "If you need to be admitted to a hospital as an inpatient for longer than 24 hours, we can guarantee or advance payments up to the limit of your emergency medical/dental coverage (listed under "Paying or guaranteeing your hospital bill."). (*Id.*) They also promised that, "[i]f you need our help while traveling, our assistance team is available 24 hours a day." (*Id.*; UF 243.) While Defendants' want to favorably describe their conduct as "not perfect," "reasonable efforts," and "beyond their control," these are contrary to the facts. Defendants knew that Mr. Antl needed surgery and let him sit in the hospital for days, when its medical staff had already signed-off on his required medical treatment by December 8. Nothing was addressed on an emergency basis, as is demonstrated through AGA's agents leaving Mr. Antl's case to sit throughout the night, even when an emergency was noted and known. The argument that Defendants' obligations do not include the "assistance" side of the Policy is refuted by the language itself: "Your travel insurance plan (your plan) includes both insurance coverage and assistance services." (UF 218) Defendants' arguments are meritless and they breached the contract in numerous ways.

Finally, Defendants also fail to realize that they are liable for any harms that are reasonably foreseeable at the time of contracting. *See* Cal. Civil Code § 3300. It is reasonably foreseeable that an insured, who requires emergency medical treatment, will be further injured if he does not receive treatment urgently. This is exactly what happened. So, while AGA guaranteed (and ultimately paid) for Mr. Antl's hospital treatment days after he needed it, they denied him the benefits of the policy of having emergency treatment available and that caused Mr. Antl to lose years of his life. Accordingly, Defendants' arguments are without merit.

### d.  Delaying Payment is a Breach of the Implied Covenant of Good Faith and Fair Dealing

Mr. Antl reasonably expected that AGA would treat medical emergencies with urgency and a multiple day delay in guaranteeing payment after they knew what immediate surgery he needed is not reasonable. "As applied to insurance contracts, it [the covenant of good faith and fair dealing] does not merely 'connote the absence ... of positive misconduct of a malicious or immoral nature....'"; it demands that the insurer act reasonably." *Hughes v. Blue Cross of N. California*, 215 Cal. App. 3d 832 (Ct. App. 1989) [citation omitted]. "[T]he covenant entails 'a duty not to withhold unreasonably payments due under a policy.'" *Id*. "When benefits are due an insured, 'delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because' they frustrate the insured's right to receive the benefits of the contract in 'prompt compensation for losses.' *Waller v. Truck Ins. Exch., Inc.,* 11 Cal. 4th 1, 36, 900 P.2d 619, 639 (1995). "[E]ven an insurer that pays the full limits of its policy may be liable for breach of the implied covenant if improper claims handling causes detriment to the insured." *Brehm v. 21st Century Ins. Co*., 166 Cal. App. 4th 1225, 1236 (2008).

"The presence of good faith implies 'consistency with the justified expectations of the other party.' '[T]he insured in a contract like the one before us does not seek to obtain a commercial advantage by purchasing the policy—rather, he seeks protection against calamity.... The purchase of such insurance provides peace of mind and security...." In a medical insurance policy, the insured's expectation of security is relevant to the interpretation of medical necessity. '[M]edical necessity' or similar policy language is an objective standard to be applied by the trier of fact, ..." *Hughes v. Blue Cross of N. California*, 215 Cal. App. 3d 832, 845 (Ct. App. 1989) [citations omitted]. "[T]he 'reasonable expectation of the insured' requires that the policy language be construed liberally 'so that uncertainties about the reasonableness of treatment will be resolved in favor of coverage.' ""[T]hat with doubts respecting coverage resolved in favor of the subscriber, there will be few cases in which the physician's judgment is so plainly unreasonable, or contrary to good medical practice, that coverage will be refused." *Id*., [citations omitted].

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants knew that Mr. Antl needed catheterization the day after he called them. Their Rule 30(b)(6) witness for their medical department testified that they would have accepted the initial treating doctor's recommendation and would not have questioned that in approving a guarantee of payment. "There can be no 'unreasonable delay' until the insurer receives adequate information to process the claim and reach an agreement with the insureds." *Nasiri v. Allstate Indem. Co.*, 41 F. App'x 76, 79 (9th Cir. 2002). Conversely to the facts here, "an insurer is not liable in bad faith where the denial or delay is 'due to the existence of a genuine dispute with its insured as to the existence of coverage liability.' *Ayala v. Infinity Ins. Co.*, 713 F. Supp. 2d 984, 986 (C.D. Cal. 2010). AGA admitted that after the first day, there was sufficient information to guarantee payment for Mr. Antl's treatment. There was no dispute of coverage and there is no dispute here that Mr. Antl's claim was to be paid by AGA. Three days later while Mr. Antl was still waiting for the payment guarantee and surgery, one of AGA's nurses also reviewed an email from Mr. Antl's treating doctor saying that he might die if surgery was not performed immediately. Instead of contacting someone to get payment transferred, she noted her review in the case file, and then she let Mr. Antl sit there all night. Nothing further was done until eight hours later in the morning. Finally, AGA also indicates in the Policy that they are available 24 hours a day and that if a patient is expected to be in the hospital for more than one day, they can simply guarantee payment up to the Policy limits. None of the actions of AGA in delaying payment can be considered reasonable.

At best, AGA's argument to the contrary demonstrates that issues of fact exist. "Thus, to survive a motion for summary judgement on a bad faith claim, Plaintiffs must meet their burden by presenting evidence of material issues of fact as to the reasonableness of Defendant's handling of the claim." *Duitch v. Travelers Ins. Co.,* No. CV16-5625 PSG JCX, 2017 WL 3579695, at *6 (C.D. Cal. Aug. 1, 2017).

To the extent that AGA argues Mr. Antl has not incurred economic loss, they are wrong. Mr. Antl has incurred attorney's fees for having to bring this action to redress their failures, which constitute economic loss. *See Brant v. Superior Court*, 37 Cal.3d 813, 817; *see also Lee v. West Coast Life Ins. Co.*, 688 F.3d 1004, 1008, n. 4 (9th Cir. 2012).

Plaintiff has sufficiently put forth evidence of Defendants' unreasonableness in delaying guarantee of payment which resulted in permanent harm to Mr. Antl and years of his life lost.

### e. The Evidence Supports Mr. Antl's Claims for Intentional and Negligent Infliction of Emotional Distress to Proceed to the Jury

#### i. It is Extreme and Outrageous to Voluntarily Delay Approval of Emergency Medical Treatment When There is a Likely Chance of Death

Defendants' voluntary delay in guaranteeing payment –after they were repeatedly told of the urgency required and the likelihood of death that Mr. Antl faced –is extreme and outrageous conduct for the jury to adjudge. "Manifestly, the standard for judging outrageous conduct does not provide a 'bright line' rigidly separating that which is actionable from that which is not. Indeed, its generality hazards a case-by-case appraisal of conduct filtered through the prism of the appraiser' values, sensitivity threshold, and standards of civility. The process evoked by the test appears to be more intuitive than analytical...." *KOVR-TV, Inc. v. Superior Ct.,* 31 Cal. App. 4th 1023, 1028 (1995). "Whether a defendant's conduct can reasonably be found to be outrageous is a question of law that must initially be determined by the court; if reasonable persons may differ, it is for the jury to determine whether the conduct was, in fact, outrageous. *Berkley v. Dowds,* 152 Cal.App.4th 518, 534, 61 Cal.Rptr.3d 304, 317 (2007). While the outrageousness of a defendant's conduct normally presents an issue of fact to be determined by the trier of fact, the court may determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. *Clark v. Cnty. of Tulare*, 755 F. Supp. 2d 1075, 1090 (E.D. Cal. 2010).

At least by December 8, Defendants knew that Mr. Antl needed surgery for his heart attack and that he needed it as soon as possible. That same day, the medical staff signed off on his treatment. Mr. Antl did not receive that treatment until three days later. This also includes the last night where Defendants were informed that Mr. Antl might die, the nurse reviewed the communication and signed-off for the night, and Defendants did not attempt to contact the hospital or get Mr. Antl into surgery until the next morning. Mr. Antl believes this conduct is so outrageous and extreme that the Court can make that determination now. But at the very least, if reasonable minds could differ here, the question should be reserved for the jury.

The fact that Mr. Antl was assured that he would be treated if his condition worsen sufficiently

does nothing to negate the liability of Defendants' or the harm that Mr. Antl suffered. The evidence sufficiently supports the finding of Defendants' conduct as extreme and outrageous.

    ii. *Mr. Antl is Suffering from Severe Emotional Distress Knowing That He Has Lost Years of His Life*

  Mr. Antl has suffered from depression, anxiety, and insomnia since learning that his lifespan is reduced because his treatment was delayed. "[S]evere" means substantial or enduring as distinguished from trivial or transitory. "Severe emotional distress means, then, emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." *Hergenroeder v. Travelers Prop. Cas. Ins. Co.,* 249 F.R.D. 595, 621 (E.D. Cal. 2008). "[T]he general standard of proof required to support a claim of mental distress is some guarantee of genuineness in the circumstances of the case. This standard is not difficult to apply as it may seem in the abstract. As Justice Traynor explained…the jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience. *Molien v. Kaiser Found. Hosps.,* 27 Cal. 3d 916, 930 (1980). "[I]t is for the Court to determine whether on the evidence provided severe emotional distress can be found and for the jury to determine, whether it has in fact existed. *Hergenroeder*, *supra*, 249 F.R.D. at 621.

  Mr. Antl avers that he has anxiety, depression, and insomnia, as a result of knowing that his lifespan has been reduced. (UF 248.) Defendants' (unsupported) argument that he has not sought and does not intend to seek medical treatment or take medication, is immaterial. Regardless of the severity of his condition, Mr. Antl does not want to take antidepressants (which is his right), and knows that non-pharmaceutical treatments will not address the underlying cause of his distress—his reduction in lifespan. The fact that Mr. Antl has "extensively traveled and lived an active lifestyle" is also immaterial. Someone can both extensively travel and live an active lifestyle as well as experience severe emotional distress. Mr. Antl never claimed his emotion stress was completely debilitating.

  Mr. Antl has testified he suffers from severe emotional distress, but to the extent there is any dispute about this, that question should be presented to the jury. This is the same situation whether addressed under his IIED or NIED claim.

---

MEMORANDUM OF POINTS AND AUTHORITIES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**f.    Plaintiff is Entitled to Recover Attorneys' Fees for Having to Remedy the Harm that He Incurred as a Result of Defendants' Bad Faith**

As a result of delaying the payment of benefits, Mr. Antl suffered harm that could have been avoided. "The bad-faith exception to the American Rule permits a court to award attorney's fees to the prevailing party when the losing party has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Nat'l Lab. Rels. Bd. v. Ampersand Publ'g, LLC*, 43 F.4th 1233, 1237 (9th Cir. 2022). "When an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense. The attorney's fees are an economic loss—damages—proximately caused by the tort. These fees must be distinguished from recovery of attorney's fees *qua* attorney's fees, such as those attributable to the bringing of the bad faith action itself. What we consider here is attorney's fees that are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action." *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 806.

Mr. Antl brings his claim for bad faith in the same action as his claim for breach of contract and breach of the implied covenant of good faith and fair dealing. The issues of whether AGA breached the Policy and did so in bad faith are inextricably intertwined. The investigation of whether Mr. Antl received the benefits of the Policy for which he paid, and how those determinations were made, are the same facts investigated regardless of the various claims that have been asserted.

While Defendants argue that they have paid out the entire amounts due and that Mr. Antl has not incurred any harm, that ignores the allegations and facts of this case. An emergency medical treatment policy is intended to apply in an urgent situation. "[I]f the damages are within the reasonable expectation of the parties at the time of contracting, they are recoverable." *Archdale v. Am. Internat. Specialty Lines Ins. Co.*, 154 Cal. App. 4th 449, 469, 64 Cal. Rptr. 3d 632, 649 (2007). It is reasonably contemplated that an emergency medical situation must be addressed on an emergency basis –not days later. It is also reasonably contemplated that an emergency medical situation that is not immediately addressed can result in very significant health damages.

Mr. Antl has to sue Defendants to recover for the harm that they caused by unreasonably delaying the guarantee of payment (i.e., coverage) under his policy. He is enforcing his rights to

benefits, because had the situation been addressed in a timely manner, Mr. Antl would not have incurred any harm.

### g.  Plaintiff Is Entitled to Punitive Damages

Defendants' conscious disregard of Mr. Antl's life and whether he would live is sufficiently egregious conduct to permit a jury to impose punitive damages. An insured "may be entitled to recover punitive damages if [they] can prove that Allstate not only denied or delayed the payment of policy benefits unreasonably or without proper cause, but, in doing so, was guilty of malice, oppression or fraud." *Jordan v. Allstate Ins. Co.*, 148 Cal. App. 4th 1062, 1080, 56 Cal. Rptr. 3d 312, 325 (2007).

A jury could reasonably find that Defendants' delay in approving treatment for Mr. Antl – especially days after their medical staff had signed off – was either despicable conduct carried on by them with a willful and conscious disregard of Mr. Antl's rights and safety, or cruel and unjust hardship in conscious disregard of Mr. Antl's rights and safety. There was no justification for delay, they knew what procedure he needed immediately, and upon the urging of his doctor for immediate treatment that they knew of, they still let him sit there longer than necessary before the guarantee of payment was communicated to the hospital. Had Mr. Antl died as a result of the delay and prior to his catheterization, Defendants would not have had to pay out the full amount of his policy benefits. Indeed, while waiting to approve Mr. Antl's treatment, Defendants were evaluating his file to determine whether he had a pre-existing condition that could be used to deny coverage. [Castro, page 62-63].

Defendants' cite to subdivision (b) of Civil Code § 3294 is misplaced. Subdivision (b) applies when a plaintiff seeks to hold a corporate employer liable for punitive damages for the actions of an employee who is sued (e.g., vicarious liability). *See* Civil Code § 3294(b); *See also Mazik v. Geico Gen. Ins. Co.*, 35 Cal. App. 5th 455, 463 (2019) ["Section 3294, subdivision (b) then describes the proof necessary when the defendant is an employer whose employee allegedly engaged in such conduct."]. Mr. Antl has sued Defendants, not their employees.

 Mr. Antl purchased an emergency medical treatment policy to ensure that he would be protected for any medical emergencies that arose and that he could timely receive treatment for them. Instead of receiving what he paid for, Defendants refused to guarantee his coverage although their medical staff

had readily approved and signed-off on the treatment he needed. A jury could easily find this to be despicable conduct in a conscious disregard of Mr. Antl's life.

Accordingly, Defendants' motion for summary judgment as to Mr. Antl's claim for punitive damages fails.

**V.      CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment should be denied. If interpreted in a light most favorable to Mr. Antl, Defendants have failed to present any undisputed facts that would entitle them to judgment as a matter of law.


Dated: October 20, 2023                    Respectfully submitted,


                                           By:    /s/ Ryan Abbott
                                           BROWN NERI SMITH & KHAN, LLP
                                           11601 Wilshire Blvd., Ste. 2080
                                           Los Angeles, CA 90025
                                           T: (310) 593-9890
                                           ryan@bnsklaw.com

                                           *Attorney for Plaintiff,*
                                           *Boris Antl*