1   Ryan B. Abbott (SBN 281641)
     ryan@bnsklaw.com
2   Kete P. Barnes (SBN 302037)
     kete@bnsklaw.com
3   **BROWN NERI SMITH & KHAN LLP**
4   11601 Wilshire Boulevard, Suite 2080
    Los Angeles, California 90025
5   Telephone: (310) 593-9890

6   Attorneys for Plaintiff,
    Boris Antl
7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11

12   BORIS ANTL, an individual;          Case No. 2:22-cv-00504-KJM-AC

13            Plaintiff,                  **DECLARATION OF KETE P. BARNES IN
                                          SUPPORT OF PLAINTIFF'S OPPOSITION
14   v.                                   TO DEFENDANTS' MOTION FOR
                                          SUMMARY JUDGMENT, OR IN THE
15   AGA SERVICE COMPANY, a Virginia      ALTERNATIVE, SUMMARY
     Corporation; JEFFERSON INSURANCE     ADJUDICATION**
16   COMPANY, a Virginia Corporation, and
     DOES 1-10, inclusive,                Hearing Date: December 8, 2023
17                                        Time: 10:00 a.m.
              Defendants.                 Courtroom: 3
18

19

20

21

22

23

24

25

26

27

28

                                   1

**DECLARATION OF KETE P. BARNES**

I, Kete P. Barnes, declare:

1.      I am an attorney license to practice before this Court. I am counsel of record for Plaintiff Boris Antl. I make this declaration in support of Plaintiff's opposition to Defendants' Motion for Summary Judgment, or in the Alternative, Summary Adjudication. I have personal knowledge of the facts set forth below, and if called as a witness, I could and would competently testify as to those facts.

2.      Attached as **Exhibit A** are true and correct copies of transcript excerpts from the August 18, 2023 deposition transcript of AGA employee Valarie Zhou and Exhibit 4 to the deposition.

3.      Attached as **Exhibit B** are true and correct copies of transcript excerpts from the August 24, 2023 Rule 30(b)(6) deposition of Defendant AGA Service Company (witness MaryAnn Fraser).

4.      Attached as **Exhibit C** are true correct copies of transcript excerpts from the September 29, 2023 Rule 30(b)(6) deposition of Defendant AGA Service Company (witness Melissa Castro).

5.      Attached as **Exhibit D** are true and correct copies of transcript excerpts from the April 7, 2023 deposition of Plaintiff Boris Antl.

6.      Attached as **Exhibit E** is a true and correct copy of a document produced by Defendants in excel form, with the file name Antl0087 Native3196098 Case Notes – JIC and AGA Production 10.17.22, that has been converted to PDF. All information remains unchanged from the excel file, and the excel file can be provided to Chambers if requested.


        I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 20, 2023, at Albany, New York.


                    /s/ Kete P. Barnes
                    Kete P. Barnes

# EXHIBIT A

Valerie Zhou

1                UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF CALIFORNIA

3

4   BORIS ANTL, an individual;    )
                                  )
5           Plaintiff,            )
                                  )
6   v.                            ) No. 2:22-cv-00504-KJM-AC
                                  )
7   AGA SERVICE COMPANY, a        )
    Virginia Corporation;         )
8   JEFFERSON INSURANCE COMPANY,  )
    a Virginia Corporation, and   )
9   DOES 1-10, inclusive,         )
                                  )
10          Defendants.           )
    _____)

11

12

13

14          REMOTE DEPOSITION OF VALERIE ZHOU

15              Friday, August 18, 2023

16

17

18

19

20

21

22

23

24   Reported by:  Monica Schoonover
                   CSR No. 10220
25   Job No.:      7533

Valerie Zhou

1                    UNITED STATES DISTRICT COURT

2                   EASTERN DISTRICT OF CALIFORNIA

3

4    BORIS ANTL, an individual;    )
                                    )
5             Plaintiff,            )
                                    )
6    v.                            ) No. 2:22-cv-00504-KJM-AC
                                    )
7    AGA SERVICE COMPANY, a         )
     Virginia Corporation;          )
8    JEFFERSON INSURANCE COMPANY,   )
     a Virginia Corporation, and    )
9    DOES 1-10, inclusive,          )
                                    )
10            Defendants.           )
     _____)

11

12

13

14

15        REMOTE DEPOSITION OF VALERIE ZHOU, taken on behalf
          of the Plaintiff, beginning at 8:02 a.m. and ending
16        at 11:47 a.m., on Friday, August 18, 2023, via Zoom
          videoconference before Monica Schoonover, Certified
17        Shorthand Reporter No. 10220.

18

19

20

21

22

23

24

25

INDEX OF EXHIBITS

EXHIBIT:                                                    MARKED

Exhibit 1       Allianz Letter of Confirmation              19
                and Certificate of Insurance

Exhibit 2       Case Notes                                  54

Exhibit 3       Self Audit Form, Bates ANTL_00044           59

Exhibit 4       EVAC Checklist, Bates ANTL_00037            62

Exhibit 5       Guarantee of Coverage Letter               67
                Bates ANTL_000700

Exhibit 6       Guarantee of Coverage Letter               69
                Bates ANTL_000698

Exhibit 7       Guarantee of Coverage Letter               88
                Bates ANTL_00034 and ANTL_00035

Exhibit 8       Defendant AGA Service Company's           114
                Response to Plaintiff Boris Antl's
                Special Interrogatories, Set One

1  might be -- at least that's what's stumping me and

2  causing me pause.  Is that what you are intending?

3         MR. BARNES:  Yeah, yeah, that's fine.

4         MS. LUETTO:  Okay.  All right.  Do you

5  understand the question?

6         THE WITNESS:  Yes.  If you are looking for my

7  opinion of what I consider an emergency, it would be

8  something that needs to be taken care of urgently.

9  BY MR. BARNES:

10     Q    Okay.  In this section titled "Emergency medical

11 and dental coverage," it says that it will apply when you

12 have to pay for emergency dental -- sorry -- emergency

13 medical or dental care for one of the following covered

14 reasons.  Do you have an understanding of what "covered

15 reasons" means?

16        MS. LUETTO:  Objection.  Overbroad.  The

17 document speaks for itself.  You can respond.

18        THE WITNESS:  Because the covered reason is

19 bolded in the certificate, then I would use the

20 definition of a covered reason which would be listed in

21 the definition section.

22 BY MR. BARNES:

23     Q    Okay.  And if we go down to the definitions, we

24 have, "Covered reasons:  The specific situations and

25 events that are covered by this certificate."

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 27

1    Is that -- so other than the explanation back in

2    emergency medical and dental coverage -- sorry, let me

3    rephrase.

4        Does that definition limit this application any

5    further in your opinion?

6        MS. LUETTO:  Objection.  Overbroad.  Vague.

7    Calls for speculation.  Beyond the scope.

8    BY MR. BARNES:

9        Q    Miss Zhou?

10       A    Could you ask your question again, please?

11       Q    Yeah.  Does the definition of "covered reasons"

12   limit these two bullet points any further with respect to

13   the application of a claim?

14       MS. LUETTO:  Objection.  Vague and ambiguous.

15   Overbroad.  Compound.  Calls for speculation.  Beyond the

16   scope of this witness's deposition.  You can respond if

17   you can.

18       THE WITNESS:  I am not sure.

19   BY MR. BARNES:

20       Q    Okay.  For this specific requirement, "This

21   treatment is medically necessary," that bolded term again

22   refers to a definition?

23       A    Yes.  If it's bolded, yes, that's right.

24       Q    Okay.  And if we go down to "medically

25   necessary," there's a little bit of a header blocking

1  this, but I think I can cover this.  It says, "Treatment

2  that's appropriate for your illness or injury consistent

3  with your symptoms, and that can safely be provided to

4  you.  It meets the standards of good medical practice and

5  isn't for your convenience or the provider's

6  convenience."

7         Who makes that determination?

8         MS. LUETTO:  Vague and ambiguous.  Overbroad.

9  Beyond the scope.  You can respond if you understand the

10  question.

11        THE WITNESS:  So that would be decided by either

12  a medical team or our claims department.

13  BY MR. BARNES:

14    Q    In the instance of a reporting of an emergency

15  medical situation, does that evaluation prevent immediate

16  treatment?

17        MS. LUETTO:  Compound.  Overbroad.  Vague.

18  Calls for speculation.  Incomplete hypothetical.

19        THE WITNESS:  I don't have that information.

20  BY MR. BARNES:

21    Q    Okay.  I am just trying to -- if AGA makes the

22  determination of what's medically necessary, how is it

23  that treatment would be provided -- or when would

24  treatment finally be approved in terms of a claim being

25  made?

1  problem is that the term "claim" is -- might be what's

2  confusing.  Claim is typically thought of as payment

3  versus assistance.

4          THE WITNESS:  Uh-huh.

5          MS. LUETTO:  I think that might be -- that might

6  be the rub here.

7  BY MR. BARNES:

8      Q    Okay.  When an insured -- I will rephrase.  When

9  an insured -- when an insured first calls to report a

10 medically -- a medical emergency -- sorry.  Let me

11 rephrase this again.

12         If AGA receives a call regarding an insured

13 needing emergency medical treatment, does AGA still at

14 that point engage in an evaluation as to whether or not

15 that treatment is medically necessary?

16         MS. LUETTO:  Overbroad.  Vague.  Compound.

17 Incomplete hypothetical.  Beyond the scope of this

18 witness's deposition.  You can respond.

19         THE WITNESS:  Can you repeat the first part of

20 that question?

21 BY MR. BARNES:

22     Q    Yeah.  When AGA first receives a call from an

23 insured regarding a need for urgent medical treatment,

24 does AGA still engage in an evaluation as to whether or

25 not that treatment is medically necessary?

1      MS. LUETTO:  Same objections.

2      THE WITNESS:  Typically, yes, they would still

3  review.

4  BY MR. BARNES:

5      Q    Are there any situations where treatment would

6  be immediately approved?

7      MS. LUETTO:  Overbroad.  Vague.  Incomplete

8  hypothetical.  Beyond the scope of this witness's

9  deposition.

10      THE WITNESS:  I don't have that information.

11  BY MR. BARNES:

12      Q    Have you ever been in a case where a claim was

13  immediately approved?

14      MS. LUETTO:  Vague and ambiguous.  Overbroad.

15  BY MR. BARNES:

16      Q    Sorry.  Actually, let me rephrase.  We are stuck

17  on this term "claim," and I keep using this maybe

18  incorrectly.

19      Have you ever been involved in a case where a

20  request for emergency medical treatment was immediately

21  approved?

22      MS. LUETTO:  Objection.  Vague.  Ambiguous.

23  Overbroad.  Compound.  Calls for speculation.

24      THE WITNESS:  I don't recall all the time frames

25  of the case reviews.

```
 1   BY MR. BARNES:

 2       Q     What would be grounds to deny a request for

 3   emergency medical treatment coverage?

 4            MS. LUETTO:  Let me -- I am going to object, but

 5   I think that, again, if you are talking about coverage

 6   which implies payment versus something else, I think that

 7   may be an issue.

 8            But overbroad.  Vague and ambiguous.  Calls for

 9   speculation.  Incomplete hypothetical.  Beyond the scope

10   of this witness.  She's not the PMK.  You can respond.

11            THE WITNESS:  Could you repeat the question?

12   BY MR. BARNES:

13       Q     Yeah.  What would be grounds to deny a request

14   for coverage for emergency medical treatment?

15            MS. LUETTO:  Same objections.

16            THE WITNESS:  If it did not meet the terms and

17   conditions of the policy.

18   BY MR. BARNES:

19       Q     Here in the certificate, page 27 of Exhibit 1,

20   it says what it covers, "Reasonable and customary costs."

21   We have another defined term.  "Reasonable and customary

22   costs," in bold, "for supplies and services from a

23   doctor, dentist, hospital, or other licensed provider."

24            If we go down to the definitions, we have, "What

25   customers would usually be charged for a specific service
```

1   in a particular geographic area.  The charges are

2   appropriate to the availability of the service, and of

3   skilled and licensed service providers."

4           Do you know of any examples of unreasonable --

5   or unreasonable or uncustomary costs?

6           MS. LUETTO:  Overbroad.  Vague.  Compound.

7   Calls for speculation.  Beyond the scope.  You can

8   respond.

9           THE WITNESS:  No.  I don't have that

10  information.

11  BY MR. BARNES:

12      Q    In terms of a heart attack like the situation we

13  had with Mr. Antl, could you give any examples of what

14  would be an unreasonable or uncustomary cost?

15          MS. LUETTO:  Vague and ambiguous.  Overbroad.

16  Compound.  Calls for speculation.  Beyond the scope.  You

17  can respond.

18          THE WITNESS:  So if I was reviewing an invoice

19  for a heart patient and I saw a prosthetic leg being

20  billed, then that would be something that would appear to

21  be uncustomary to me.  I would review that with our

22  medical team to see if it was medically necessary.

23  BY MR. BARNES:

24      Q    Okay.  Since we are dealing with foreign travel,

25  at least in this case, are there instances where the

1   steps would be.

2   BY MR. BARNES:

3       Q    Okay.  In the situation of a heart attack, what

4   would be the next steps there?

5           MS. LUETTO:  Same objections.  You can respond.

6           THE WITNESS:  So same variables.  If someone

7   called us and said that they had a heart attack, we

8   would -- we would need to find out where they were; were

9   they admitted; when did this heart attack happen.  There

10  would be a lot of questions that we would ask them to

11  make sure that we knew the best way to move forward, and

12  so that is very general to say.

13  BY MR. BARNES:

14      Q    When you first receive a call for assistance

15  with respect to an emergency medical situation, does it

16  happen that assistance is denied?

17          MS. LUETTO:  Objection.  Overbroad.  Incomplete

18  hypothetical.  You can respond.

19          THE WITNESS:  I don't recall assistance being

20  denied.

21  BY MR. BARNES:

22      Q    Okay.  Are agents available 24 hours a day for

23  assistance?

24          MS. LUETTO:  Objection.  Vague.

25          THE WITNESS:  That's the goal, yes.

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 41

```
 1   BY MR. BARNES:
 2        Q    Okay.  You say, "That's the goal."  Is there a
 3   situation where that goal is not met?
 4        A    I don't have that information.  I don't have
 5   everybody's shifts.
 6        Q    Other than the individual -- individuals that
 7   you identified who are assigned when a call for
 8   assistance is made, is there anyone else involved in the
 9   process for approving assistance?
10             MS. LUETTO:  Overbroad.  Vague.  Ambiguous.
11   Compound.  Incomplete hypothetical.  Beyond the scope.
12   You can respond.
13             THE WITNESS:  Yeah, I am not -- I am really not
14   sure what you mean by that question.  I am not sure how
15   to answer it.  I am not sure how to answer it.  Can you
16   rephrase it another way?
17   BY MR. BARNES:
18        Q    Sure.  As the -- the person who receives the
19   call, do they have discretion -- what's their level of
20   discretion in providing assistance?
21             MS. LUETTO:  Overbroad.  Compound.  Incomplete
22   hypothetical.  Vague and ambiguous.  Calls for
23   speculation.
24             THE WITNESS:  Right.  Yeah, it depends on what
25   you mean by "assistance" and what you mean by
```

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 42

1    Q    I guess, if an insured is reporting the need for

2    medical -- emergency medical treatment, is that -- is the

3    approval of that treatment within the hands of the

4    medical team?

5         MS. LUETTO:  Objection.  Vague and ambiguous.

6    Overbroad.  Incomplete hypothetical.  You can respond.

7         THE WITNESS:  Our medical team would advise if

8    the treatment was -- is medically necessary and by what

9    method would be safe for that person, and then whether or

10   not it's met, the terms and conditions would be reviewed

11   by the assistance coordinator or the claims department.

12   BY MR. BARNES:

13   Q    Okay.  Are there any instances where medical

14   treatment is requested and the medical team is not

15   involved?

16        MS. LUETTO:  Overbroad.  Vague.  Calls for

17   speculation.  Beyond the scope.

18        THE WITNESS:  I don't have that information.

19   BY MR. BARNES:

20   Q    Have you ever been involved in a case where the

21   medical team was not involved?

22        MS. LUETTO:  Vague and ambiguous.  Overbroad.

23   Incomplete hypothetical.  You can respond.

24        THE WITNESS:  We have different types of medical

25   cases, how we define a medical case.  So if a customer

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 44

1    called and asked for names of hospitals in the area, I

2    can provide a list to them without the medical team's

3    involvement.  But other than that, I don't have that

4    information.

5    BY MR. BARNES:

6        Q    For requests for treatment, are there any

7    instances where the medical team would not be involved?

8             MS. LUETTO:  Overbroad.  Incomplete

9    hypothetical.  Vague and ambiguous.

10            THE WITNESS:  Yeah, I am not sure how to answer

11   that.  The -- the way that we explain it to a customer,

12   they don't need our permission to receive treatment.  The

13   policy is designed for them to receive treatment that's

14   medically necessary.  They don't -- I am not sure how to

15   answer that question.  So we are not looking --

16   BY MR. BARNES:

17       Q    Sorry.  You were going to say?

18       A    So with the policy, it's designed for what's

19   medically necessary.  We are not deciding what medical

20   treatment they are getting.

21       Q    Okay.  After an approval -- I am sorry.  After a

22   request for assistance is made and approved, what happens

23   next?  Sorry.  Let me rephrase.

24            After request for assistance is made and

25   assistance is provided, what happens next?

1    a case contact instead of the patient, making sure --

2    answering questions that they may have about their policy

3    and coordinating the assistance needed.

4           Yes, I may speak to hospital staff.  So it could

5    range from admissions, billing.  I might even speak to

6    the operator or even the nurse station if I need a fax

7    number.  So I may speak to the hospital staff, but my

8    role is to coordinate assistance, and then the medical

9    staff job is to monitor the medical care that's being

10   received, so either reviewing the medical report or

11   speaking to the treating doctor, if available.

12      Q      With respect to -- let's just talk about Mr.

13   Antl's situation.  After Mr. Antl is admitted to the

14   hospital and needs treatment, what goes into the approval

15   of -- sorry.  Let me rephrase.  Who makes the

16   determination to provide a guarantee of payment?

17           MS. LUETTO:  Objection.  Overbroad.  Vague.

18   BY MR. BARNES:

19      Q      I guess I can narrow it down.

20           Is the case manager involved in the

21   determination of guarantee of payment, or is that the

22   medical staff?

23      A      The Assistance Coordinator II would be

24   responsible for creating and sending the guarantee letter

25   once the medical team has finished their medical review.

1    Q    Okay.  When you say "finish their medical

2    review," is it accurate to say they have signed off on

3    the treatment?

4            MS. LUETTO:  Objection.  Vague and ambiguous.

5    You can respond.

6            THE WITNESS:  The medical team would be the one

7    to tell us -- would advise us if this is medically

8    necessary for the situation.

9    BY MR. BARNES:

10    Q    Okay.  Would the medical staff recommend -- or

11    sorry.  Let me rephrase.

12            Have you ever been involved in a case where

13    medical staff recommended a different treatment

14    procedure?

15            MS. LUETTO:  Objection.  Overbroad.  Vague.

16            THE WITNESS:  I don't recall.

17    BY MR. BARNES:

18    Q    Okay.  Are you familiar with Mr. Antl's case?

19    A    I reviewed the log notes.

20    Q    Okay.  Prior to reviewing the log notes, did you

21    have any recollection of this case?

22    A    No.

23    Q    Okay.  Do you know -- after reviewing the log

24    notes, do you know when you first became involved in this

25    case?

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 52

Valerie Zhao

1  　　A　　I don't recall the date.  I would have to look

2  at the notes again.

3  　　Q　　Okay.  Do you know if you received the call or

4  someone else?

5  　　A　　The initial call was not received by me.

6  　　Q　　Okay.  Once the case is made -- or sorry.  Let

7  me restart that.

8  　　　　Once the initial call is received, how are you

9  assigned to that case?

10  　　A　　I don't recall the process from 2014.

11  　　Q　　Is there any -- any specific factors that go

12  into assigning you to a case?

13  　　　　MS. LUETTO:  Objection.  Vague.  Overbroad.

14  Calls for speculation.

15  　　　　THE WITNESS:  I don't recall.

16  BY MR. BARNES:

17  　　Q　　Other than the duties and obligations that we

18  discussed with your job earlier with your title and

19  position, were there any other duties that you had with

20  respect to Mr. Antl's claim?

21  　　A　　I don't recall.

22  　　Q　　Okay.  I am going to introduce the call log.  I

23  will put it in the chat as well.

24  　　　　MS. LUETTO:  Are you attaching this as an

25  exhibit?

1        MR. BARNES:  Yeah.  I am going to introduce it

2   as Exhibit 2.

3           (Exhibit marked 2 for identification.)

4        MS. LUETTO:  Just so you know, these are

5   typically referred to as case notes.

6        MR. BARNES:  Case notes, yeah, as the document

7   title says.

8        MS. LUETTO:  Oh, I didn't know it said that.  I

9   am not trying to be a smart aleck.

10  BY MR. BARNES:

11      Q    Do you know who Dina Berik is?

12      A    I do.

13      Q    Sorry.  I meant to share this screen.  For some

14  reason it didn't.

15      MS. LUETTO:  There we go.

16  BY MR. BARNES:

17      Q    Who is Miss Berik?

18      A    She was a Assistance Coordinator I.

19      Q    Okay.  And is Miss Berik still employed with

20  AGA, if you know?

21      A    Not that I am aware of.

22      Q    Okay.  If you see here, the call was received

23  at -- sorry.  Yes.  The first entry of the case notes,

24  Exhibit 2, it seems that this -- the first entry was

25  received around 3:03 a.m. on December 7th, 2014.  Do you

1    A    Current location.

2    Q    Okay.  If we go to C-60, "Case Manager Senior

3  Kim approves ground ambulance 100 USD."

4         Do you know who this refers to?

5    A    So she is saying we can move forward with the

6  guarantee letter for a hundred dollars.

7    Q    Do you know specifically who CM Senior Kim is

8  referring to?

9    A    Yes I do.

10   Q    Okay, and who is that?

11   A    It's a senior case manager, Kim, and her last

12  name is Greer.

13   Q    Okay.  Sorry.  One second.

14        If we go to Case Note 13, column D, it says, "CM

15  adv RN that receiving hospital will not accept patient

16  until billing is arranged."

17        Do you know who they were referring to for the

18  case manager here?

19   A    No, I do not.

20   Q    Okay.  What does MAS stand for as we see in

21  column C?

22   A    So I don't remember exactly what the MAS stands

23  for, but it was a previous term for case manager.  It was

24  how HR wrote the job title, and I don't remember the

25  exact -- what the MAS stands for, but it's talking about

1    Q    Does this entry of "Diagnosis matches medical

2    notes" refresh your recollection?

3    A    No, it doesn't.  I would have to look at the

4    notes.

5         What's that referring to is when I am preparing

6    the guarantee letter is if it's matching what the medical

7    team put in their note, so it's not me making the

8    diagnosis.

9    Q    Would it be accurate to say this is just more of

10   a confirmation of the accuracy of the information that's

11   available?

12   A    Yes.  That would be a good way of putting it.

13   Q    Okay.  I am going to bring back Exhibit 2.

14        MS. LUETTO:  Just one moment.  Just for the

15   record, Exhibit 3 is Bates-stamped ANTL_0044.

16        MR. BARNES:  Correct.  Yes.

17        MS. LUETTO:  It makes it much easier for the

18   transcript.

19        MR. BARNES:  Very good.  Thank you.  I

20   appreciate it.

21   BY MR. BARNES:

22   Q    If we go down to -- go down to C-632 -- or

23   sorry -- Case Note entry 66, the column C says, "CM next

24   steps."  In column D, it says, "Confirm distance to the

25   second hospital."

 1          At this point, was this already done?

 2     A    No.  I don't believe so.  I believe there was

 3  another hospital with a similar name, so we wanted to

 4  make sure we had the right -- being accurate of where we

 5  were sending him.

 6     Q    Okay.  In column D at the bottom, it says, "EMTT

 7  summary for evac."  Do you know what that's referring

 8  to?

 9     A    Yes, I do.

10     Q    Okay.  And what is that?

11     A    It's a data entry list.  We basically keep data

12  for all the transports that we have arranged for

13  headquarters so they can keep track of how many we have

14  done.  So basically we would make a summary at the end of

15  the transport.  It's just for data entry.

16     Q    Okay.  So this is after that's completed?

17     A    The summary would be done after the transport is

18  completed, yes.

19          MR. BARNES:  Okay.  I am going to introduce --

20  and let me send this over to you as well.  We will mark

21  this Exhibit 4.

22          (Exhibit 4 marked for identification.)

23  BY MR. BARNES:

24     Q    Do you see this document, Miss Zhou?

25     A    I do.

1    Q     And is this the document that you are referring

2 to?

3    A     It is not.

4    Q     What is this document?

5    A     This is a checklist for -- whenever we would

6 arrange a transport, this is a checklist to make sure

7 that we stayed organized and that we had all of the

8 pieces that we needed to be successful.

9    Q     Okay.   At this point in time, the diagnosis was

10 determined that Mr. Antl was having a heart attack; is

11 that correct?

12         MS. LUETTO:  Objection.  Vague.  Overbroad.

13 Called for speculation.

14         THE WITNESS:  I don't have a recollection of

15 that, but if it's typed on that form, then that must have

16 been information we had at the time, but I don't recall

17 independently.

18 BY MR. BARNES:

19    Q     After -- let me rephrase.

20         Do you know where the information is obtained

21 for this form?

22         MS. LUETTO:  Overbroad.

23         THE WITNESS:  Yes, it would --

24         MS. LUETTO:  You can respond.

25         THE WITNESS:  It would just be from different

1    Q     If we go back to Exhibit 2 -- I think I am just

2    going to leave this document open next time.  Make this a

3    little quicker.

4          Let me go down to 68, column C, "Reviewed with

5    Case Manager Senior Kim.  Okay to send CGL's."  Do you

6    know what CGL's this was referring to at this point?

7    A     It says GCL's.

8    Q     Sorry.  Yeah.  I might have a little dyslexia.

9          Do you know what GCL's this was referring to at

10   this point?

11   A     Yes.  The guarantee letters.

12   Q     Okay.  And was this for the transportation and

13   admission to the second hospital?

14   A     Yes.

15   Q     Okay.  Right below here in Case Note 69, section

16   D, "Emailed the agent."  Sorry.  Section C says, "Emailed

17   the agent.  This is a go, manually attach GCL treatment 1

18   and 2."

19         It may be obvious, but it may not.  "This is a

20   go," was that just taken literally?

21   A     Yes.  That's right.

22   Q     Okay.  When you say, "We accept our assistance,"

23   column D, "and would like for you to tell the hospital

24   they can proceed with the ground ambulance," do you know

25   if Mr. Antl had already been transported at this time?

1    A    I don't recall.

2    Q    Okay.  Do you know if there were any issues with

3  the transportation for Mr. Antl?

4         MS. LUETTO:  Objection.  Vague.  Overbroad.

5         THE WITNESS:  I don't recall.

6         MR. BARNES:  Okay.  I am going to introduce

7  Exhibit 5.  I will put it in the chat first.

8         (Exhibit 5 marked for identification.)

9  BY MR. BARNES:

10   Q    Do you recognize this document, Miss Zhou?

11   A    I do.

12   Q    And what is this document?

13   A    This is the guarantee of coverage letter.

14   Q    Okay.  And this indication, "Diagnosis: Ground

15  ambulance, heart attack," does that just follow again

16  from the confirmation of the information that was

17  available?

18   A    That's right.

19   Q    Okay.  So this diagnosis, I guess, is there any

20  certainty to it at that point, or is it just based on

21  what's known?

22   A    So if I -- so when I type in "heart attack," I

23  would have just gotten that from the notes.

24   Q    Okay.  Based on those notes or the initial

25  information, does the -- does the assistance or help that

1    A    So this was for the initial admission to the

2  second hospital, and I believe that amount was based on

3  an email from the agent.

4    Q    Okay.  Do you know if any treatment was going to

5  be provided based on that $2,500?

6         MS. LUETTO:  Objection.  Vague.  Calls for

7  speculation.  You can respond.

8         THE WITNESS:  I don't recall.  I would have to

9  assume there's a reason he needs to go to the hospital,

10 but I don't know what procedures he needed.

11 BY MR. BARNES:

12   Q    At this point, the dates of service were only

13 intended to be December 8th to December 9th, 2014; is

14 that correct?

15   A    Based on the information we had at the time,

16 those were all the dates that we put down --

17   Q    Okay.

18   A    -- in the guarantee.

19   Q    I am sorry.

20   A    The guarantee letter can always be updated with

21 additional information.

22   Q    Okay.  Do you know if there was any discussion

23 between the medical staff and the medical service

24 provider that Mr. Antl would be there longer than one

25 day?

Boris Antl vs. AGA Service Company, et. al.                    Page: 70

Focus Litigation Solutions

Valerie Zhou

 1    have -- sorry.  I am trying to find the exact line I

 2    want.  "CM advised will continue to monitor and CB as

 3    soon as we have STT."

 4              I know CM is case manager.  What is CB?

 5    A    Call back.

 6    Q    Okay.  And STT?

 7    A    Stable to travel.

 8    Q    Okay.  Go to Case Note 97.  Sorry.  One second.

 9              You know what?  Actually, why don't we take a

10    break?  Sorry.  I need to check on my notes.  We can go

11    off the record.

12              (Recess taken.)

13    BY MR. BARNES:

14    Q    Miss Zhou, I am going to introduce Exhibit 2

15    again.  It's the case notes.  If we look at Case Note

16    102, column C, it says, "Medrx in file."

17              What is "Medrx" referring to?

18    A    Medical report.

19    Q    Okay.  And is it your understanding -- do you

20    have any understanding as to whether this was received

21    from the final hospital that Mr. Antl received treatment

22    from or another one?

23    A    I don't recall.  I don't recall.

24    Q    Okay.  If we go -- let me ask this:  After you

25    have a day off from work and you come back onto a case,

1  do you review the case notes from the time that you were

2  out?

3       A    Yes.  That is a typical process for me.

4       Q    Okay.  Would that happen immediately, or, you

5  know, is it -- handling multiple cases, it's when you get

6  to it coming back?  How does that go?

7            MS. LUETTO:  Objection.  Overbroad.  Vague.

8  Incomplete hypothetical.  You can respond.

9            THE WITNESS:  I don't recall.  It would be too

10 many variables.

11 BY MR. BARNES:

12      Q    Okay.  If we go down to Case Note 106 and we go

13 down here specifically in column D -- well, sorry.  Let

14 me refer to column -- column C, "CM to SAJAN.

15 Translation request one page."

16           What does SAJAN stand for?

17      A    That was the name of the outside translation

18 company that we used at the time.  That was their -- that

19 was one of the names that they went by.  Excuse me.

20      Q    Does AGA employ its own translators, or no?

21           MS. LUETTO:  Objection.  Vague.  You can

22 respond.

23           THE WITNESS:  So Allianz does not employ people

24 solely for performing translation.  At the time in 2014,

25 I do believe there were some people who were bilingual.

1   BY MR. BARNES:

2       Q    Okay.  Not intentional.  Just that was one of

3   their skills.  Sure.

4            If you see here, column D of Case Note 106, it

5   says, "Assistance Urgent Request."  Blank, yes.  Check

6   mark, no.

7            Is that your -- is it your understanding that

8   this translation wasn't requested on an urgent basis?

9            MS. LUETTO:  Objection.  Calls for speculation.

10  Vague.

11           THE WITNESS:  I see that he clicked "no" for

12  that email.

13  BY MR. BARNES:

14      Q    Okay.  If we go back up to -- sorry.  One

15  second -- Case Note 85, "CM-BU requesting urgent update

16  on transport or med update."

17           Is there any reason why there would be an urgent

18  update here and not an urgent request following it?

19           MS. LUETTO:  Overbroad.  Vague.  Calls for

20  speculation.

21           THE WITNESS:  I don't have that information.

22  BY MR. BARNES:

23      Q    Is it your understanding that at the time the

24  medical report was received, Mr. Antl had reported this

25  claim two days previously?

1    A    Correct.  It had been -- from the time that the

2    case was opened until now, it had been two days.

3    Q    Okay.  And then if we go down to Case Note 110,

4    you come in here the next day, December 10th at 10:14

5    a.m.; is that correct?

6    A    Yes.

7    Q    Okay.  And your initial action here was

8    informing the agent that you guys were reviewing the

9    medical report before taking any further action; is that

10   correct?

11        MS. LUETTO:  Objection.  Vague.  Overbroad.

12   Misstates the document.  You can respond.

13        THE WITNESS:  So I don't know that it means that

14   we won't do anything else, but in regards to extending

15   the guarantee letter, we are waiting for that report to

16   be reviewed.

17   BY MR. BARNES:

18   Q    Okay.  That's fair.

19        Going back up, kind of back to my reference to

20   you reviewing the case notes when you come back into, you

21   know, work after a day off, if you look at Case Note 106,

22   you have an entry at 9:23 p.m. on December 12th -- or

23   December 9th -- sorry.  If we go to Case Note 107, you

24   have an entry -- not you.  Sorry.  There's an entry in

25   the case notes, the next one, for 7:23 p.m. the following

1    day.

2          Does work stop on a case after business hours?

3          MS. LUETTO:  Overbroad.  Vague.  Calls for

4    speculation.  Incomplete hypothetical.  You can respond.

5          THE WITNESS:  So, no, the associates in our

6    department typically will continue -- we are 24 hours, so

7    for our business, we don't have normal business hours.

8    BY MR. BARNES:

9          Q    Is it safe to say AGA has shift work, multiple

10   shifts, so that you have agents available working cases

11   continuously?

12         A    We are staffed 24 hours a day.

13         Q    Okay.  Yeah.  That's probably a better way of

14   putting it.

15         If we go down to Case Note 122, this was an

16   entry by you; correct?

17         A    Yes.  I put that note in, yes.

18         Q    Okay.  And in the middle of column D, it says --

19   sorry.  Is this an entry regarding the communication from

20   Mr. Antl?

21         A    Yes.  It looks like this is an email from him to

22   me, yes.

23         Q    Okay.  And in this email, it says, "In the

24   meanwhile, make sure you have sent to the Clinic des

25   Andes an authorization to proceed with the tests

1    and have gotten the release form as part of our process

2    here.  I will continue being in contact with you and our

3    agent to get this done."

4           This was a communication that you sent to Mr.

5    Antl; correct?

6        A    Yes, that's right.

7        Q    What was the need for the further analysis

8    here?

9           MS. LUETTO:  Objection.  Vague.

10          THE WITNESS:  Yes.  Could you clarify which

11   paragraph?

12   BY MR. BARNES:

13       Q    Yes.  So you are saying, "Once we have finished

14   the medical report."  What exactly was -- what exactly

15   needed to be evaluated or needed to be reviewed or needed

16   to be finished with respect to this medical report?

17       A    Yes.  So you -- as you pointed out previously,

18   the guarantee letter was sent for just those two days,

19   and so now that it's the 10th, he's indicated that an

20   updated guarantee letter is sent.  And so in order to

21   know how much more is needed to make sure that we are

22   being accurate and making sure that he's getting good

23   care that he needs, we use that medical report.  Our

24   medical team reviews that to see what his treatment plan

25   is and so a guarantee letter can be updated

 1   appropriately.

 2        Q      Okay.  Do you know if the second guarantee

 3   coverage letter included any treatment?

 4           MS. LUETTO:  Objection.  Vague.

 5           THE WITNESS:  So the guarantee letter, if you

 6   want to pull that up again, it indicates that it's for

 7   whatever is medically necessary.  So in our practice, we

 8   don't typically put a list of procedures that they can

 9   and can't have.  It usually has, like, a diagnosis, and

10   it indicates what's medically necessary up to that dollar

11   amount that's indicated on the form, but it doesn't

12   usually list all the procedures.

13   BY MR. BARNES:

14        Q      Okay.  I guess more my question is:  If it is

15   determined that an insured needs medically necessary

16   treatment and treatment is, you know, covered, what

17   warrants a further evaluation of whether any, you know,

18   extension of a guarantee would be made?

19           MS. LUETTO:  Objection.  Vague.  Overbroad.

20   Incomplete hypothetical.

21           THE WITNESS:  Yeah.  I was going to say, could

22   you rephrase that question?

23   ///

24   BY MR. BARNES:

25        Q      Sure.  Mr. Antl here was given a guaranteed

1    coverage letter, both for transport to a hospital and for

2    $2,500 for any treatment that was medically necessary.

3         At that point in time, what would warrant a

4    further review of what's necessary for that guaranteed

5    coverage letter to be extended?

6    A    So, typically, whatever would be included in the

7    medical report:  so the treatment plan, how many more

8    days are they anticipating that the treatment would

9    extend.  Also, we want to make sure that the hospital

10   that he's in currently can continue treating him

11   appropriately.

12         And then also it makes sure that when we send

13   the guarantee letter, we are being accurate about the

14   amount that we are sending.  So, like you mentioned, he

15   was at another hospital before this one.  Are we going to

16   be needing to do any billing with them?  So we are making

17   sure the guarantee letter is sent as accurately as we can

18   for the amount of days that is anticipated.

19   Q    In this type of situation -- in this situation,

20   was it -- was there an evaluation done for the hospital

21   that Mr. Antl ultimately arrived at that it would be

22   incapable of providing the treatment he needed?

23   A    I don't recall.  I am sorry.

24   Q    Before an approval of transportation to another

25   medical facility is made, is that treatment evaluated --

1   or is that treatment facility evaluated?

2        MS. LUETTO:  Vague and ambiguous.  Overbroad.

3   Incomplete hypothetical.  It may call for speculation.

4   You can respond.

5        THE WITNESS:  Typically, the medical team would

6   do that.  It just depends on the variables.  So like, for

7   example, this one, the hospital had already picked out

8   where he would be going.  I really don't have that

9   information.  Typically, our medical team would review

10  what's appropriate.

11  BY MR. BARNES:

12      Q    Does AGA maintain a list of providers throughout

13  the world?

14       MS. LUETTO:  Overbroad.  Vague.  You can

15  respond.

16       THE WITNESS:  And I apologize.  I need you to

17  repeat that.  I didn't hear the beginning part of it.

18  BY MR. BARNES:

19      Q    Does AGA maintain a list of medical providers

20  throughout the world?

21      A    That is a vague question.  We -- they do

22  have -- we do have -- they do have -- like, they do keep

23  documentation on hospitals' capabilities.  Now, it

24  doesn't -- the world is a big place.  I don't know that

25  it has every hospital listed, but hospitals that we have

1    interacted with a lot, I know that they do keep some

2    documentation about that.

3        Q    Do you know if that documentation includes

4    contact numbers?

5        A    I don't recall.

6        Q    In any case that you have been involved in, has

7    AGA ever approved transport to a medical facility that

8    was incapable of providing necessary treatment?

9            MS. LUETTO:  Calls for speculation.  Overbroad.

10   Vague.

11           THE WITNESS:  I wouldn't be able to answer -- I

12   don't recall every case.  I don't have that information.

13   BY MR. BARNES:

14       Q    Okay.  Was it disputed by December 10th that Mr.

15   Antl needed treatment for a heart attack?

16           MS. LUETTO:  Objection.  Overbroad.  Vague.

17   Compound.  You can respond.

18           THE WITNESS:  That would be out of my scope.  I

19   usually don't -- I usually go off whatever the medical

20   team has said.  I really don't -- it's really out of my

21   scope to comment on that.  I really don't know.  I know

22   we put heart attack on the guarantee letter, but,

23   ultimately, it's up to our medical team to review those

24   reports and document what is going on.

25   BY MR. BARNES:

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 84

1   think that's a medical emergency?

2         MS. LUETTO:  Calls for speculation.  Incomplete

3   hypothetical.

4         THE WITNESS:  That would be very speculative.  I

5   have actually heard when women have heart attacks, they

6   don't know they are having them because they have a high

7   pain tolerance.

8         So, yes, very speculative.  I don't know what I

9   would consider when I was having a heart attack and how I

10  would feel, so I can't answer that.

11  BY MR. BARNES:

12     Q    What would you consider a medical emergency?

13        MS. LUETTO:  Overbroad.  Vague.  Calls for

14  speculation.

15        THE WITNESS:  Medical emergency, if

16  you -- something that you are going to pass away if not

17  attended to immediately.

18  BY MR. BARNES:

19     Q    If we go down to 132, we are looking at

20  essentially the end of the day December 10th.  At this

21  point, AGA had extended the GCL; correct?

22     A    Yes, that's right.

23     Q    Okay.  Do you know why it was only extended for

24  a period of two days there?

25     A    Yes.  Because in two days, we want to get

Valerie Zhao

1   another medical report.

2        Q      Okay.   I want to reintroduce Exhibit 1.

3              If we go to the policy -- one second, please.

4   If we go to page 22 of the PDF, 37 of the document, it

5   says, "Paying or guaranteeing your hospital bill," under

6   the section "Medical Assistance."   And I will zoom in a

7   little bit, try to make that a little easier.

8              It says, "If you need to be admitted to a

9   hospital as an inpatient for longer than 24 hours, we can

10  guarantee or advance payments up to the limit of your

11  emergency medical/dental coverage described in Section

12  2."

13             Is it your understanding that the policy permits

14  AGA to provide the maximum coverage at this point for Mr.

15  Antl?

16        MS. LUETTO:   Objection.   Vague.   You can

17  respond.

18             THE WITNESS:   Yes.   So we can do a guarantee

19  letter up to the limit on their policy.   That's correct.

20  BY MR. BARNES:

21        Q      Okay.   And is it accurate to say that didn't

22  happen?

23        MS. LUETTO:   Overbroad.   Vague.   You can

24  respond.

25             THE WITNESS:   So I would have to look at the

 1    notes again.  I don't believe that we sent a guarantee

 2    letter up to the limit on his policy.  I don't

 3    believe -- I don't believe his bill was that high, but I

 4    would have to look at the notes again.

 5              MR. BARNES:  Okay.  I am going to introduce -- I

 6    believe we are on Exhibit 7, if I am counting correct.

 7              MS. LUETTO:  Correct.

 8              MR. BARNES:  And I will send this in the chat

 9    and I will give you Bates numbers as well.  We are

10    ANTL_00034 to 35.

11              (Exhibit 7 marked for identification.)

12    BY MR. BARNES:

13        Q    Do you recognize this document, Miss Zhou?

14        A    This one specifically, no, I don't remember it.

15    I mean, it's a guarantee letter, but I don't remember

16    looking at it with the handwriting on it.

17        Q    This isn't your handwriting?

18        A    I don't recall.

19        Q    Okay.  I am going to go to the next page.

20              Does it appear to you that this was the prior

21    guarantee of coverage letter that was provided that has

22    now been marked up for a different situation?

23        A    Yes.  That's right.  Updated, yes.

24        Q    And it says, "See next page," and, you know, I

25    am going to represent, I don't know if this was

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 88

1    Q    Okay.  Do you know who this communication was

2    from?

3    A    Only just from reading -- reading the note that

4    it says Dr. Fuentes, but otherwise, no, I am not familiar

5    with it.

6    Q    Okay.  I am just going to go down a little bit

7    more.

8         We had right before Case Note 135 your Case Note

9    134.  Would this be a change in shifts for the different

10   person being -- making the note?

11        MS. LUETTO:  Objection.  Vague.  If you know.

12        THE WITNESS:  Are you -- if you are asking me

13   what shift Teresa worked, I don't recall.

14   BY MR. BARNES:

15   Q    No, no.  I am just kind of asking, you know, we

16   have your entry here at 5:31 p.m., and then we have an

17   entry by Miss Faber at 7:56 p.m.  I am just trying to see

18   if you were no longer on the clock at that point in time.

19   A    I don't recall, but it's very unlikely that I

20   was still there anymore.  I usually worked a day shift.

21   Q    Okay.

22   A    My shift had probably ended by then, yes.

23   Q    Okay.  You also notice here that the email from

24   the doctor was directed to you.  Is that just the case

25   that it's a general account that the communication is

1   made by, or do multiple people have access to it?

2           MS. LUETTO:  Objection.  Vague and ambiguous.

3           THE WITNESS:  I was going to say, can you scroll

4   up?  I just want to verify.  I am pretty sure I know

5   where she emailed to.

6           So Assistance Group, yes, that is a

7   customer-facing email that associates in our department

8   have access to, the Assistance Group email address.  It

9   is not my personal -- I am not the only one that has

10  access to it.

11  BY MR. BARNES:

12      Q    Okay.  At this point, we are approximately two

13  and a half hours post guarantee.  Is that accurate to

14  say?

15      A    Yes, it is.

16      Q    Okay.  And we receive a note from the doctor

17  that says, "I hope you understand how serious is the

18  situation.  In case of emergency, I will call the

19  cardiologist for an emergency procedure."

20          If we go down to -- sorry.  If we go up to the

21  prior sentence, "If the blood vessel that is not

22  completely open suffer a new lesion, he probably will

23  die, because we are talking of a lesion in the anterior

24  descendent artery in it proximal part."

25          Do you know if anyone had spoken to this doctor

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 93

Valerie Zhao

1    at the medical treatment facility before this?

2            MS. LUETTO:  That calls for speculation.

3            THE WITNESS:  I don't recall.

4    BY MR. BARNES:

5        Q    Okay.  Had you talked to this doctor?

6        A    Did I speak to the doctor?  No.

7        Q    Okay.  If we go down to Case Note 139, the

8    column D indicates "TMO" -- sorry.  Who does TMO refer to

9    here?

10       A    Treating medical officer.

11       Q    Okay.  "TMO sent email last evening stating

12   patient requires this and has risk of death if not done.

13   They are holding off until they hear from insurance."

14           At this point in time, we have had another day

15   pass from the communication from the doctor; correct?

16       A    It was the next day, yes.

17       Q    And this was after the doctor said that Mr. Antl

18   might die if this isn't done immediately; correct?

19       A    He did state that.  He also stated that if it

20   was an emergency, I believe -- if you scroll up, I

21   believe he said if it was -- if he was in a bad

22   situation, if in case of emergency, I will call for the

23   procedure, but, yes, the previous paragraph I do believe

24   he said -- he did say what you stated.

25       Q    My question here:  After a day -- after a day

1    past approval of the guarantee letter, after a day

2    passed, the communication from the medical staff

3    indicating the urgency of this situation, where is the

4    response that says proceed immediately -- or sorry.  Let

5    me rephrase.

6              Why isn't the response "proceed immediately; do

7    whatever we have to do to get this going forward"?

8              MS. LUETTO:  Objection.  Vague.  Calls for

9    speculation.  Overbroad.  You can respond.

10             THE WITNESS:  Right.  Since I wasn't there, I

11   wouldn't be able to comment on how people did or didn't

12   respond.  When I left my shift, I had sent that guarantee

13   letter to our agent, and I had no reason to believe that

14   the agent wasn't -- hadn't already provided that to the

15   hospital.  So I wouldn't be able to speculate on what

16   happened after I left or --

17   BY MR. BARNES:

18      Q    Okay.  We can go to Case Note 140.  Excuse me.

19   This is Myra Kovacs.  Do you know who Miss Kovacs is?

20      A    Yes, I do.

21      Q    And who is Miss Kovacs?

22      A    She was a Assistance Coordinator I.

23      Q    Okay.  Not medical staff; correct?

24      A    Correct.  She was not a medical personnel,

25   correct.

1  describe an affiliate or communication with an affiliate

2  or other office maybe?

3      A    Typically, MAUSA would be used to refer to our

4  department.

5      Q    Okay.  With respect to this entry, Case Note

6  140, it says, "Concern regards sub treatment."

7           Is this referring to the treatment Mr. Antl was

8  needing?

9           MS. LUETTO:  Objection.  Vague.  Calls for

10  speculation.  You can respond.

11           THE WITNESS:  Right.  I mean, it would be

12  speculative, but along the lines of the case notes, I

13  would assume that she is referring to that recent email

14  from the doctor, but it would be an assumption.

15  BY MR. BARNES:

16      Q    Okay.  Could it be referring to the cell before

17  from Case Note 139?  I am assuming that says, "Advised

18  that I read last notes and concerned that cardiac cath

19  not done -- TMO sent email last evening stating patient

20  requires this and has risk of death if not done.  They

21  are holding off until hear from insurance."

22      A    Yes.  I believe those case notes go together.

23  So they were having a conversation with each other and

24  then they each documented the conversation.

25      Q    Okay.  If we go to Case Note 138, you see here,

1    "RN reviewed med report in Case Note 135.  SGRN."  Do you

2    know what that refers to?

3         A    Yes.  Susan Gabriel, Registered Nurse.

4         Q    Okay.  That makes sense.  And she is reviewing

5    this communication from the doctor regarding Mr. Antl; is

6    that correct?

7         A    Yes, it is.

8         Q    After this, I guess, my question is:  You have

9    both Susan Gabriel and Miss Linda Bergeron reviewing --

10   or sorry -- you have both Miss Gabriel and Miss Linda

11   Bergeron reviewing these notes at this point in time.

12   What is -- I mean, what is the purpose of the review?

13        A    So my assumption would be from my experience of

14   working here so they could come up with a plan to move

15   forward.  So, like, Myra put in her note, "CM advised

16   will move forward and verify with agent."  So the

17   conversation -- so the medical staff would be updating

18   what they reviewed, and then they would be coming up with

19   a plan to move forward.

20        Q    After this is reviewed -- you have this email

21   from the medical staff directly from the treating doctor

22   at the medical treating facility.  Why would AGA not

23   email the guaranteed coverage letter just back to that

24   email account?

25             MS. LUETTO:  Can I have that question back

1  again?

2  BY MR. BARNES:

3     Q   Yeah.  You were directly communicating with the

4  doctor and you had their email address.

5        My question is:  Why didn't AGA just send the

6  guaranteed coverage letter to this email account?

7        MS. LUETTO:  Calls for speculation.  Vague.  You

8  can respond.

9        THE WITNESS:  So the guarantee letter as you

10 have pulled up and shown is actually not written to the

11 treating doctor.  So the guarantee letter, if you look on

12 there, it's written as an agreement between ourselves and

13 our agent, and then the agent places it with the

14 hospital, and who the agent places it with at the

15 hospital, that contact, I don't have that information in

16 front of me.

17       So we don't typically send a guarantee letter to

18 the doctor, and in this case it wouldn't be appropriate

19 because that guarantee letter was intended as an

20 agreement between us and the agent.

21 BY MR. BARNES:

22    Q   Is there any reason why AGA wouldn't email both

23 the agent and the hospital at the same time in saying

24 this coverage is approved, it's guaranteed, please

25 proceed?

Boris Antl vs. AGA Service Company, et. al.         Page: 99

Focus Litigation Solutions

1    A    Yes, because our --

2         MS. LUETTO:  Go ahead.

3         THE WITNESS:  Yes.  Our contact was the

4    hospital.  So the agent was responsible in this case for

5    the relationship -- the billing relationship between us

6    and the hospital.

7    BY MR. BARNES:

8         Q    If the agent is responsible for the payment, why

9    isn't the agent included in the conversation between the

10   hospital and AGA?

11        MS. LUETTO:  Calls for speculation.  Vague.

12        THE WITNESS:  I don't have the information as to

13   why the doctor sent that to us instead of the agent.  I

14   don't have that information.

15   BY MR. BARNES:

16        Q    Do you know if the agent was communicating

17   directly with the hospital?

18        MS. LUETTO:  Overbroad.  Vague.  Calls for

19   speculation.  You can respond.

20        THE WITNESS:  Because the transportation took

21   place as we guaranteed and then I do believe they placed

22   the first guarantee letter.  I don't have any reason to

23   believe that they weren't in communication with them, but

24   I don't have that information as to the agent's

25   conversation with outside parties.

```
1    the placement of the guarantee?

2              MS. LUETTO:  Calls for speculation.  Vague.  You

3    can respond.

4              THE WITNESS:  No, I don't.

5    BY MR. BARNES:

6         Q    Did you review these case notes with respect to

7    the communications for the placement of this guaranteed

8    coverage letter with the agent?

9         A    Yes.  I did review these notes, yes.

10        Q    Okay.  And were there a few back and forths

11   regarding whether or not it got accomplished?

12        A    Yes.  Yes, there was.

13        Q    And do you know what happened and why that

14   resulted?

15             MS. LUETTO:  I am sorry.  You trailed off on

16   that last -- the end of that question.  Would you mind

17   repeating it or having the reporter read it back?

18   BY MR. BARNES:

19        Q    Yeah.  Do you know why this happened?

20             MS. LUETTO:  Vague and ambiguous.  Asked and

21   answered.  Calls for speculation.  You can respond.

22             THE WITNESS:  No, I don't.  I didn't have any

23   reason when I left my shift to have any doubt that they

24   got my guarantee letter, and then as you probably saw, I

25   also -- I didn't send a copy of the guarantee letter to
```

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 102

Valerie Zhou

1  Mr. Antl, but I did send him an email and also let him

2  know that I had send it.

3       So I had been successful in the past.  I had no

4  reason to believe neither one of them had received my

5  correspondence.

6  BY MR. BARNES:

7  Q    We are on cell -- Case Note 141, Miss Kovacs.

8  In column D, it says, "We wanted to make sure the

9  hospital did receive the guarantee of coverage regarding

10 our patient, Mr. Boris Antl, as we have been informed

11 that he is going to need a procedure done right away, and

12 we do not want this to be held."

13      This is an email from Miss Kovacs to the agent;

14 is that correct?

15 A    Yes, it is.

16 Q    Okay.  And then the next case note, you have an

17 email from the agent to Miss Kovacs; correct?

18 A    Technically, it was to the assistance group,

19 but, yes, I think they were trying to get their message

20 back to her, yes.

21 Q    And then we have another email from Miss Kovacs

22 to the agent; correct?

23 A    Yes, that's right.

24 Q    Okay.  And then following that entry, we have

25 another email from you to the agent; is that correct?

1    Q     Okay.  Case Note 148, Miss Kovacs, "Hospital

2  billing rep advised still have not received the GTE for

3  sub."

4        Do you know what she's referring to with GTE

5  here?

6    A    I am assuming guarantee letter.  I don't know if

7  it's a typo or an abbreviation I am not familiar with.

8  So, no, I am not sure exactly what that means.

9    Q    Okay.  Next email, next entry, email from you, I

10 believe, to the agent indicating that the hospital is not

11 working directly with you; correct?

12   A    Correct.

13   Q    Okay.  Had there been any prior conversations,

14 if you recall, with the agent about the hospital not

15 working directly with you?

16   A    I don't recall if there was a direct

17 conversation, but this is not the first time we have

18 worked with this agent, and when a guarantee letter is

19 sent from us to the agent, they become our representative

20 for the billing.  So that -- that is -- I don't want to

21 say assumed, but that's part of the relationship, so

22 that's why I am not sure why they asked that, and it's

23 not usually needed to be clarified.

24   Q    So would it be safe to say it's typical

25 operating procedure that AGA isn't making a payment

1    directly?

2             MS. LUETTO:  Objection.  Vague.

3             THE WITNESS:  When an agent is involved.

4    BY MR. BARNES:

5        Q    Do you know if this is part of the relationship

6    that's established between AGA and its agent that that is

7    known from the beginning?

8             MS. LUETTO:  Overbroad.  Vague.  Incomplete

9    hypothetical.  You can respond.

10            THE WITNESS:  I guess I don't have that in

11   writing, but that is a typical protocol with our agents.

12   BY MR. BARNES:

13       Q    Okay.  And if we go down to Case Note 150, now

14   we have confirmation that the CGL -- or sorry -- the GOP,

15   which I am assuming is guarantee of payment, was received

16   by the hospital; is that correct?

17       A    Yes, that's correct.

18       Q    Okay.  If we go on the time stamps in Case Note

19   150, we have 10:48 a.m. on 12-11-2014, and then if we go

20   back to -- I believe it was Miss Kovacs' email, we are

21   about an hour, hour and a half between these email

22   exchanges for the guarantee letter to be submitted to the

23   hospital.  Is that accurate?

24       A    Yes.

25            MS. LUETTO:  Misstates the documents.

| CASE: 3196098 | ASSIGNED CM: DINA (VALERIE) | ADMISSION DATE: 12/07/2014 | |
|---|---|---|---|

**PATIENT NAME: BORIS ANTL**       **PHONE: NONE**

Current location: Puerto Montt, Chile     Transport Destination: Los Andes, Chile *same city*    DX: Heart attack (needs cardiac cath)

City of Primary Residence: Mammoth Lakes, CA     Mode of transport: Ground Ambulance
Original Travel Dates: 10/09/2014 - 01/21/2015

Age: 69  Sex: ☒ M ☐ F        HIPPA auth/contact info:

Management Review ☒ Yes ☐ No  Approval Amount: $100 USD   CN:60      Approved by: Kim

| CN | EVAC Checklist | | CN |
|---|---|---|---|
| | ***Remember to notify Noreen and Paula by email of possible evac** | | |
| 10 | Document benefits | What is the cost of the transport? | 43 |
| | Inform patient/family of Emergency Transport benefit | What are the transport benefit limits? | $500K |
| n/a | Confirm if previous transport has taken place; what are the Remaining benefits? | Obtain Approval Does CM fee apply? ☐ Yes ☒ No | 60 |
| Yes | Does incident fall within travel dates? | Relay itinerary to member/ family | |
| ---- | Obtain full name, DOB, passport information, and height/weight | Obtain fax # or email to send CC auth if there is none/partial benefit | n/a |
| ---- | Obtain home address & phone number | Inform family of AA restrictions (TC/Bags) | n/a |
| 50 | Is pre-ex waived? | CC auth received | n/a |
| n/a | Obtain PCP information | Notify our agent of acceptance/approval | 109 |
| | What is the primary health insurance? | GCL is issued to facility, prior to discharge and transport, up to date of discharge | 109 |
| | Obtain signed AAMEDs | What arrangements have been made for TC? | unknown |
| unknown | Anyone traveling with patient? | Obtain full name(s), DOB, and passport information for traveling companion | n/a |
| 14 | Obtain STT | Assist TC with hotel and flight options | n/a |
| 47 | Medical Director note in the case | Assist TC with shipping of luggage | n/a |
| n/a | **If evac is being handled by another company, ensure management's approval is in the case** | Create and Close new case | n/a |
| n/a | Create AA request, send to Central Desk/local agent | Add new provider to interested parties | Done |
| 43 | If using agent – confirm if ground quote is included | Document remaining benefits? | |
| 43 | If using agent – confirm if they are arranging a receiving bed | CSA | 96 |
| | | | |

Sending hospital: Base Hospital
GCL Sent ☐ Yes ☒ No

Receiving hospital: Clinica Los Andres
GCL Sent ☒ Yes ☐ No     $2500

Departure Date/Time:

Arrival Date/Time:

**All approvals must be noted in the case - Medical approvals by team management required**
***CM up to $2,500 Additional expenses on an already approved transport only***
CM to $7,500   Repat of remains only (separate Audit)
Sr. ACs up to $10,000     Evac and Repat
Harry and Paula up to $25,000     Evac and Repat
Noreen - $25,000+     Evac and Repat

12/8/2014

**EXHIBIT 4**
8-18-23 V.ZHOU

ANTL_00037

1  employee or attorney or counsel of any of the parties,

2  nor am I a relative or employee of such attorney or

3  counsel, nor am I financially interested in the outcome

4  of this action.

5          IN WITNESS WHEREOF, I have subscribed my name

6  this 5th day of September, 2023.

7

8  _____

     MONICA SCHOONOVER, CSR No. 10220

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

1                 UNITED STATES DISTRICT COURT

2                 EASTERN DISTRICT OF CALIFORNIA

3

4    BORIS ANTL, an individual;      )
                                     )
5              Plaintiff,            )
                                     )
6    v.                              )     Case No.
                                     )     2:22-cv-00504-KJM-AC
7                                    )
     AGA SERVICE COMPANY, a          )
8    Virginia Corporation;          )
     JEFFERSON INSURANCE COMPANY,    )
9    a Virginia Corporation, and     )
     DOES 1-10, inclusive,           )
10                                   )
               Defendants.           )
11   _____ )

12

13

14          VIDEOTAPED DEPOSITION VIA ZOOM OF

15       AGA SERVICE COMPANY'S 30(b)(6) WITNESS

16                  MARYANN FRASER

17            Thursday, August 24, 2023

18

19

20

21

22

23

24   Reported by:  Monica Schoonover
                   CSR No. 10220
25   Job No.:      7534

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3

4  BORIS ANTL, an individual;    )
                                 )
5          Plaintiff,            )
                                 )
6  v.                            )   Case No.
                                 )   2:22-cv-00504-KJM-AC
7                                )
   AGA SERVICE COMPANY, a        )
8  Virginia Corporation;         )
   JEFFERSON INSURANCE COMPANY,  )
9  a Virginia Corporation, and   )
   DOES 1-10, inclusive,         )
                                 )
10                               )
           Defendants.           )
11  _____ )

12

13

14

15

16          VIDEOTAPED REMOTE DEPOSITION OF MARYANN FRASER,
       taken on behalf of the Plaintiff, beginning at
17     7:56 a.m. and ending at 1:07 p.m., on Thursday,
       August 24, 2023, via Zoom videoconference
18     before Monica Schoonover, Certified Shorthand
       Reporter No. 10220.

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS

2    EXHIBIT:                                          MARKED

3    Exhibit 1      Plaintiff Boris Antls              11
                    Rule 30(b)(6) Notice of
4                   Deposition of Defendant
                    AGA Service Company
5
     Exhibit 2      Allianz Letter of                  31
6                   Confirmation and Certificate
                    of Insurance
7
     Exhibit 3      Case Notes                         66
8
     Exhibit 4      Superior Medical Case              73
9                   Management Quick Reference
                    Guide, Bates ANTL_00428
10                  to ANTL_00434

11   Exhibit 5      Guarantee of Coverage Letter       103
                    Bates ANTL_000700
12
     Exhibit 6      Guarantee of Coverage Letter       104
13                  Bates ANTL_000698

14   Exhibit 7      Guarantee of Coverage Letter       142
                    Bates ANTL_00034 to ANTL_00035
15
     Exhibit 8      Assitance, Reference Documents     143
16                  Bates ANTL_00442 to ANTL_00492

17

18

19

20

21

22

23

24

25

```
1              THE WITNESS:  Yes, I am.
2   BY MR. BARNES:
3      Q    Okay.  What was the purpose just in a
4   general sense of the emergency medical treatment
5   aspect of the policy?
6              MS. LUETTO:  Calls for speculation.
7   Overbroad.  Vague.  Beyond the scope of this
8   witness's designation.  You can respond.
9              THE WITNESS:  Okay.  Can you ask the
10  question again?  I am not sure what you are asking
11  specifically.
12  BY MR. BARNES:
13     Q    Yeah.  Just, generally, what was the
14  purpose of the emergency medical treatment part of
15  the policy?
16             MS. LUETTO:  Same objections.
17             THE WITNESS:  It's to help customers when
18  they travel outside of their state.
19  BY MR. BARNES:
20     Q    And when you say "help," are you referring
21  to receiving medical treatment?
22             MS. LUETTO:  Vague.  Overbroad.
23             THE WITNESS:  In assistance, we would help
24  with many things, so it all depends upon what the
25  request was.
```

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 36

1      A     Yes.

2      Q     And for emergency medical and/or dental

3   care on page 34 of the document or of the --

4   sorry -- the policy, 21 of the PDF, it says,

5   "Medical and dental services, supplies, and charges

6   that are for a health emergency."

7          In your understanding of the policy, is

8   there any other definition or limitations on what

9   constitutes an emergency -- what constitutes

10  emergency medical and/or dental care?

11         MS. LUETTO:  Overbroad.  Vague.  Compound.

12  You can respond.

13         THE WITNESS:  The policy is set for

14  coverage for any unforeseen medical care or

15  diagnosis.

16  BY MR. BARNES:

17     Q     Okay.  How would you define a health

18  emergency?

19         MS. LUETTO:  Objection.  Vague.

20         THE WITNESS:  I am trying to understand

21  what you are asking.

22  BY MR. BARNES:

23     Q     So the definition says emergency medical --

24  the definition -- or the word being defined is

25  "emergency medical and/or dental care."  Within that

1  definition, it also uses the word "emergency"

2  itself.  I am trying to understand exactly what is

3  meant by the word "emergency" here.

4       A      An emergency is a -- we would consider

5  something that is not a preplanned event.

6       Q      Would it be accurate to say it's something

7  that should be addressed immediately?

8              MS. LUETTO:  Overbroad.  Calls for

9  speculation.

10             THE WITNESS:  An emergency is

11  something -- it all depends upon the situation;

12  right?  An emergency is something that is

13  unforeseen.

14  BY MR. BARNES:

15      Q      I think I would kind of like to explore

16  this a little more.  It's unforeseen.  I think

17  unforeseen doesn't necessarily mean it has to be

18  addressed immediately though.

19             In saying it's something that's unforeseen,

20  what do you mean by that in applying the policy?

21      A      So on page 34, an elective cosmetic surgery

22  is something that's preplanned.  An emergency is

23  something that you don't expect happening.

24      Q      Okay.  Is an emergency something that

25  requires being addressed?

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 41

1        MS. LUETTO:  Overbroad.  Vague.  Calls for

2  speculation.

3        THE WITNESS:  An emergency is something

4  that should be treated, yes.

5  BY MR. BARNES:

6    Q    Is there an urgency in an emergency

7  situation?

8        MS. LUETTO:  Same objections.

9        THE WITNESS:  It's all about the timing.

10  BY MR. BARNES:

11    Q    Could you give me any examples of a medical

12  emergency that wouldn't have to be addressed

13  immediately?

14        MS. LUETTO:  Calls for speculation.

15  Overbroad.  Vague.  You can respond.

16        THE WITNESS:  I am trying to understand

17  what you are asking.

18  BY MR. BARNES:

19    Q    I am just trying to see if you could give

20  me any examples of emergency situations that

21  wouldn't be addressed as quickly as possible.

22        MS. LUETTO:  Calls for speculation.  Vague

23  and ambiguous.

24        I am sorry.  Go ahead, MaryAnn.

25        THE WITNESS:  Okay.  So an emergency --

1    let's say, just an example to be vague, somebody is

2    in a car accident and that's an emergency.  It's up

3    to the paramedics to get them to the hospital so

4    they can be treated.  It's still an emergency, but

5    it's for -- it's for those people on ground to the

6    paramedics to treat that initial care to get them

7    better.

8    BY MR. BARNES:

9        Q    In -- have you ever received calls for

10   emergency medical treatment that involved car

11   accidents?

12       A    Yes.

13       Q    Okay.  Would a situation that had a high

14   possibility of death or serious injury be considered

15   an emergency?

16            MS. LUETTO:  Overbroad.  Vague.  You can

17   respond.

18            THE WITNESS:  Yes.

19   BY MR. BARNES:

20       Q    Would a heart attack be considered an

21   emergency?

22            MS. LUETTO:  Overbroad.  Vague.  Calls for

23   speculation.

24            THE WITNESS:  Yes.

25   ///

```
 1  BY MR. BARNES:
 2      Q    Okay.  Would it be accurate to say here
 3  that emergency is intended in its normally
 4  understood sense?
 5              MS. LUETTO:  Vague.  Compound.
 6              THE WITNESS:  What do you mean by "its
 7  understood sense"?
 8  BY MR. BARNES:
 9      Q    In a general definition that you would find
10  in a dictionary?
11      A    Yes.
12      Q    Okay.  If we go back up to page 17 of the
13  PDF, 27 of the document, it says -- sorry.  I am
14  finding my place here.  It says, "You have to pay
15  for emergency medical and/or dental care for one of
16  the following covered reasons:  you have a sudden,
17  unexpected illness or injury during your trip that's
18  either life threatening or could cause serious and
19  irreparable harm if it isn't treated; you have an
20  injury or infection, a lost filling or a broken
21  tooth during your trip that requires immediate
22  treatment by a dentist."
23              We also have this definition of covered
24  reasons, and we go down and it says the specific
25  or -- "The specific situations or events that are
```

1      THE WITNESS:  I am sorry, Mr. Barnes.  I

2  don't know.  You are asking me if this policy

3  provides coverage before it happened?  I don't

4  understand what you are asking.

5  BY MR. BARNES:

6      Q    My question is more, if a request for

7  assistance is made and treatment is intended but not

8  yet happened because, you know, payment has not been

9  made or guaranteed, would this policy still apply to

10  provide coverage if under one of the covered

11  reasons?

12      MS. LUETTO:  Oh, wow.  Vague and ambiguous.

13  Overbroad.  Compound.  Calls for speculation.

14  Beyond the scope of this witness's designation.

15      You can respond if you can.

16      THE WITNESS:  I am trying to understand

17  your question.

18  BY MR. BARNES:

19      Q    Yeah, sure.  No problem.

20      This policy isn't only for reimbursement of

21  payments; is that accurate?

22      MS. LUETTO:  Vague and ambiguous.

23  Overbroad.

24      THE WITNESS:  The policy -- the policy is

25  set up where when the claim is processed that it

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 46

1  would pay the policyholder.

2  BY MR. BARNES:

3       Q     Okay.   If a policyholder hadn't incurred a

4  charge yet, could they still request a guarantee of

5  coverage?

6             MS. LUETTO:   Objection.   Vague.   Overbroad.

7             THE WITNESS:   A guarantee of coverage is

8  something that we do in the assistance department to

9  help the customer when they are traveling.   It's

10 part of the benefit that we supply here in

11 Allianz.

12 BY MR. BARNES:

13      Q     And why would a guarantee of coverage be

14 made?

15      A     Well, when a customer is traveling and they

16 have a medical emergency, some customers do not have

17 thousands of dollars to provide to the hospital up

18 front.

19      Q     And in that instance, AGA would guarantee

20 that payment so that the customer could receive

21 treatment; is that correct?

22            MS. LUETTO:   Overbroad.

23            THE WITNESS:   Hospitals will -- many

24 hospitals outside the U.S. will treat the customer

25 whether they have the payment or not.   We help them

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 47

1   BY MR. BARNES:

2        Q      AGA has agents available 24 hours a day to

3   provide assistance; is that correct?

4        A      Correct.

5        Q      Okay.  And is that in any way affected by

6   working hours?

7                MS. LUETTO:  Vague.

8                THE WITNESS:  What do you mean "affected

9   by"?

10  BY MR. BARNES:

11       Q      Are agents involved -- sorry.  Let me

12  rephrase.

13               In providing assistance 24 hours a day, do

14  agents change off on shift changes?

15               MS. LUETTO:  Objection.  Vague.

16               THE WITNESS:  I am not sure what you are

17  asking.  Would we activate a different agent because

18  of the time change?

19  BY MR. BARNES:

20       Q      Yeah.  So if an agent worked from 9:00 to

21  5:00 and they received a claim for assistance at

22  noon and then some follow-up had to happen at 7:00

23  p.m., what would happen in that situation?

24               MS. LUETTO:  Overbroad.  Vague.  Compound.

25               THE WITNESS:  Are you asking -- are you

1   the second shift?

2       A    Well, we would speak verbally.  We could

3   communicate correspondingly.

4       Q    I guess my question more, and I think you

5   answered it, is just it's not necessarily limited to

6   the case summary; is that correct?

7            MS. LUETTO:  Objection.  Vague.

8            THE WITNESS:  Correct.

9   BY MR. BARNES:

10      Q    Thank you.

11           Is there a way to indicate any urgency in

12   the case summary?

13           MS. LUETTO:  Objection.  Vague and

14   ambiguous.  Overbroad.  Incomplete hypothetical.

15           THE WITNESS:  Are you asking -- I am not

16   sure what you are asking.

17   BY MR. BARNES:

18      Q    If a case needs some immediate attention,

19   how would that be documented or how would that be --

20   sorry.  Not documented.  Let me strike that.

21           How would that be communicated to the

22   person coming on the next shift?

23           MS. LUETTO:  Incomplete hypothetical.

24   Vague.  Overbroad.

25           THE WITNESS:  We would let the associate

1  know what had been done on that case and the next

2  steps needed to have it move forward.

3  BY MR. BARNES:

4      Q    Are there any specific designations -- you

5  know that "important" aspect of an email that we

6  get?  We get a little red exclamation point in some

7  systems.  Are you familiar with that?

8      A    Are you asking me if I would send an email

9  with an exclamation?

10     Q    No.  I am familiar -- I am asking if you

11 are familiar with indicating different importance in

12 emails that you can receive.  Outlook, as one

13 aspect, uses a red exclamation point for high

14 priority emails.  Are you familiar with that?

15     A    Sending a high priority email, yes.

16     Q    Okay.  Kind of in a similar sense, does AGA

17 have any method within their case summary of

18 indicating whether something is a high priority or

19 not?

20         MS. LUETTO:  Overbroad.  Vague.  Incomplete

21 hypothetical.

22         THE WITNESS:  That's hard for me to answer,

23 Mr. Barnes, because it's a very broad question

24 because every case that we look at is a priority to

25 us.

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 65

```
 1   BY MR. BARNES:

 2        Q    Okay.  That's fair.

 3             All right.  One second.

 4        A    You're okay.

 5        Q    Why don't we go into the case notes?  I am

 6   going to introduce Exhibit 3.  Let me share this in

 7   the chat first.

 8             (Exhibit 3 marked for identification.)

 9             MR. BARNES:  That is not what we want.

10   Sorry.  One second.

11             MS. LUETTO:  You showed us your emails.

12             MR. BARNES:  I am not trying to do that.

13   Not at all.

14             There we go.  I think that's the one I

15   want.

16             MS. LUETTO:  That's it.

17   BY MR. BARNES:

18        Q    Miss Fraser, are you familiar with this

19   document?

20        A    Yes.

21        Q    Okay.  Have you reviewed this document?

22        A    With counsel, yes.

23        Q    How -- have you reviewed every entry in

24   this document?

25        A    Specifically, is there a specific entry you
```

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 66

1   are asking?

2       Q    I am just trying to understand if, you

3   know, you read through every last thing that

4   happened in this case.

5           MS. LUETTO:  Overbroad.  Vague.

6           THE WITNESS:  I did review the case, yes.

7   BY MR. BARNES:

8       Q    Okay.  We are going to go through the

9   cells, so if you don't remember something or, you

10  know, anything like that, it's not a problem.  I

11  just kind of wanted to get your initial

12  understanding.

13          It's correct that Mr. Antl made the first

14  request for emergency medical assistance at about

15  3:00 p.m. on December 12th; is that correct?

16          MS. LUETTO:  Objection.  Vague and

17  ambiguous.  Misstates the document.  Misstates the

18  evidence.

19          THE WITNESS:  So from the case note, it is

20  stating that either the patient or the ambulance

21  representative reached out to Allianz.

22  BY MR. BARNES:

23      Q    Good point.  It might not have been Mr.

24  Antl.

25          My question is:  Would AGA have recorded

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 67

1   the telephone number from which they received that

2   phone call?

3          MS. LUETTO:  Objection.  Vague.

4          THE WITNESS:  So if I can recall correctly,

5   when the call came in, it doesn't record the phone

6   number on our phone.

7   BY MR. BARNES:

8       Q    Do you know if AGA had caller ID?

9       A    I could only guess in 2014.  I don't

10  remember.

11      Q    Okay.

12      A    Yeah.

13      Q    Under Case Note 3, this is documenting an

14  email that AGA had sent to Mr. Antl in response to

15  the call; is that correct?

16      A    I am sorry.  Can you repeat the question?

17      Q    Case Note 3, does that refer to an email

18  that AGA sent to Mr. Antl in response to the call

19  they received?

20      A    That is correct.  We were reaching out to

21  Mr. Antl.

22      Q    Okay.  And if you go down to Case Note 5,

23  section B says "OUTCL."  Do you know what that's

24  referring to?

25      A    That means that we made an outbound call.

1    BY MR. BARNES:

2        Q    If we look at Case Note 8 at C, it says,

3    "AC dialed with Maggie on the line.  Clinica Los

4    Andes de Puerto Montt at all the numbers below

5    several times.  No one is picking up, but it rings

6    as normal."

7            Does that change your prior response?

8        A    No.

9        Q    Isn't it correct that no one at AGA had

10   spoke with anyone at Clinica Los Andes de Puerto

11   Montt?

12       A    In that note, it appears they didn't.

13       Q    So Clinica Los Andes de Puerto Montt

14   wouldn't have been able to call back AGA if Mr. Antl

15   arrived; correct?

16           MS. LUETTO:  Objection.  Argumentative.

17   Overbroad.  Vague.

18           THE WITNESS:  It's a possibility, but they

19   could also have caller ID.

20   BY MR. BARNES:

21       Q    The next contact in Mr. Antl's case

22   actually came from the doctor treating him.  Do you

23   see that in Case Note 11?

24       A    I do.

25       Q    Okay.  And at that point, AGA was informed

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 76

1  that Mr. Antl had a heart attack; is that correct?

2      A     Yes.

3      Q     They were also informed that the present

4  location he was at could not treat him.  Is that

5  your understanding as well?

6           MS. LUETTO:  Objection.  The document

7  speaks for itself.  Calls for speculation.

8           You can respond.

9           THE WITNESS:  It says right there, "They

10  are unable to treat him and have no more beds."

11  BY MR. BARNES:

12      Q     Okay.  And this was at 12:33 a.m. in the

13  morning; correct?

14      A     Approximately, yes.

15      Q     Okay.  That's fair given that the case

16  notes might not be contemporaneous because they were

17  recorded.

18           If we go down to -- sorry.

19           If we go down to Case Note 17, you have an

20  entry at 8:39 a.m. the next day -- sorry -- 8:39

21  a.m. that day since we were past midnight December

22  8th; is that correct?

23      A     Yes.

24      Q     And it says, "We need to know hospital that

25  patient is currently at.  Then facility review for

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 77

1    MS. LUETTO:  Overbroad.  Vague and

2  ambiguous.  Calls for speculation.

3    THE WITNESS:  When the nurse took the call

4  and she had the conversation with the ICU nurse,

5  that was the information that she was provided.

6  BY MR. BARNES:

7    Q   Okay.  It wasn't until about 12:26 p.m.

8  Chile time that AGA was able to contact the hospital

9  Mr. Antl needed to be transferred to; is that

10  correct?

11    MS. LUETTO:  Objection.  Vague and

12  ambiguous.  The document speaks for itself.

13    THE WITNESS:  Can you ask me that question

14  again, Mr. Barnes?

15  BY MR. BARNES:

16    Q   Yeah.  If this case note was recorded

17  around the same time as it indicates, AGA had not

18  been able to contact the receiving hospital until

19  about 12:30 p.m. Chile time; is that correct?

20    A   So that looks like we spoke to the -- let's

21  see.  That's the sending hospital.  That's the

22  original hospital that Mr. Antl was at.

23    Q   Okay.  So if we go to 23, is this the

24  contact for the receiving hospital?

25    MS. LUETTO:  Objection.  Vague and

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 83

1  ambiguous.   The document speaks for itself.

2          THE WITNESS:   It appears that was the

3  receiving hospital.

4  BY MR. BARNES:

5      Q     Okay.   And that note indicates that AGA was

6  informed that the receiving hospital would need a

7  letter of guarantee before Mr. Antl was admitted?

8          MS. LUETTO:   Same objections.

9          THE WITNESS:   It's stating that they need

10  the letter of guarantee and they are able to receive

11  the patient and she doesn't know the quote for that

12  kind of admission.   So they are -- they are looking

13  to find out what the patient's benefits are.

14  BY MR. BARNES:

15      Q     Okay.   It indicates the billing department

16  was closed that day; right?

17          MS. LUETTO:   Same objections.

18          THE WITNESS:   That's what it appears on the

19  note, yes.

20  BY MR. BARNES:

21      Q     Do you know what Case Note 24 is referring

22  to, "AAMED sent to PT with TMO's email address"?

23      A     So it looks like our AAMED's were sent to

24  the patient with the doctor's email address.

25      Q     Is that referring to Case Note 25 or

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 84

1   medical@mok.cl?

2        A     It appears to be, yes.

3        Q     Okay.  We have a difference in time entries

4   from 33 which is 12:33 p.m. to 21 which was 9:21

5   p.m.; is that correct?

6        A     That's what it has, yes.

7        Q     Okay.  In between these two entries, it

8   appears that AGA had spoken to the treating medical

9   officer for Mr. Antl at the first hospital.  Is that

10  what you see in Case Note 22?

11       A     Uh-huh.

12       Q     Okay.

13            MS. LUETTO:  Is that a "yes"?

14  BY MR. BARNES:

15       Q     And the notes record, "Patient needs to be

16  transported ASAP maybe today."  Do you see that?

17       A     I see that.

18       Q     Okay.  And if we go down to Case Note 30,

19  it appears we have another recording of a discussion

20  between the case manager and the treating medical

21  officer informing AGA that the second hospital can

22  receive Mr. Antl.  Is that what you see?

23            MS. LUETTO:  I am sorry.  Wait, wait,

24  MaryAnn.  Can I have that question read back,

25  please?

1       A     Yes.  They have confirmed receipt of our

2  email.

3       Q     Okay.

4       A     And our request.

5       Q     And they create a new case for themselves

6  internally.  Is that the 299605?

7            MS. LUETTO:  Misstates the document.

8            THE WITNESS:  Yes.  They created their own

9  case number for their tracking purposes.

10  BY MR. BARNES:

11      Q     Okay.  If we go down to Case Note 43, this

12  is December 8th at 1:13 p.m.  AGA receives an email

13  from the agent.  It says, "The patient needs a

14  medical procedure within the next two hours.  Please

15  let us know as soon as possible if we can arrange

16  the ambulance."

17            And at that same point in time, AGA is also

18  informed of the cost of the ambulance and the

19  admission for the new hospital; is that correct?

20      A     Yes.

21            MS. LUETTO:  I would object as vague.

22  BY MR. BARNES:

23      Q     Do you recall the case notes before from a

24  doctor indicating that the transport needed to be

25  done as soon as possible?

1          MS. LUETTO:   Objection.   Misstates

2    testimony.   Calls for speculation.

3    BY MR. BARNES:

4        Q      If we go to Case Note 32, there's an email

5    from a case manager to the AGA nurse; is that

6    correct?

7        A      Yes.   That's an email, uh-huh.

8        Q      And the case manager is informing the nurse

9    that the doctor they spoke to indicated that Mr.

10   Antl needed to be transported -- sorry -- needed to

11   be transferred as soon as possible; is that

12   correct?

13       A      That's what's stated.

14         MS. LUETTO:   The document speaks for

15   itself.

16   BY MR. BARNES:

17       Q      Okay.   After these conversations, after AGA

18   receives an email from its local agent informing it

19   of the price -- informing it of the cost of the

20   ambulance and the admission, there is an

21   entry -- sorry.

22         In Case Note 43, following this email that

23   is from a Dr. Syverud -- sorry -- that it's -- it

24   appears from the nurse department to Dr. Syverud

25   that says, "We have activated our agent as well but

1    no reply from them yet."

2              MS. LUETTO:  What note are you on?

3              MR. BARNES:  47.

4              MS. LUETTO:  Thank you.

5    BY MR. BARNES:

6         Q    Do you know why it would have said there

7    was no reply for them when four case note entries

8    before there was a reply documented?

9              MS. LUETTO:  Calls for speculation.

10   Assumes facts.

11             THE WITNESS:  I am sorry.  Can you repeat

12   that question?

13   BY MR. BARNES:

14        Q    Yeah.  Do you know why Case Note 47 would

15   say there was no reply received from the agent when

16   Case Note 43 was a reply?

17        A    Well, that goes back to earlier.  We are

18   working the case real time, and the nurse was

19   probably speaking with the doctor before the

20   information was added to the case, or the nurse

21   didn't see that information in the case while she

22   was speaking to the doctor.

23        Q    Okay.  Do you know if this entry in Case

24   Note 47, column C, indicates a phone call or an

25   in-person discussion?  Excuse me.

Maureen Frau

1        A      It was most likely a phone call.

2        Q      Okay.  Do you know who Dr. Syverud is, what

3   his position in AGA is?

4               MS. LUETTO:  Assumes facts.  Vague.

5               THE WITNESS:  He was one of the medical

6   doctors at University of Virginia that the nurses

7   would speak to to discuss cases.

8   BY MR. BARNES:

9        Q      Okay.  Was he an employee of AGA, if you

10  know?

11       A      He was employed with -- he was our consult

12  for AGA, and he also worked at University of

13  Virginia.

14       Q      Okay.  At this point in time, Dr. Syverud

15  had agreed that Mr. Antl needed both the

16  ambulance -- sorry -- needed the ambulance transfer

17  for a cardiac catheter.  Do you see that?

18       A      Yes.

19       Q      Then approximately -- sorry -- less than

20  ten minutes later in the Case Notes 51 through 53,

21  these are entries where the nurse approves --

22  sorry -- where the nurse recommends Mr. Antl's

23  ground transport for an ICU bed and cardiac

24  catheter, the stay at the first hospital, as well as

25  a stay at the second hospital for December 8th and

1      9th.  Do you see those?

2           A     Yes.  I see them.

3           Q     Do you know if Mr. Antl was transferred at

4      this point?

5                 MS. LUETTO:  Objection.  Vague.

6                 THE WITNESS:  From what I could see in the

7      case note in front of me, it doesn't appear he has

8      been transported yet.

9      BY MR. BARNES:

10          Q     Okay.  If we come down to 56, in column C,

11     it says, "Rafael to AGA."

12                Do you know who Rafael is?

13          A     It looks like that's the agent reaching out

14     to us.

15          Q     Would this have been a phone call or an

16     email?  Can you tell either way?

17          A     Well, from the case note, it says, "Calling

18     to find," so I would assume it was a phone call.

19          Q     That's a good point.  Thank you.

20          A     I don't mean that in a bad way.

21          Q     No, no.  You're fine.  You're fine.  That

22     was my oversight.

23                As part of the case note here, it says,

24     "Easier to email than call."

25                Am I correct in assuming that this was

1  BY MR. BARNES:

2      Q    Okay.  I think I just recognized your name

3  here in the case notes.  Is this you on Case Note

4  65?

5      A    That is me.

6      Q    Okay.  "Reassigned case to Valerie."

7           I am assuming that means Miss Valerie

8  Zhou?

9      A    Yes.

10     Q    Do you know why -- sorry.  Let me strike

11  that.

12          I am going to go back up a little bit.

13          Okay.  Actually, I will strike that

14  question or nonquestion.

15          Sorry.  One second.

16          If we go to Case Note 69, AGA indicates to

17  its agents that -- to its agent that it is sending a

18  guarantee letter for the ambulance as well as

19  another guarantee for $2,500.  Do you see that?

20     A    Yes.  I see it.

21     Q    Okay.  And it says, "We may extend for more

22  money once we see how long the patient will be in

23  the hospital."

24          Sorry.  Do you see that too?

25     A    Yes.  I see that too.

1    an outgoing call in column B?

2        A    Yes, it does.

3        Q    And that happened approximately 90 minutes

4    after Miss Zhou emailed the local agent?

5        A    That's what it has on there, yes.

6        Q    Okay.  And if you review Case Note 72,

7    73 -- sorry -- Case Note 72 through 75 -- no.  Let

8    me strike that.

9            If you review Case Note 72 through 76,

10   those are the remaining entries for Mr. Antl's case

11   for December 8th.  Do you see that?

12       A    Yes.  I see that.

13       Q    Okay.  And then the next morning on

14   December 9th, we have in Case Note 85, "BU to CM."

15           Do you know what that's referring-- or what

16   that indicates?

17           MS. LUETTO:  I am sorry.  Wait, wait.

18   Which case note again?

19           MR. BARNES:  85, column C.

20           MS. LUETTO:  Right.  Misstates -- misstates

21   the document.

22   BY MR. BARNES:

23       Q    Do you know what this is indicating, Miss

24   Fraser, "BU to CM"?

25           MS. LUETTO:  Misstates the document.  It's

1   "CM to BU."

2   BY MR. BARNES:

3       Q       Miss Fraser, is that CM to BU or BU to

4   CM?

5       A       It's stating the case manager reached out

6   to the BU.

7       Q       Okay.   And who is BU?

8       A       That's also known as the agent.

9       Q       Okay.   And in the notes here, it indicates,

10  "Requesting urgent update on transport"; is that

11  correct?

12      A       Uh-huh.   That's correct.

13      Q       And this is more than 12 hours after AGA

14  had provided the guarantee letter to its local agent

15  for the cost of transport; is that correct?

16              MS. LUETTO:   It may call for speculation.

17  Overbroad.

18              THE WITNESS:   That looks like the case note

19  at 9:02 a.m.

20  BY MR. BARNES:

21      Q       Okay.   Do you know what -- why this entry

22  would have been listed as urgent and the prior ones

23  would not have been?

24              MS. LUETTO:   Vague and ambiguous.

25  Overbroad.   Calls for speculation.   Assumes facts.

1          THE WITNESS:  Can you rephrase the

2   question?

3   BY MR. BARNES:

4       Q     Yeah.  Do you know why this entry was

5   recorded as urgent but others weren't?

6          MS. LUETTO:  Same objections.

7          THE WITNESS:  I don't know why others were

8   not recorded as urgent.

9   BY MR. BARNES:

10      Q     Okay.  And the next entry in the case notes

11  are -- is -- sorry.

12          The next entry in the case note is a call

13  from Mr. Antl to AGA; is that correct?

14      A     Yes.

15          MS. LUETTO:  That's Case Note 86?  I am

16  just trying to keep us so we know where we are.

17          MR. BARNES:  That's fine.  No problem.

18  BY MR. BARNES:

19      Q     Case Note 87, this indicates when Mr. Antl

20  was -- sorry.  Let me restart that question.

21          Case Note 87 indicates that the transport

22  of Mr. Antl from the first to second hospital is now

23  occurring.  Do you see that?

24          MS. LUETTO:  The document speaks for

25  itself.  Calls for speculation.

1          THE WITNESS:   Yes.   I see Case Note 87.

2    BY MR. BARNES:

3        Q    Okay.  Go down to Case Notes 92 to 94.  In

4    column C, they will indicate, "Provider request

5    decision," and then column -- sorry.  92, column D,

6    says, "Provider request was denied."

7          Do you know what this is referring to?

8        A    So what that means is that we have a team

9    that reviews the hospital information that's put in

10   the case because it's cross-referenced between

11   assistance and the claims department, and while it's

12   saying it was denied, it doesn't mean we denied them

13   going to that facility.  It just means that it was

14   denied because the information that was inputted --

15   was put in the case may have been off by a character

16   or a number, so it was fixed properly.

17       Q    Okay.

18       A    That has nothing to do with the denial of

19   the facility.  It's for internal reasons.

20       Q    Okay.  It's more of a recordkeeping aspect

21   rather than -- rather than a implementation of a

22   case aspect?

23       A    Yes.  So from what Case Note 92 is stating

24   that the -- whoever put in the hospital information,

25   we already had that hospital in the case, so they

```
 1    reactivated the hospital number of 11897 for that
 2    facility that we have on file.
 3        Q    Okay.   Thank you.
 4              Here in Case Note 96, it appears that this
 5    is a communication from Mr. Antl to -- sorry.   Let
 6    me re-ask that question.
 7              What is this case note indicating?
 8              MS. LUETTO:   Objection.   Vague.
 9              THE WITNESS:   Incoming call.
10    BY MR. BARNES:
11        Q    Okay.   It appears that this is from Mr.
12    Antl to AGA.   Is that what you see as well?
13        A    Yes.
14        Q    Okay.   So all of these -- all of this
15    description in column D would be what Mr. Antl
16    communicated; is that correct?
17              MS. LUETTO:   Overbroad.   Vague.
18              THE WITNESS:   Right.   That would be the
19    summary of the call.
20    BY MR. BARNES:
21        Q    Okay.   It says, "TMO advised sub that he
22    will probably be staying in the hospital for up to
23    five day, but depending on recovery it may only be
24    three days."
25              So at that point in time, the $2,500
```

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 112

1  guaranteed coverage letter wouldn't -- wouldn't

2  cover these additional days; is that correct?

3          MS. LUETTO:  Vague.  Assumes facts.  Calls

4  for speculation.

5          THE WITNESS:  Right.  So the letter of

6  guarantee that we sent out was for the admission and

7  up to the $2,500.  So once we reviewed the medical

8  report, we could go ahead and extend it.

9  BY MR. BARNES:

10     Q    Okay.  Could it be possible that Mr. Antl

11  would have -- I guess my question is this:  The

12  $2,500 GCL had a date range of 12-8 to 12-9, but it

13  also had an amount of $2,500.  Would the coverage be

14  limited to the dates, or could those dates be

15  extended as long as the amount remained -- as long

16  as there remained some amount of coverage?

17          MS. LUETTO:  Vague.  Calls for speculation.

18          THE WITNESS:  So we -- in assistance, we

19  would work with the billing office, and the billing

20  office would give us the new estimated cost for the

21  procedures, for the ongoing treatment for Mr. Antl.

22  BY MR. BARNES:

23     Q    Okay.  Is it fair to say then that -- or is

24  it accurate to say then that the $2,500 GCL wasn't

25  intended to cover treatment beyond admission?

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 113

```
 1              MS. LUETTO:  Overbroad.  Calls for
 2   speculation.
 3              THE WITNESS:  I am not understanding what
 4   you are saying.
 5   BY MR. BARNES:
 6       Q    Did AGA expect to provide another GCL for
 7   any treatment that Mr. Antl required beyond
 8   admission to the second hospital?
 9              MS. LUETTO:  Objection.  Vague.
10              THE WITNESS:  Are you asking if we were
11   limiting his benefits for 2,500 or if we had
12   intended to continue?
13   BY MR. BARNES:
14       Q    I am asking whether or not AGA expected --
15   sorry -- whether or not AGA -- yeah, whether or not
16   AGA expected to issue another GCL for any treatment
17   that Mr. Antl would receive at the second hospital
18   beyond admission.
19              MS. LUETTO:  Overbroad.  Vague.  Calls for
20   speculation.
21   BY MR. BARNES:
22       Q    Let me rephrase.
23              What was the $2,500 GCL intended to
24   cover?
25       A    So that was to get him admitted into the
```

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 114

1  second facility, and then once we got a medical

2  update, the hospital and the agent understood that

3  that letter of guarantee would be extended.

4      Q    Okay.  So the $2,500 GCL was not intended

5  to cover surgery if he needed it?

6            MS. LUETTO:  Objection.  Vague.  Calls for

7  speculation.

8            THE WITNESS:  Yeah.  We moved him to the

9  facility so he could get the treatment needed.  It

10 wasn't to stop any treatment.

11           I don't understand what you are asking

12 me.

13 BY MR. BARNES:

14     Q    Sure.  Sure.

15     A    We would not send him to a facility where

16 they wouldn't treat him.  If the bill hit $2,500, we

17 would work with the hospital and get medical updates

18 and send a letter of guarantee as needed so he could

19 get his treatment.

20     Q    Okay.  And I think we are on the same page.

21 I am just trying to kind of narrow this down in that

22 whether it was expected when that $2,500 guarantee

23 was sent that there would need to be another one

24 sent.

25           Did AGA have that understanding at that

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 115

1  point?

2     A    Well, yeah, because the hospital was going

3  to continue treatment.

4     Q    Okay.

5     A    And they were to supply us with the next

6  steps.

7     Q    Okay.  The $2,500 guarantee letter was

8  never expected to be the last one to be issued?

9     A    If the hospital was going to continue

10  medical care, we were going to extend that letter.

11  That's what Valerie had said to the agent.  The

12  agent was relaying that to the hospital.

13     Q    Okay.  If we go to Case Note 99 -- sorry.

14  Not 99.  I don't think any of us are going to be

15  able to understand that completely.  Maybe some of

16  us.

17          If we go to Case Note 100, we have an email

18  from the nurse to the agent asking for an updated

19  medical report; is that correct?

20     A    Yes.

21     Q    Okay.  At this point in time, was there any

22  dispute that Mr. Antl needed a cardiac catheter?

23          MS. LUETTO:  Assumes facts.  Vague.  Calls

24  for speculation.

25          THE WITNESS:  Are you asking me if we

1  denied that he needed services at this hospital?

2  BY MR. BARNES:

3      Q    No.  I am asking whether AGA had known what

4  treatment Mr. Antl required prior to being

5  transferred to the second hospital.

6      A    So the medical team had spoken with the

7  doctor in the beginning of the case, and that was

8  relayed to the medical team.

9      Q    Okay.  I believe before you had indicated

10 that AGA staff could use Google Maps to -- excuse

11 me -- to determine distance between hospitals.  Here

12 we have a email from the hospital to AGA in Case

13 Note 104 in Spanish.  Do you see that?

14         MS. LUETTO:  I am sorry.  Where are you

15 looking?  What note?

16         MR. BARNES:  104.

17         MS. LUETTO:  Thank you.

18         THE WITNESS:  Yes.  I see that.

19 BY MR. BARNES:

20      Q    Does AGA ever use Google translate to

21 translate documents?

22      A    I am sorry?

23      Q    Are there any Internet translation services

24 that AGA uses in this type of case?

25         MS. LUETTO:  Objection.  Vague.  Incomplete

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 117

1   hypothetical.

2          THE WITNESS:  We have various ways to get

3   information translated.

4   BY MR. BARNES:

5       Q    Have you ever used an Internet translation

6   service in a case?

7          MS. LUETTO:  Objection.  Vague.

8          THE WITNESS:  Have I personally?  I don't.

9   The medical team would translate it.

10  BY MR. BARNES:

11      Q    Okay.  Reading this case note, do you

12  understand how much the services that Mr. Antl

13  needed would cost?

14      A    Saying about 8,600.

15      Q    Just kind of going back a little bit to the

16  description in column C, it says, "Email from

17  hospital with att hosp invoice."

18          Do you think that was recorded correctly?

19  It appears that this came from the agent, if I am

20  reading it or as I read it.

21      A    Yes.  It looks like it came from the agent.

22      Q    Okay.

23      A    It's noting --

24      Q    Sorry.

25      A    You're fine.

1    Q      If we go down to Case Note 106, this

2    appears to be a translation request from the case

3    manager to a translator; is that correct?

4    A      Yes.

5    Q      And do you see that it was marked as

6    non-urgent?

7    A      Yes.

8    Q      Okay.  And this was at 9:23 p.m.  Do you

9    see that?

10   A      Yes.

11   Q      The next entry that we have in Case Note

12   107 is an email from the translator to AGA

13   confirming receipt of the translation request; is

14   that correct?

15   A      Yes.  That's what I see.

16   Q      That didn't come in until the next morning;

17   right?

18   A      Yes.

19   Q      If this has been marked urgent, would it

20   have been translated immediately; do you know?

21          MS. LUETTO:  Calls for speculation.  Vague.

22          THE WITNESS:  If I recall, the way the time

23   for a translation request for urgent requests, it

24   would be within 24 hours, and this one here, because

25   the report was probably one or two pages, non-urgent

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions                                    Page: 119

1    Case Note 109 has the same subject as the email that

2    Miss Zhou sent to the agent in Case Note 110; is

3    that correct?

4        A    It has what?  I am sorry.

5        Q    The same subject line.

6        A    It looks like it, yes.

7        Q    Okay.  Do you know what Miss Zhou meant

8    when she said, "We will review the report to confirm

9    that we can extend the guarantee letter"?

10       A    I don't know what you are asking me.

11       Q    From the prior testimony today, the

12   impression that I got was that AGA was -- sorry.

13   Let me strike all of that.

14            Is there any reason that AGA wouldn't have

15   extended the guarantee letter at this point?

16            MS. LUETTO:  Calls for speculation.

17   Overbroad.  Incomplete hypothetical.

18            THE WITNESS:  As long as it's medically

19   necessary to continue the treatment, the letter of

20   guarantee would continue.

21   BY MR. BARNES:

22       Q    Okay.  I am sorry.  Can we go to Case Note

23   121?  This is where AGA receives the translated

24   report; is that correct?

25       A    Yes.

1   Mr. Antl's treatment at this point?

2       A    That would be more of the expertise of the

3   medical team.

4       Q    Okay.  It was known that Mr. Antl needed a

5   cardiac catheter at this point; is that correct?

6            MS. LUETTO:  Objection.  Vague.  Calls for

7   speculation.  Assumes facts.

8            THE WITNESS:  We know that we got him to

9   this facility so he could get the treatment, yes.

10  BY MR. BARNES:

11      Q    I guess my question more is:  If he was

12  intended to receive treatment at this facility, why

13  would there need to be further evaluation in order

14  for that treatment to go forward?

15           MS. LUETTO:  Calls for speculation.

16  Overbroad.  May be beyond the scope of the witness's

17  deposition.  Also, assumes facts.

18           THE WITNESS:  So I -- I am not a medical

19  expert, but I would think that the doctor at the

20  receiving hospital would want to evaluate the

21  patient and let our medical team know of the next

22  steps that are needed to help Mr. Antl.

23  BY MR. BARNES:

24      Q    Okay.  Then on December 10 at 3:19, the

25  nurse recommends Mr. Antl stay from 12-9 to 12-11;

1   is that correct?

2           MS. LUETTO:  Sorry.  What note?

3           MR. BARNES:  125.

4           THE WITNESS:  That's correct.

5   BY MR. BARNES:

6       Q    Was there a reason -- sorry.  Let me

7   restart.

8           Do you think it was an error to approve a

9   day in the past?

10      A    To approve what?  I am sorry.

11      Q    The day before?  Do you understand my

12  question?  Sorry.  She approved 12-9, but it was

13  already 12-10.

14          MS. LUETTO:  Calls for speculation.  May be

15  beyond the scope of this witness's deposition.

16          THE WITNESS:  I would have to look at the

17  previous letter of guarantee, but I believe it said

18  from 12-8 to 12-9, so this would be a continuance of

19  that original letter that was sent out, the

20  guarantee letter.

21  BY MR. BARNES:

22      Q    Okay.  In Case Note 132, for December 10th,

23  5:30 p.m., AGA has approved two more days under

24  another guarantee letter; is that correct?

25      A    Yes, that's correct.

1    Q    Okay.  And this was 5:30 p.m., 12-10?

2    A    Yes.

3    Q    If we go down to Case Note 135, we are at

4    7:56 p.m., 12-10.  AGA receives an email from the

5    treating doctor.  Do you see that?

6    A    Yes.  I see it.

7    Q    Okay.  And do you see that in the email, it

8    says, "If the blood vessel that is not completely

9    open suffer a new lesion, he probably will die

10   because we are talking of a lesion in the anterior

11   descendent artery in it proximal part," and then the

12   nurse or the doctor continues in the email that

13   says, "I hope you understand how serious is the

14   situation."  In case of emergency, I will

15   call -- I'm sorry.  "In case of emergency, pain and

16   new myocardial infarction, I will call the

17   cardiologist for an emergency procedure."

18        In reviewing the notes, do you know if this

19   doctor had spoken to anyone at AGA before this?

20        MS. LUETTO:  Calls for speculation.

21        THE WITNESS:  This is Mayra Valenzuela, and

22   I thought the email said Mayra Fuentes; right?

23   Yeah, Dr. Mayra Fuentes.

24        Okay.  So Case Note 135?

25   ///

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 129

BY MR. BARNES:

Q      Yeah.

A      Okay.  So I am sorry.  I see that.

Q      Do you know if there was any prior
communication with this doctor?

A      Oh, I would have to look through the case.

Q      Okay.  Did you review this entry in your
review of the case notes prior to the deposition?
Do you recall this one?

A      Yeah, I see it.  Uh-huh.

Q      Okay.  And then it appears that Mr. Antl
forwards this same email in the next case note
entry.  Do you see that?

A      Yes.  I see it.

Q      Okay.  Right about 8:00 o'clock p.m. on
December 10th.  And then there's two more entries
that night in the case notes.

One is Case Note 137, email to RN and CM.
See Case Note 135 for email from treating medical
officer.  Note 138, nurse review of medical report
in Case Note 135.  These were both referring to that
email that we just reviewed.

My question is:  For the next 12 hours
nothing happens in the case.  The RN, Susan Gabriel,
reviewed the medical report from the email that came

1   in at 7:56, approximately 20 minutes later.  There's

2   no communication within AGA, outside of AGA to its

3   agents, AGA to the hospital.

4           Do you know why -- do you know why there's

5   no communication within this time period?

6           MS. LUETTO:  Overbroad.  Vague.  Assumes

7   facts.  Calls for speculation.

8           THE WITNESS:  Well, can you go back a

9   little bit, please?

10          You can go back a little more.  I am sorry.

11          So I see in Case Note 133, Valerie updated

12  Mr. Antl that the letter of guarantee was sent.

13          Can we go up one more?  We also authorized

14  to the agent in Case Note 132 that the letter of

15  guarantee was sent.

16          So the steps were taken to proceed with

17  next steps.  The communication with the agent has

18  been consistent on the case, and we also let Mr.

19  Antl know that that letter was sent as well, so...

20  BY MR. BARNES:

21      Q    Is there any means of a nurse alerting a

22  case manager of the urgency of a matter at any point

23  in time?

24          MS. LUETTO:  Objection.  Vague.  May be

25  beyond the scope of the witness's deposition or call

1  letter of guarantee in proceeding with Mr. Antl

2  being treated.

3  BY MR. BARNES:

4      Q    Yeah.  My question was more just whether

5  someone was available.  Someone would have been

6  available at that time to respond to the doctor;

7  correct?

8          MS. LUETTO:  Asked and answered.  And

9  assumes facts.

10          THE WITNESS:  So there is somebody

11  available 24/7 is what you are asking.  There is

12  staff there, yes.

13  BY MR. BARNES:

14      Q    Thank you.

15          Was the agent available 24 hours?

16          MS. LUETTO:  Asked and answered.

17          THE WITNESS:  I can't recall.  I would have

18  to -- I don't know.

19  BY MR. BARNES:

20      Q    Are there situations where an agent isn't

21  available 24 hours?

22          MS. LUETTO:  Overbroad.  Vague and

23  ambiguous.  Incomplete hypothetical.  Calls for

24  speculation.

25          THE WITNESS:  Yeah.  There are certain

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 134

1      I further certify that I am not a relative

2  or employee or attorney or counsel of any of the

3  parties, nor am I a relative or employee of such

4  attorney or counsel, nor am I financially interested

5  in the outcome of this action.

6      IN WITNESS WHEREOF, I have subscribed my

7  name this 11th day of September, 2023.

8

9  _____

10  MONICA SCHOONOVER, CSR No. 10220

# EXHIBIT C

1                    UNITED STATES DISTRICT COURT

2                    EASTERN DISTRICT OF CALIFORNIA

3

4

5    BORIS ANTL, an individual,

6               Plaintiff,

7    vs.                                    Case No.
                                            2:22-cv-00504-KJM-AC
8    AGA SERVICE COMPANY, a
     Virginia Corporation;
9    JEFFERSON INSURANCE COMPANY,
     a Virginia Corporation, and
10   DOES 1-10, inclusive,

11               Defendants.
                                    /
12

13

14

15    REMOTE RULE 30(B)(6) DEPOSITION BY VIDEOCONFERENCE OF

16             AGA SERVICE COMPANY, MELISSA CASTRO

17

18

19   DATE:           FRIDAY, SEPTEMBER 29, 2023

20   TIME:           4:08 p.m. BST

21

22

23   REPORTED BY:   KIMBERLY J. WALDIE,
                    CSR No. 8696, RPR
24

25

```
                          I N D E X

                                                      PAGE

     EXAMINATION BY MR. ABBOTT                           5




                        E X H I B I T S

     Exhibit 1    Plaintiff Boris Antl's Rule 30(b)(6)   112
                  Notice of Deposition of Defendant
                  AGA Service Company

     Exhibit 2    Allianz Global Assistance policy and   112
                  related documents

     Exhibit 3    Notes                                  112
```

Melissa Camp

```
 1      if you know?
 2              MS. LUETTO:  Overbroad.  Compound.
 3              Let me just ask are you talking about
 4      specifically -- what -- what time frame?  Because that's
 5      pretty -- that's a pretty broad time frame.  Are we
 6      limiting it to Mr. Antl's time or some other time?
 7              MR. ABBOTT:  Yeah.  Let's please limit this to
 8      Mr. Antl's time unless --
 9              MS. LUETTO:  Okay.  So we are talking about
10      December of 2014 --
11              MR. ABBOTT:  Yeah --
12              MS. LUETTO:  -- approximately?
13              MR. ABBOTT:  -- December of 2014.
14              MS. LUETTO:  Thank you.
15              THE WITNESS:  In December of 2014, the staff in
16      Canada, to my knowledge, was nurses and, essentially, a
17      senior nurse or senior nurses.
18         Q    MR. ABBOTT:  And do you know about how large
19      that team was, how many individuals were on it?
20              MS. LUETTO:  Overbroad.  Vague.
21              THE WITNESS:  I have no idea, Mr. Abbott.  I
22      don't have that information.
23         Q    MR. ABBOTT:  Fair enough.
24         A    I do know that we would have enough staff to
25      provide 24/7 coverage, but I don't know the -- the
```

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 26

```
1              You can respond.
2              THE WITNESS:  In regards to the medical -- let
3    me rephrase that.
4              The case manager or assistance coordinator
5    take -- seeks a recommendation from the medical team.
6    The medical team's recommendation is taken by the case
7    manager/assistance coordinator, and they make their
8    determinations or whatever process they follow on their
9    side in regards to the patient's plan.
10             But I can't speak any further to that because,
11   realistically, I don't -- I am not an assistance
12   coordinator.  I -- I don't speak to their processes and
13   procedures.
14        Q    MR. ABBOTT:  Okay.  So if we go to Case Note 11
15   here, "Dr. Lopez contacted AGA with the following
16   information:  SUB has had a heart attack - came in on
17   12/07 at 1949."
18             So is that Mr. Antl's treating physician
19   informing Allianz that Mr. Antl has had a heart attack?
20             MS. LUETTO:  The document speaks for itself.
21             You can respond.
22             THE WITNESS:  Yes, that would be my
23   interpretation of it.
24        Q    MR. ABBOTT:  And at that point, would the
25   diagnosis have been accepted or would Allianz have had
```

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 47

Melissa Capra

1  to do any additional diligence?

2           MS. LUETTO:  Objection.  Vague and ambiguous.

3           THE WITNESS:  I'm not sure I understand the

4  question.

5       Q   MR. ABBOTT:  Sure.

6           So is being told by Mr. Antl's treating

7  physician that he's had a heart attack enough for you --

8  for the medical team to accept his diagnosis as a heart

9  attack, or would they have needed any additional

10 information?

11      A   The medical team would have accepted the

12 diagnosis as a heart attack at this point.

13      Q   Do you know who JL Pressley is who it says

14 added this note here in Column E?

15      A   I don't know.  I -- my interpretation is it's a

16 case manager/assistance coordinator.  But I -- I don't

17 know specifically who he is.

18      Q   Is that -- okay.  Fair enough.

19      A   And, sorry to interrupt.  Is there a way to

20 make the text bigger or -- sorry.  It's -- just on my

21 screen, it looks very small.

22      Q   Is that helpful?

23      A   Yes.  Much better.  Thank you.

24      Q   Sure.

25          And I -- I know we talked about the time

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 48

1      Q   MR. ABBOTT:  And here in Case Note 14, another

2   medical case note, it looks like -- do you know who Don

3   O'Connor is?

4           MS. LUETTO:  Objection.  Vague.

5           THE WITNESS:  My understanding is that Don was

6   an RN for the medical team at that time.

7      Q   MR. ABBOTT:  And then case note here says,

8   "S/W."  Is that "spoke with"?

9      A   Yes, that's "spoke with," shorthand, just note

10  summary.

11     Q   "Spoke with Dr. Lopez who --" I guess I should

12  just ask to be clear -- "ADV."  Is that "advised"?

13     A   Yes, that's "advised."

14     Q   And "PT," is that shorthand for "patient"?

15     A   Yes.

16     Q   "Spoke with Dr. Lopez who advised that patient

17  is stable but will need transfer to other hospital for

18  ICU bed.  No beds available at current hospital.  RN

19  asked if patient required cardiac cath.  Dr. Lopez

20  advised that patient will need cardiac cath at some

21  point, but there is no urgency to be now."

22          So would the medical team have accepted that

23  statement from Mr. Antl's treating physician, that he

24  needed a cardiac catheterization, or would they have

25  needed to do -- would they have needed additional

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 52

Melissa Capua

1    information?

2              MS. LUETTO:  Overbroad.  Assumes facts.

3    Compound.  Vague.

4              You can respond.

5              THE WITNESS:  Based on the information in

6    context and the fact that it was being provided by what

7    we interpret as the treating -- treating physician of

8    Mr. Antl, we would understand that, yes, he would

9    require a transfer and a cardiac cath at some point.

10        Q    MR. ABBOTT:  And was the medical group at this

11   time asked to make a recommendation on whether a cardiac

12   catheterization was necessary?

13             MS. LUETTO:  Calls for speculation.  Vague.

14             THE WITNESS:  I'm sorry.  Asked by whom?

15        Q    MR. ABBOTT:  Let me -- let me rephrase that

16   question.

17             Is there a reason -- if there was an acceptance

18   that Mr. Antl needed a transfer and a cardiac

19   catheterization, is there a reason that Allianz didn't

20   simply approve those expenses at this time?

21             MS. LUETTO:  Beyond the scope of this witness's

22   deposition.  Argumentative.  Assumes facts.  Overbroad.

23   Compound.  Incomplete hypothetical.

24             You can respond.

25             THE WITNESS:  I can't speak to approving

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 53

Melissa Cargo

1    point.

2         Q    MR. ABBOTT:   And would there ever be an

3    instance if a treating physician recommended a

4    catheterization, that the medical team might not

5    recommend a catheterization for a patient having a

6    myocardial infarction?

7              MS. LUETTO:   Overbroad.   Vague.   Incomplete

8    hypothetical.   Calls for speculation.

9              You can respond.

10             THE WITNESS:   In my experience as chief medical

11   officer, during my tenure as chief medical officer, I

12   did not encounter any cases where we would not recommend

13   a cardiac catheterization.

14             I think it -- again, I'm speaking to my

15   experience, to the experience and recommendations of

16   medical teams that was under me at that time.

17   Realistically, I don't see -- a situation does not come

18   to mind where we would not recommend a cardiac

19   catheterization.

20        Q    MR. ABBOTT:   Why is it -- why is a cardiac

21   catheterization -- let me start generally.

22             Why is a cardiac catheterization important for

23   a patient having a heart attack?

24             MS. LUETTO:   Overbroad.   Vague and ambiguous.

25   Beyond the scope of this witness's deposition.   Calls

```
1    for an expert opinion.  It's an incomplete hypothetical.

2    Sorry.  Excuse me.

3            Go ahead.

4            THE WITNESS:  No worries.  I am not going to

5    respond to that question.  I'm a GP.  It's out of my

6    area of specialty.  I am not a cardiologist or a cardiac

7    interventionist.

8            I know that some heart MIs require cardiac

9    cath; some might not.  So I -- I can't speak to the

10   details as to why a case would or would not require one.

11       Q   MR. ABBOTT:  Do you know specifically why

12   Mr. Antl needed a cardiac catheterization?

13           MS. LUETTO:  Assumes facts.  Overbroad.  Beyond

14   the scope of this witness's deposition.  Calls for

15   expert opinion.

16           You can respond.

17           THE WITNESS:  Again, I am not a cardiologist.

18   I'm not a cardiac interventionist.  So I wouldn't be

19   able to be the most suited to respond to that question.

20       Q   MR. ABBOTT:  And do you know if -- well,

21   scratch that.

22           Would you agree generally with the proposition

23   that someone's treating physicians are in a better

24   position to determine what's medically necessary for

25   them than -- scratch that question too.
```

Boris Antl vs. AGA Service Company, et. al.

Focus Litigation Solutions

Page: 57

Melissa Cargo

1    40 minutes of that time stamp.  They were trying to call

2    the information (verbatim), to get more information.

3            However, at the end of the day, this

4    information is also being provided to us by an agent,

5    not by a hospital, physician, or any -- and there's no

6    context being provided as to where the agent is getting

7    this information from.

8            So the medical team is working on it.  They are

9    trying to call to get information.  They are already

10   working.  And I believe a few short notes after that,

11   the RN actually speaks with Dr. Syverud or the guy who

12   whose name I'm going to butcher -- I believe his first

13   name is Scott; so we will stick with Dr. Scott

14   Syverud -- and is discussing the case based on the

15   medical review of the report that she's just been

16   reading in the previous notes and so forth.

17           So the two hours is taken, observed by the

18   medical team.  They review it.  They contact the

19   hospital, attempt to try and get that information and

20   keep the case moving with their medical recommendation.

21      Q    Got it.

22           So then we see here at 47, "M.D."  "Dr. S at

23   UVA to RN department."  And this is 1:38 Eastern Time.

24           So it says here, "Dr. S agreed patient requires

25   ground ambulance transfer for cardiac catheterization."

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 79

Melissa Cagno

1   So does this mean -- well, would this have

2   meant that the medical team would have asked him for a

3   recommendation about ground transportation and a

4   catheterization?

5           MS. LUETTO:  Calls for speculation.  Vague.

6           THE WITNESS:  The medical team would have

7   contacted him to discuss what was being received via the

8   medical record.  They probably -- but, again, I can't

9   speak to if they mention the two hours or any other

10  information.  I don't -- I wasn't on the call.  I don't

11  have the call.  I don't know what they spoke to in

12  detail.

13          But, essentially, they're discussing the case

14  with him, advising him this case might require a cardiac

15  catheterization, and he is giving his expert

16  recommendation that, yes, the patient is stable to

17  transport from one hospital to another based on the

18  medical records that we have and that a cardiac

19  catheterization is medically appropriate.

20      Q   MR. ABBOTT:  So if Dr. S agreed that a cardiac

21  catheterization was appropriate, would anyone at Allianz

22  have disagreed with that?

23          MS. LUETTO:  Calls for speculation.  Incomplete

24  hypothetical.  Overbroad.  Vague.

25          THE WITNESS:  There's no reason per my

Melissa Caspo

```
 1      understanding of the processes that anybody would
 2      medically disagree with his recommendations on the
 3      Allianz side.
 4          Q    MR. ABBOTT:   So would a catheterization be
 5      considered, you know, recommended by the medical group
 6      at this point in time?
 7              MS. LUETTO:   Objection.   Vague.   Compound.
 8              THE WITNESS:   The medical team is recommending
 9      a cardiac catheterization.   I believe if you scroll down
10      one or two more notes, there's a recommendation.   And
11      the medical team clearly states -- yeah, hold on just a
12      second.   Case Note 51 on line 565, "RN medically
13      recommends ground ambulance transfer to second hospital
14      for ICU bed and cardiac catheterization."
15              The medical team is recommending it.   It's just
16      a few moments after RN Linda speaks with -- with
17      Dr. Scott.
18          Q    MR. ABBOTT:   Got it.
19              And so that is a recommendation for both the
20      transport and the ICU admission and the catheterization.
21      Correct?
22          A    That is correct.
23          Q    And when it says here in Case Note 49, which is
24      an RN note, "Sending hospital does not have available
25      ICU beds and wishes patient to have cath today, if
```

Boris Antl vs. AGA Service Company, et. al.
Focus Litigation Solutions

Page: 81

1          STATE OF CALIFORNIA      )

2                                   )   ss.

3          COUNTY OF EL DORADO      )

4               I hereby certify that the witness in the

5     foregoing Rule 30(b)((6) deposition of AGA Service

6     Company, Melissa Castro, was by me duly sworn to testify

7     to the truth, the whole truth, and nothing but the

8     truth, in the within-entitled cause; that said

9     deposition was taken at the time and place herein named;

10    that the deposition is a true record of the witness's

11    testimony as reported by me, a duly certified shorthand

12    reporter and a disinterested person, and was thereafter

13    transcribed into typewriting by computer.

14               I further certify that I am not interested in

15    the outcome of the said action, nor connected with, nor

16    related to any of the parties in said action, nor to

17    their respective counsel.

18               IN WITNESS WHEREOF, I have hereunto set my hand

19    this 10th day of October, 2023.

20    Reading and Signing was:

21       requested        waived   X  not requested

22

23

24    -----------------------------

25          KIMBERLY J. WALDIE, CSR 8696, RPR

# EXHIBIT D

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


BORIS ANTL, an individual,

              Plaintiff,

    V.                           2:22-cv-00504-KJM-AC

AGA SERVICE COMPANY, a Virginia

corporation, JEFFERSON INSURANCE

COMPANY, a Virginia corporation,

and DOES 1-10, inclusive,

              Defendants.

_____/


VIDEOTAPED DEPOSITION OF BORIS ANTL

APPEARING REMOTELY FROM PRAGUE, CZECH REPUBLIC

_____

FRIDAY, APRIL 7, 2023; 10:02 A.M.


REPORTED BY:  DONNA J. WILLIAMS, CSR NO. 11133

JOB NO.:  954335



```
 1                    I N D E X

 2                                              PAGE

 3   PROCEEDINGS                                   4

 4   EXAMINATION OF BORIS ANTL

 5       BY MS. LUETTO                             6

 6

 7

 8                  E X H I B I T S

 9   EXHIBIT          DESCRIPTION          PAGE

10

11                      (NONE)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 100

            1    he said, well, that's what we're here for.  And I
            2    felt fantastic.  I felt better than I felt in many,
            3    many years.
12:34    4        Q.  Okay.  Did the doctor explain to you why you
            5    felt better?
12:34    6        A.  Yes.
12:34    7        Q.  What did he tell you?
12:35    8        A.  He said, you know, your blood is flowing
            9    normally the way it should.
12:35   10       Q.  Did he indicate to you any opinion that
           11    you'd had an occluded artery before the heart attack?
12:35   12       A.  Well, there were several doctors.  There was
           13    doctors and there were guy who performed the surgery.
           14    The one who performed the surgery, he didn't really
           15    say almost a word.  But the doctors before and after,
           16    they talked to me about things.
12:35   17       Q.  What did -- what did they tell you?
12:35   18       A.  Well, before the surgery they told me as I
           19    told you before, that I needed the surgery right
           20    away, and it was being delayed, delayed, delayed, and
           21    after the surgery, that's what I mentioned earlier
           22    and I said I feel fantastic.
12:35   23       Q.  My question was a little bit different.  It
           24    was did anyone offer the opinion that you had
           25    probably had an occluded artery before you had the



Page 104

```
12:40  1        Q.  Okay.  What were you told --
12:40  2            Okay.  What did Myra tell you about the need
       3    for the procedure?  And by Myra I'm talking about
       4    this physician.  I think her name is Dr. Myra
       5    Valenzuela Fuentes.  What did she tell you about your
       6    need for the procedure?
12:40  7            A.  Well, No. 1, she was there for, you know,
       8    several days.  So I saw her several times.  And she
       9    was the one who was, I believe, in touching with
      10    Allianz quite a bit, because when I started writing
      11    she said, no, I will take care of it because I could
      12    not write anything consistent an more.  And she told
      13    me things are bad, I need a surgery immediately, and
      14    she's trying to get authorization.  And she also told
      15    me that the administration at the hospital is trying
      16    to get at least a guarantee of payment so they could
      17    proceed.  And she told me things are very serious.  I
      18    could be dying any moment.
12:41 19        Q.  Okay.  Did any other physician tell you
      20    about your condition --
12:41 21        A.  Go ahead.  Sorry.
12:41 22        Q.  I'm sorry.  Let me ask again so it's a clean
      23    question.
12:41 24            Did any other physician tell you about your
      25    medical condition before the procedure?
```



12:43  1        Q.  Did you have the financial ability to pay

       2   for that procedure notwithstanding how much cash you

       3   were carrying?

12:43  4        A.  Not at all.  I had a few hundred dollars.

12:43  5        Q.  Did you have a credit card?

12:43  6        A.  Yes.

12:43  7        Q.  Okay.  Could you have paid -- could you have

       8   paid for that medical care with a credit card?

12:43  9             MR. ABBOTT:  Objection.  Sorry.  Objection;

       10  calls for speculation.

12:43 11             You can answer, Boris.

12:43 12             THE WITNESS:  I'm sorry, what was question

       13  again?

12:43 14   BY MS. LUETTO:

12:43 15        Q.  Could you have paid for the medical care at

       16  Clinica de Los Andes?

12:43 17        A.  Personally, no.  I had no money.

12:43 18        Q.  Did you have a credit card available to you

       19  for use?

12:44 20        A.  Yes.

12:44 21        Q.  Could you have used that credit card?

12:44 22        A.  I never asked about it.

12:44 23             MR. ABBOTT:  Sorry.  Again, calls for

       24  speculation, and then you can answer.

12:44 25             THE WITNESS:  I'm sorry, I don't understand



1    what's going on.

12:44  2              MR. ABBOTT:  Sorry.  So I haven't objected

3    in a while or really at all, but please let her

4    finish her question, then give me a chance to make an

5    objection, and then, unless I instruct you not to

6    answer, please answer the question she asked.

12:44  7              THE WITNESS:  Which was the question again

8    please?

12:44  9              MS. LUETTO:  I'll ask the question again.

12:44 10         Q.  I understand you weren't carrying much cash,

11   but could you have used your credit card if they

12   accepted a credit card to pay for your procedure?

12:44 13              MR. ABBOTT:  And, objection, calls for

14   speculation.

12:44 15              MS. LUETTO:  You can respond.

12:44 16              THE WITNESS:  Should I answer?

12:44 17              MR. ABBOTT:  Yes, answer please.

12:44 18              THE WITNESS:  Well, the limit on my credit

19   card was probably some $5,000, which wouldn't pay for

20   anything except the room maybe.

12:44 21   BY MS. LUETTO:

12:44 22         Q.  So you're telling me --

12:45 23         A.  And I didn't even ask if I could use it

24   because I knew the limit I had was a fraction of what

25   the cost would be.



12:45 1    Q.  Okay.  So your testimony is your credit card
2    had only a $5,000 limit?

12:45 3    A.  I do not know exactly the limit, but
4    something like that.  I do not know exactly.

12:45 5    Q.  What credit --

12:45 6         Go ahead, finish your answer.

12:45 7    A.  I don't know exactly, but it was not, you
8    know, I had no idea how much it would cost, No. 1,
9    and, No. 2, the limit I had was definitely not enough
10   to pay for it.

12:45 11   Q.  Do you know how much -- do you know how much
12   it cost after the fact?

12:45 13   A.  After the fact I do, yeah, yeah.

12:45 14   Q.  What's your understanding of what -- what
15   your stay at Clinica de Los Andes cost and your
16   procedure?

12:45 17   A.  If I remember correctly from the records I
18   received, somewhere between 15 and 16 thousand
19   dollars.

12:46 20   Q.  All right.  Were you carrying only a single
21   credit card with you?

12:46 22   A.  Probably.

12:46 23   Q.  Do you recall one way or the other?

12:46 24   A.  I don't remember, no.

12:46 25   Q.  So is it your testimony --



12:46  1          Let me just make sure we're really clear.

       2  You recall only a single credit card.  Right?

12:46  3      A.  Yes, uh-huh.

12:46  4      Q.  And it's your testimony that your single

       5  credit card had a limit of around $5,000?

12:46  6      A.  That's speculation.  I don't know how much

       7  it was, but it was not -- I assumed that it's going

       8  to cost another 10, 20, 30 thousand dollars, and I

       9  had no -- no limit, no access to such money through a

      10  credit card.  And I didn't ask.  I don't think they'd

      11  accept a credit card, to be honest, but something --

      12  that's, again, that's my impression.

12:46 13      Q.  What credit card --

12:46 14      A.  They didn't ask for it.  They would have

      15  asked if it was possible.

12:46 16      Q.  Is it possible they asked you and you don't

      17  recall that?

12:47 18      A.  No, they did not ask me.  For sure they

      19  didn't ask me.

12:47 20      Q.  Okay.  What credit card were you carrying?

12:47 21      A.  I think it was a Visa from Bank of America.

      22  But, again, I should say I changed credit cards a few

      23  times over the last ten years, so I don't know what

      24  which card I had.

12:47 25      Q.  Okay.  Was it your custom and practice to



1   travel with a credit card with a fairly -- with a

2   limit of around $5,000 while being away from home for

3   months on end?

12:47  4        A.  At the time traveling in Argentina having a

5   few thousand dollars in cash and credit card and a

6   debit card was absolutely enough.

12:47  7        Q.  Okay.  You were carrying a debt card as

8   well?

12:48  9        A.  Yes.

12:48 10        Q.  Could you have paid for a medical procedure

11   with money in the bank, that you had in the bank?

12:48 12        A.  I'm sorry, again?

12:48 13        Q.  Could you have personally paid for that

14   procedure with money that you had in the bank?

12:48 15            MR. ABBOTT:  And, objection, calls for

16   speculation.

12:48 17            You can answer.

12:48 18            THE WITNESS:  I possibly had enough money in

19   the bank, but I do not remember.  It might be

20   invested.  It might be in my IRA.  I don't know.

21   But, again, I don't carry balances of thousands and

22   thousands of dollars in my bank.

12:48 23   BY MS. LUETTO:

12:48 24        Q.  Let me put it this way.  Is it possible, did

25   you have the financial ability to have paid for that



1  procedure yourself regardless of how you accessed the
2  money?  Whether it's a credit card or debit card or
3  something like that, did you have the financial
4  wherewithal to pay for that procedure yourself?
12:49  5      A.  Yes, if I liquidated some of my investments,
6  yes.
12:49  7      Q.  And it's my understanding that you didn't
8  make any effort to try to pay for that procedure
9  yourself.  Correct?
12:49  10      A.  Correct, I didn't try because I had
11  insurance.  I had a policy from you to pay for it.
12  It never even occurred to me I should be paying for
13  it.  It didn't occur to me it was going to take you
14  five days to authorize it.
12:49  15      Q.  Okay.  And when you're referring to me,
16  you're talking about Allianz?
12:49  17      A.  Yes.  Of course.  I'm sorry.
12:49  18      Q.  All right.  Did anyone tell you you could
19  not pay for the treatment yourself?
12:50  20      A.  Again please?
12:50  21      Q.  Did anyone at Clinica de Los Andes tell you
22  that you were not allowed to pay for your own medical
23  care?
12:50  24      A.  It was never discussed.
12:50  25      Q.  All right.  Did anyone at Clinica de Los



Page 113

12:51  1        A.  I do not know.

12:51  2        Q.  Okay.

12:51  3        A.  I don't know.

12:51  4        Q.  Okay.  Did you understand it to mean that if

        5   your situation got worse, they would perform surgery

        6   on you without regard to Allianz and your insurance

        7   because it was an emergency?

12:52  8        A.  Again please the question?

12:52  9            MS. LUETTO:  Donna, would you mind reading

       10   that back please?

12:52 11            (Record read.)

12:52 12            THE WITNESS:  Yes, the way I would answer

       13   it, it's was the first time I had heard that, but,

       14   No. 2, immediately -- I was immediately very shortly

       15   after this letter was sent -- Allianz provided a

       16   guarantee to pay so that I didn't have to think about

       17   it.

12:52 18   BY MS. LUETTO:

12:52 19        Q.  But to be very clear, you did understand

       20   what she meant.  Right?

12:52 21        A.  I don't know what she meant, no.  I don't

       22   know she meant that I'm going to die if nothing is

       23   done.

12:53 24        Q.  Let me ask the question just one more --

12:53 25            I'm sorry, Donna, would you mind reading the



1    until I read the medical reports that came, I

2    believe, from Allianz.  I was never given a report.

3    If so, I need a doctor to understand it especially

4    since it was in Spanish.

13:02  5    BY MS. LUETTO:

13:02  6        Q.  It's my understanding that you could read

7    Spanish however.  Is that correct?

13:02  8        A.  Correct, but, you know, specialized

9    medicine, you know, medical terms, no.

13:02  10        Q.  Did you read -- did you ever read your

11    medical records from Hospital Puerto Montt?

13:02  12        A.  I never got too much.  I got to the EKG's

13    and I got the echocardiograms and I got the -- from

14    the surgery I got the video which they made a

15    pictures of it what happened.  So I got this, but I

16    never got anything else.

13:03  17        Q.  You mentioned you got the video.  What -- do

18    you have something separate from the video?  Do you

19    have still photographs from that video?

13:03  20        A.  To be honest, I never looked at the video.

21    I just gave it to my cardiologist in Prague, and I

22    also gave it to my counsel.

13:03  23        Q.  A moment ago you said pictures.  Did you get

24    pictures as well?

13:03  25        A.  I don't think so.



```
         1   obtain medical care?
13:57    2         A.  Again, question please?
13:57    3         Q.  Did you understand that there was a plan in
         4   place to provide medical care to you?
13:57    5         A.  Of course.  He was driving to the hospital
         6   to get medical care, yes.
13:57    7         Q.  To take care -- to take care of you because
         8   of your heart attack.  Is that your understanding?
13:57    9         A.  Yes, yes, yeah.
13:57   10         Q.  So my question is what were you waiting for
        11   Allianz to call and tell you about your medical care
        12   at that point?
13:58   13         A.  Well, when you read the contract they said
        14   that they will assist me finding the best doctor and
        15   responding.  Here they didn't do anything.  And they
        16   could have called me right back and saying you should
        17   be going to this hospital here, arranged for the
        18   payment.  They didn't do any of that.  They just let
        19   go for five days.
13:58   20         Q.  Is it your understanding that they did
        21   nothing for five days?
13:58   22         A.  Yes.
13:58   23         Q.  What do you base that on?
13:58   24         A.  Well, because I had to wait five days for
        25   the surgery.
```



MAGNA
LEGAL SERVICES

Page 152

13:59  1      Q.  When did you first learn that you needed a
       2  surgical procedure?

13:59  3      A.  I think in the first hospital.

13:59  4      Q.  After you received -- after you arrived at
       5  Hospital Puerto Montt?

13:59  6      A.  Yes.

13:59  7      Q.  Was it after they performed tests on you?

13:59  8      A.  I assume.

13:59  9      Q.  Do you know?  Do you know?

13:59 10      A.  I do not know, but they did some tests of --
      11  to see what's going on.

14:00 12      Q.  Do you have any information or facts that
      13  Allianz intentionally delayed to cause you harm?

14:00 14      A.  I don't know.

14:00 15      Q.  Do you have any information or facts that
      16  Allianz had any intention of causing you harm?

14:00 17      A.  Not really, no.

14:00 18      Q.  Do you have any facts or information that
      19  Allianz intended to be reckless with your -- with
      20  your claim or with your care?

14:00 21      A.  They were reckless.

14:00 22      Q.  How were they reckless?

14:01 23      A.  They didn't respond for five days.

14:01 24      Q.  When you say they didn't respond for five
      25  days, are you talking about responding to you or are



Page 153

1    you talking about responding to anyone?

14:01  2        A.  To anyone, authorizing the surgery.

14:01  3        Q.  So you're not saying responding; you're

4    saying not authorizing the surgery.  Is that correct?

14:01  5        A.  That's correct.

14:01  6        Q.  When you're saying responding, you're saying

7    making a decision; you're not saying communicating.

8    Is that correct?

14:01  9        A.  Yes.  There was some communication, but they

10   did not -- when I say reckless, they did not

11   authorize it, authorize the surgery or guarantee the

12   payment.

14:02  13       Q.  How do you know that?

14:02  14            I'm sorry, did you not hear my question?  I

15   said how do you know that?

14:02  16       A.  Well, it's a fact.  I mean, facts are

17   speaking for themselves here.

14:02  18       Q.  What do you base that on?

14:02  19       A.  My knowledge.

14:03  20       Q.  And my question is -- strike that.

14:03  21            Do you have any facts or information that

22   Allianz intentionally disregarded your safety and

23   health to cause you harm?

14:03  24       A.  No.

14:03  25       Q.  Do you have any facts or information that



Page 154

```
           1    Allianz or any act or conduct by them was willful?
14:03      2         MR. ABBOTT:  Objection; calls for a legal
           3    conclusion.
14:03      4    BY MS. LUETTO:
14:03      5         Q.  You can respond.
14:03      6         A.  Could you repeat the question again please?
14:03      7         Q.  Of course.
14:03      8         Do you have any facts or information that
           9    any act or conduct by Allianz was willful?
14:03     10         MR. ABBOTT:  Same objection.
14:03     11         THE WITNESS:  Yes.  All they talked about in
          12    these logs is money, but not providing a service
          13    which I paid and putting my life in danger.
14:03     14    BY MS. LUETTO:
14:04     15         Q.  Do you understand what discussions about
          16    money in the log notes were about?
14:04     17         A.  I'm puzzled.  I do not understand it.  I
          18    don't understand how anybody could do anything like
          19    that.
14:04     20         Q.  Do you understand that the hospital was
          21    requesting a guarantee and those were the dollar
          22    figures being requested?
14:04     23         A.  There are two questions together.  Could you
          24    separate them?
14:04     25         Q.  Of course.
```



MAGNA ▶
LEGAL SERVICES

            1    profession, but in my business dealings if anybody

            2    asked like this, I'd go this is fraud.  I paid -- I

            3    paid for something, and I didn't get it.

14:06   4    Q.  Your medical care was paid for.  Correct?

14:06   5    A.  Medical care where?

14:06   6    Q.  Everywhere.  Any place that requested

            7    payment for your -- for your medical.

14:06   8    A.  In Chile?

14:06   9    Q.  Yes, correct.

14:06  10    A.  In Chile, yes, everything was paid for,

           11    correct.

14:07  12    Q.  Do you have any information or facts that

           13    any act or conduct by Allianz was malicious?

14:07  14    A.  Same reply as before.  I purchased a

           15    service, I didn't get it, and I waited for five days

           16    and put my danger -- my life in danger.

14:07  17    Q.  What service did you not get for five days?

14:07  18    A.  Authorization to proceed with the surgery,

           19    or guarantee payment for it at least.

14:08  20    Q.  And when did you first know that -- we

           21    talked about it.  Strike that.

14:08  22        I'm trying to understand how you calculate

           23    the five days.

14:08  24    A.  Question?

14:08  25    Q.  No, I'll withdraw that question.



Page 163

14:17  1           MR. ABBOTT:  Objection; calls for

       2   speculation.

14:17  3           And you can answer.

14:17  4           THE WITNESS:  I have seen at least seven

       5   cardiologists following the -- following my stay at

       6   the Clinica de Los Andes --

14:18  7           (Reporter interruption.)

14:18  8           THE WITNESS:  I have seen about seven

       9   cardiologists following my treatment at Clinica de

       10  Los Andes, and all of those discussions were kind of

       11  positive saying you had a heart attack, your -- you

       12  have (inaudible) number, whatever it is called, of

       13  the heart running at 45 to 50 percent, but that's

       14  quite normal after heart attack, and you could lead a

       15  normal life.

14:18  16          And it was consistent --

14:18  17          Of course all the cardiologists, we then

       18  discussed life-style and, you know, taking the

       19  medicine and seeing other doctors until September of

       20  '20 -- '21, sorry, when I saw Dr. Chamik for my

       21  regular -- for my regular checkup, and he broke the

       22  news to me saying that my life-span is going to be

       23  shortened because of the delay in the surgery and the

       24  damage caused by it.

14:19 25          And I should add that I asked him again,



Page 228

```
16:28  1    STATE OF CALIFORNIA      )

16:28  2                             )

16:28  3    COUNTY OF SACRAMENTO      )

16:28  4

16:28  5            I, Donna J Williams, a Certified Shorthand

       6    Reporter, do hereby certify:

16:28  7            That prior to being examined, the witness in

       8    the foregoing proceedings was by me duly sworn to

       9    testify to the truth, the whole truth, and nothing

      10    but the truth;

16:28 11            That said proceedings were taken remotely

      12    before me at the time and places therein set forth

      13    and were taken down by me in shorthand and thereafter

      14    transcribed into typewriting under my direction and

      15    supervision;

16:28 16            I further certify that I am neither counsel

      17    for, nor related to, any party to said proceedings,

      18    not in any way interested in the outcome thereof.

16:28 19            In witness whereof, I have hereunto

      20    subscribed my name.

16:28 21

16:28 22            Donna J. Williams

16:28 23            Donna J Williams

16:28 24            CSR No. 11133

16:28 25
```



# EXHIBIT E

| Note ID | Note Type | Subject | Description | Added By | Datetime Added |
|---|---|---|---|---|---|
| | | | Warm transfer from TCSR Carol - Carol said that as we speak SUB is on his way to the hospital and SUB is having a heart attack, Carol doesn't know CURLO<br><br>AC spoke to Maggie, the interpreter, someone (SUB or the ambulance - unknown at this stage) was on the line and the line is breaking and the only thing they relayed to Maggie was Puerto Montt possibly in Chile and who is paying the medical bill and then the call disconnected | | |
| 1 | INCL | SUB OR AMBULANCE --> AGA | AC thanked Maggie for help | Dina Berik | 12/07/2014 3:03PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Sunday, December 07, 2014 3:40 PM<br>To: 'AZGA-RN@allianz-assistance.ca'<br>Subject: Case #3196098<br><br>Greetings,<br><br>FYI ¿ new intake ¿ case #3196098. At this stage we don¿t know very much apart from SUB having a heart attack and on his way to the hospital per the ambulance representative (?). Hospital is unknown. Possibly in Puerto Montt in Chile (?) and DX is heart attack ¿ it was all the interpreter told me that they have communicated with her on. I will try to find out today which hospital SUB is in.<br><br>Thank you.<br><br>Dina Berik | | |
| 2 | OUTEM | AC --> RN | Assistance Coordinator I, USA | Dina Berik | 12/07/2014 3:39PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Sunday, December 07, 2014 3:56 PM<br>To: 'boris_antl@yahoo.com'<br>Subject: Case #3196098<br><br>Greetings Mr. Antl,<br><br>We have received a phone call from an ambulance representative saying that you are on the way to the hospital. Unfortunately we didn¿t manage to speak as the line was bad and eventually the call has been disconnected. | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | If you need our assistance please call us back at +1 804.673.1173 (you can call collect from a hospital or a landline) and we are open 24/7. You can also e-mail us at assistance.group@allianzassistance.com ¿ whenever you e-mail us or call us please reference your case #3196098.<br><br>Thank you.<br><br>Dina Berik | | |
| 3 | OUTEM | AC --> SUB | Assistance Coordinator I, USA | Dina Berik | 12/07/2014 3:56PM |
| 4 | RN | Rn next steps | monitor for admission<br>if admitted-need facility eval and new case procedures.<br>obrn | Borges,Orsoyla | 12/07/2014 4:14PM |
| 5 | OUTCL | AC --> SUB | 510/735-6462 - left VM | Dina Berik | 12/07/2014 4:41PM |
| 6 | OUTCL | AC --> INTERPRETER --> HOSPITAL | AC dialed the interpreter line and Paula will be assisting<br><br>AC dialed:<br><br>Hospital Puerto Montt<br>+56 65 2 362698<br><br>Karim says that SUB is not there<br><br>Karim suggested we call:<br><br>Clínica Los Andes de Puerto Montt<br>Address: Avenida Bella Vista, 123, Puerto Montt, Los Lagos, Chile<br>Phone:+56 65 228 9193<br><br>or<br><br>Clinica Puerto Montt<br>Panamericana Sur<br>Puerto Montt, Chile<br>+56 65484800<br><br>AC will try with Paula to call other hospitals<br><br>AC told Paula to thank Karim for her help<br><br>Karim disconnected | Dina Berik | 12/07/2014 5:09PM |
| 7 | OUTCL | AC --> INTERPRETER --> HOSPITAL | AC dialed<br><br>Clinica Puerto Montt<br>+56 65 2484830<br><br>SUB is not there<br><br>AC was going to dial the next hospital but Paula disconnected | Dina Berik | 12/07/2014 5:10PM |

| | | | | | |
|---|---|---|---|---|---|
| 8 | OUTCL | AC --> INTERPRETER --> HOSPITAL | AC dialed with Maggie on the line - Clinica Los Andes de Puerto Montt at all the numbers below several times:<br><br>Informaciones 065 2289132<br>Central Telefónica 065 2289142<br>Ambulancia 065 2289911<br>Urgencia Adultos 065 2289149<br><br>Noone is picking up but it rings as normal<br><br>AC thanked Maggie for her assistance<br><br>Both disconnected | Dina Berik | 12/07/2014 5:22PM |
| 9 | CASE | ***NEXT STEPS*** | - call all the hospitals once again tomorrow to see if SUB has been admitted<br>- keep an eye on a response from SUB or a hospital about SUB's admission | Dina Berik | 12/07/2014 5:33PM |
| 10 | VC | ***VC***VC***VC***VC***VC*** | Name of the product: Classic Plan<br><br>Deposit Date: 07/18/2014<br>Purchase Date: 10/03/2014<br>Departure Date: 10/09/2014<br>Return Date: 01/21/2015<br><br>Emergency Medical Transportation $500,000.00<br><br>Baggage Coverage $1,000.00<br>Baggage Delay Coverage $300.00<br>Change Fee Coverage $250.00<br>Frequent Traveler/Loyalty Plan Coverage $250.00<br>Missed Connection Coverage $800.00<br>Emergency Medical and Dental $25,000.00<br>Trip Cancellation Protection<br>Travel/Trip Delay Coverage $800.00<br>Trip Interruption Protection<br><br>Emergency Medical and Dental benefits are primary and there is no deductible.<br>There is a $750 maximum for all covered dental expenses.<br><br>Pre-ex waiver available: N<br><br>Purchased within 14 day of deposit: N<br><br>Look back dates: 06/05/2014 - 10/03/2014 | Dina Berik | 12/07/2014 5:46PM |
| | | | Dr. Lopez contacted AGA with the following information:<br>SUB has had a heart attack - came in on 12/07 at 1949<br>Chest pain has decreased - now stable<br>Where the SUB is located now, they are unable to treat him and have no more beds | | |

| | | | | | |
|---|---|---|---|---|---|
| 11 | CASE | PH information | SUB needs to be transported to Los Andes Clinic for more critical care<br>Los Andes will not accept SUB until AGA contacts them with policy information<br>Admission office is not open at the time of the call<br>Can be reached at 9am (2 hr ahead of US)<br>+56 65 228 9110, 9111, 9316<br>Dr. Lopez can be reached +56 65 236 2715 | JL Pressley | 12/08/2014 12:33AM |
| 12 | CASE | Outbound to AGA Nurse | Spoke with Don<br>Advd of the case and the need for transport<br>Verified he had Dr. Lopez's phone number<br>Stated he would reach out to Dr for further information | JL Pressley | 12/08/2014 12:41AM |
| 13 | RN | MAS to RN | Called inform Rn that a Dr. Lopez called to adv that pt had MI and will need to be transferred to other hosp as there is no ICU bed available at current hosp. CM adv RN that receiving hosp will not accept pt until billing arranged, billing depart not open until 0900. Rn will contact Dr. Lopez. | Don O'Connor | 12/08/2014 1:16AM |
| 14 | RN | RN to TMO Dr. Lopez with intrep (662413) | S/w Dr. Lopez who adv that pt is stable but will need transfer to other hosp for ICU bed. No beds availabe at current hosp. Rn asked if pt required cardiac cath. Dr. Lopez adv that pt will need cardiac cath at some point but there is no urgency to be now. Dr. Lopez adv that they are capable of looking after pt at current location until can be transferred. Dr. lopez adv that receiving hosp Los Andes Clinic can send ground ambulance for pt to be transferred once we have contacted the hosp.<br>Rn adv will contact hosp in am to arrange billing and ground transfer of pt. | Don O'Connor | 12/08/2014 1:22AM |
| 15 | RN | RN next steps | await transfer to Los Andes Clinic for ICU bed<br>MC hosp tx, px, elos, stt/tn | Don O'Connor | 12/08/2014 1:24AM |
| 16 | INCL | Don w/AZGA--->AGA | Don called to s/w JL. AC adv on another call. Don wanted to ensure we reach out to receiving hosp first thing this am when they open to arrange billing with them so sub can be received there. AC adv would do. Thanked. | Eric Lee | 12/08/2014 1:48AM |
| 17 | RN | RN Review | We need to know hospital that pt is currently at. Then facility review for both<br>We need to know type of MI, current status-? CP, ? SOB -tx: medications/O2?. Blood values-troponin, etc.<br>PMH -? pt has any cardiac hx-need to clear pre-ex<br>We need to know how far away the receiving hospital is from current hospital.<br>Need to review with UVA once we have more information | Bergeron,Linda | 12/08/2014 8:39AM |
| 18 | INCL | RN Shannon->CM->Dr. Lopez +56 65 236 2715 | Shannon tried this number but did not go through.<br>CM called the number and conf'd Shannon once connected. | Yoko Gary | 12/08/2014 9:01AM |

| | | | | | |
|---|---|---|---|---|---|
| 19 | RN | Rn to Dr Lopez, then Los Andes clinic | RN could not get call to engage to CN 11 #s- US treid and was able to engage call- s/w ICU nurse who adv pt has been already transferred to Los Andes clinic- gave # to there 011 56 65 22 89 142. Dr Lopez not there to s/w us. SMRN | Mangan,Shannon | 12/08/2014 9:13AM |
| 20 | RN | RN to Los Andes Clinic 011 56 65 22 89 142 | RN with voiance # 661236 to clinic- no reception avail- have to pick admitted, then intensive care, then tried to s/w ICU staff but they could not hear us. Tried to cb x3 but could not get through. Need to activate an agent for med info. SMRN | Mangan,Shannon | 12/08/2014 9:16AM |
| 21 | RN | RN to US - need to activate an agent | RN requested to activate agent- need facility review of both hosptials, and initial med info for pt and pla of care. They will activate now. SMRN | Mangan,Shannon | 12/08/2014 9:21AM |
| 22 | OUTCL | AC---> Interpreter--->TMO | Interpreter Maggie<br><br>TMO Daniela Loeben on the phone, she is treating the PT.<br>She is requesting an email for the medical report: Dani_loeben@yahoo.com<br>The hosp doesn't provide the invoice before the PT is discharged.<br>The name of the Hosp is: "Hospital Base de Puerto Montt",<br>The phone number of the Hosp is:+56.65.490.206<br><br>TMO will contact the second hosp to arrange the transfer.<br>The phone number of the second Hosp is: +56.65.228.9142 (front desk).<br><br>TMO is requesting to be reach at 2PM Chile time (+56 65 236 2715)<br><br>PT needs to be transfer asap, maybe today.<br><br>PT's phone number is:+56.821.37.350 | Laurent Beausergent | 12/08/2014 10:26AM |
| | | | Interpreter Maggie<br><br>Hospital's front desk: +65.228.9142<br>Billing departement is closed for the day (holiday)<br>Phone number: +65.289.166 or +65.289.112<br>Contact:Rodriguo Abila<br><br>Email address:admissionurgencia@clinicande.cl<br><br>Today<br>Contact:Marly Uribe<br>Phone number: +65.289.149<br><br>Email address is: urgenciaclinandes@gmail.com | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | She works until 8PM (chile time) | | |
| 23 | OUTCL | AC--->Interpreter--->Hosp los Andes | She stated that the hospital needs AGA letter of guarantee before any admission. They are able to receive the PT. She doesn't know a quote for this kind of admission. | Laurent Beausergent | 12/08/2014 10:31AM |
| 24 | CASE | email address | . | Beausergent | 12/08/2014 10:42AM |
| 25 | OUTEM | Email to TMO: Medical report request | From: Beausergent, Laurent (Allianz Global Assistance) On Behalf Of AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 08, 2014 10:45 AM<br>To: 'Dani_loeben@yahoo.com'<br>Subject: #3196098 _ Boris Antl<br><br>Hello Dr Loeben,<br>Per our conversation, can you send the medical report regarding this patient:<br>-Boris Antl<br>-Date of Birth : 09 November 1945<br><br>My email address is:<br>assistance.group@allianzassistance.com<br><br>Thank you very much and I will contact you this afternoon at 2PM (Chile time).<br><br>Cheers<br><br>Laurent Beausergent | Laurent Beausergent | 12/08/2014 10:45AM |
| | | | _____<br>_____<br><br>From: Mail Delivery Subsystem [mailto:MAILER-DAEMON@mailgw.allianz.de]<br>Sent: Monday, December 08, 2014 10:46 AM<br>To: Beausergent, Laurent (Allianz Global Assistance)<br><br>Subject: Undeliverable: #3196098 _ Boris Antl<br><br><br>Delivery has failed to these recipients or distribution lists:<br><br>Dani_loeben@yahoo.com<br><br>An error occurred while trying to deliver this message to the recipient's e-mail address. Microsoft Exchange will not try to redeliver this message for you. Please try resending this message, or provide the following diagnostic text to your system administrator.<br><br>The following organization rejected your message: mta7.am0.yahoodns.net. | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Diagnostic information for administrators:<br><br>Generating server: mailgw.allianz.de<br><br>Dani_loeben@yahoo.com<br><br>mta7.am0.yahoodns.net<br>#<mta7.am0.yahoodns.net #5.0.0 SMTP; 554 delivery error: dd This user doesn't have a yahoo.com account (dani_loeben@yahoo.com) [0] - mta1290.mail.bf1.yahoo.com> #SMTP#<br><br>Original message headers:<br><br>Received: from SW008410.wwg00m.rootdom.net (sw008410.wwg00m.rootdom.net [10.103.111.19] (may be forged)) by mailgw.allianz.de with ESMTP id sB8FjLEf009760 for <Dani_loeben@yahoo.com>; Mon, 8 Dec 2014 15:45:34 GMT<br>Received: from WMUCV481.wwg00m.rootdom.net ([fe80::144e:cb76:5f3a:aee]) by SW008410.wwg00m.rootdom.net ([fe80::7c24:fcdb:3d8e:ff8b%13]) with mapi;<br>Mon,<br>8 Dec 2014 16:45:21 +0100<br>From: "AssistanceGroup (Allianz Assistance USA)"<br><Assistance.Group@allianzassistance.com><br>To: "Dani_loeben@yahoo.com"<br><Dani_loeben@yahoo.com><br>Sender: "Beausergent, Laurent (Allianz Global Assistance)"<br><br><Laurent.Beausergent@allianzassistance.com><br>Date: Mon, 8 Dec 2014 16:45:16 +0100<br>Subject: #3196098 _ Boris Antl<br>Thread-Topic: #3196098 _ Boris Antl<br>Thread-Index: AdAS/fS9muBQgs4qRKegy+XSdXmmEQ==<br><br>Message-ID:<br><4A7BCF976C592547BF18ABD47F3C1401AE076087@WMUCV481.wwg00m.rootdom.net><br>Accept-Language: en-US, de-DE<br>Content-Language: en-US<br>X-MS-Has-Attach: yes<br>X-MS-TNEF-Correlator:<br>acceptlanguage: en-US, de-DE<br>Content-Type: text/plain | | | |
| 26 | INEM | Undelivered email to TMO | MIME-Version: 1.0 | | Laurent Beausergent | 12/08/2014 10:51AM |

_____

From: Mail Delivery Subsystem [mailto:MAILER-DAEMON@mailgw.allianz.de]
Sent: Monday, December 08, 2014 10:51 AM
To: Beausergent, Laurent (Allianz Global Assistance)

Subject: Undeliverable: #3196098 _ Boris Antl

Delivery has failed to these recipients or distribution lists:

dani_loeben@yahoo.com

An error occurred while trying to deliver this message to the recipient's e-mail address. Microsoft Exchange will not try to redeliver this message for you. Please try resending this message, or provide the following diagnostic text to your system administrator.

The following organization rejected your message: mta5.am0.yahoodns.net.

Diagnostic information for administrators:

Generating server: mailgw.allianz.de

dani_loeben@yahoo.com

mta5.am0.yahoodns.net
#<mta5.am0.yahoodns.net #5.0.0 SMTP; 554 delivery error: dd This user doesn't have a yahoo.com account (dani_loeben@yahoo.com) [0] - mta1496.mail.gq1.yahoo.com> #SMTP#

Original message headers:

Received: from SW008343.wwg00m.rootdom.net (sw008343.muc.allianz [10.103.111.7]) by mailgw.allianz.de with ESMTP id sB8FoNkw032146 for <dani_loeben@yahoo.com>; Mon, 8 Dec 2014 15:50:35 GMT
Received: from WMUCV481.wwg00m.rootdom.net ([fe80::144e:cb76:5f3a:aee]) by

| | | | SW008343.wwg00m.rootdom.net ([fe80::9d97:acee:1169:b0a5%13]) with mapi; Mon, 8 Dec 2014 16:50:23 +0100 From: "AssistanceGroup (Allianz Assistance USA)" <Assistance.Group@allianzassistance.com> To: "dani_loeben@yahoo.com" <dani_loeben@yahoo.com> Sender: "Beausergent, Laurent (Allianz Global Assistance)" <Laurent.Beausergent@allianzassistance.com> Date: Mon, 8 Dec 2014 16:50:18 +0100 Subject: #3196098 _ Boris Antl Thread-Topic: #3196098 _ Boris Antl Thread-Index: AdAS/qj/7MQvkAG/Qtu72ImpAZrIIQ== Message-ID: <4A7BCF976C592547BF18ABD47F3C1401AE07608B@WMUCV481.wwg00m.rootdom.net> Accept-Language: en-US, de-DE Content-Language: en-US X-MS-Has-Attach: yes X-MS-TNEF-Correlator: acceptlanguage: en-US, de-DE Content-Type: text/plain | | |
| 27 | INEM | Undelivered email to TMO | MIME-Version: 1.0 | Laurent Beausergent | 12/08/2014 10:51AM |
| 28 | INEM | Email from Daniela Loebel | From: Daniela Loebel [mailto:dani_loebel@yahoo.com] Sent: Monday, December 08, 2014 11:27 AM To: AssistanceGroup (Allianz Assistance USA) Subject: Re: #3196098 _ Boris Antl hi i send the mediacl dignosis and threatment Daniela Loebel dani_loebel@yahoo.com ------------------------------------------ | Sarah Ntouskas | 12/08/2014 11:32AM |
| 29 | CASE | Cm Notified | Dina Verbally | Sarah Ntouskas | 12/08/2014 11:33AM |
| 30 | OUTCL | AC--->Interpreter--->TMO Loebel | Interpreter: Salvatore TMO has contacted the second hospital and they can receive the PT. Her email address is: dani_loebel@yahoo.com Name of the first hospital: Nuevo Hospital de Puerto Montt AGA needs to arrange transfer with the second hospital. TMO is requesting to be contacted when it is ready. | Laurent Beausergent | 12/08/2014 11:38AM |
| 31 | OUTEM | email address | dani_loebel@yahoo.com | Beausergent | 12/08/2014 11:41AM |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | From: Beausergent, Laurent (Allianz Global Assistance) On Behalf Of AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 08, 2014 11:59 AM<br><br>To: AZGA-RN <AZGA-RN@allianz-assistance.ca> (AZGA-RN@allianz-assistance.ca)<br>Subject: #3196098<br><br>Hello<br>We got the medical report in Spanish from the first hospital (CN28).<br><br>DT Loebel is treating the patient and she told me that the PT needs to be transferred asap.<br>Thanks<br>Laurent | | |
| 32 | OUTEM | Email to RN | Laurent Beausergent | Laurent Beausergent | 12/08/2014 12:09PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 08, 2014 12:33 PM<br>To: 'medical@mok.cl'<br>Cc: 'asistenciamok@mok.cl'<br>Subject: Case #3196098<br><br>Greetings from Allianz Global Assistance USA,<br><br>With reference to patient listed below:<br><br>Patient: Boris Antl<br>Diagnosis: Heart Attack<br>Date of Admission: 12/7/14<br>City: Puerto Montt, Chile<br><br>Date of Birth: 11/08/1945<br><br>Sending Hospital Details: Hospital Base de Puerto Montt or Nuevo Hospital Puerto Montt<br>TEL: 065 2 362000 / 001 / 338 / 340 / 065 490 206 / 065 2 36200 (-1)<br><br>Treating Doctor: Dr. Daniela Loebel<br>TEL: 065 2 362715<br><br>Receiving hospital: Clínica Los Andes de Puerto Montt ¿ Mary Uribe (065 2 89149)<br>TEL: 065 2 289193 / 065 2 289142<br><br>Can you please assist us with the following:<br><br>- estimate bill for the Sending hospital<br>- for the Receiving Hospital: we need to know the amount of money required to get patient admitted | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | - can patient be moved to the receiving hospital today?<br>- how much is the transport fee from Sending to Receiving Hospital<br>- get updated Medical Report for the patient<br>- have the patient fill in our Medical Release Form which we will send to you on a separate email<br>- monitor patient¿s care<br><br>Thank you for your assistance.<br><br>Dina Berik | | | |
| 33 | OUTEM | AC --> AGENT | Assistance Coordinator I, USA | Dina Berik | 12/08/2014 12:33PM | |
| | | | AC dialed the interpreter line and interpreter Uma will be assisting<br><br>AC dialed +56 65 228 9110, 9111, 9316 and 65 236 2715 - no response | | | |
| 34 | OUTCL | AC --> INTERPRETER --> HOSPITAL | AC thanked Uma and all disconnected | Dina Berik | 12/08/2014 12:41PM | |
| 35 | OUTCL | AC --> SUB | AC dialed +56.821.37.350 - busy signal | Dina Berik | 12/08/2014 12:42PM | |
| | | | From: Mail Delivery Subsystem [mailto:mailer-daemon@googlemail.com]<br>Sent: Monday, December 08, 2014 12:34 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br><br>Subject: Delivery Status Notification (Failure)<br><br><br>Hello assistance.group@allianzassistance.com,<br><br>We're writing to let you know that the group you tried to contact (asistenciamok) may not exist, or you may not have permission to post messages to the group. A few more details on why you weren't able to post:<br><br>* You might have spelled or formatted the group name incorrectly.<br>* The owner of the group may have removed this group.<br>* You may need to join the group before receiving permission to post.<br>* This group may not be open to posting.<br><br>If you have questions related to this or any other Google Group, visit the Help Center at http://support.google.com/a/mok.cl/bin/topic.py?topic=25838.<br><br>Thanks, | | | |
| 36 | INEM | Mailer Daemon | mok.cl admins | Sarah Ntouskas | 12/08/2014 12:54PM | |
| 37 | CASE | CM notified | Dina verbally of mailer daemon | Sarah Ntouskas | 12/08/2014 12:55PM | |
| | | | From: Rodrigo Urbina<br>[mailto:rodrigo.urbina@grupomok.com] | | | |

Sent: Monday, December 08, 2014 12:40 PM

To: AssistanceGroup (Allianz Assistance USA)

Cc: medical@mok.cl; asistenciamok@mok.cl;
Subject: Re: Case #3196098

Dear team:

We have created a new medical case number
2099605. As soon as we get further information
we will let you know.

Regards.


Atte.,

RODRIGO URBINA BRIONES
Coordinador Asistencia en Viaje


Av. El Bosque 90, Piso 13
Las Condes, Santiago, Chile
Mesa Central: +56(2) 433 4500
Directo: +56(2) 433 0000

| 38 | INEM | Email from Agent | medical@grupomok.com | | Sarah Ntouskas | 12/08/2014 12:56PM |

From: AssistanceGroup (Allianz Assistance USA)
Sent: Monday, December 08, 2014 12:57 PM
To: 'wsanchez@mok.cl'; 'adonoso@mok.cl';
'gbesnier@mok.cl';
'jose.monsalve@grupomok.com'
Subject: Case #3196098


Greetings from Allianz Global Assistance USA,

With reference to patient listed below:

Patient: Boris Antl
Diagnosis: Heart Attack
Date of Admission: 12/7/14
City: Puerto Montt, Chile

Date of Birth: 11/08/1945

Sending Hospital Details: Hospital Base de Puerto
Montt or Nuevo Hospital Puerto Montt
TEL: 065 2 362000 / 001 / 338 / 340 / 065 490
206 / 065 2 36200 (-1)

Treating Doctor: Dr. Daniela Loebel
TEL: 065 2 362715

| | | | Receiving hospital: Clínica Los Andes de Puerto Montt ¿ Mary Uribe (065 2 89149)<br>TEL: 065 2 289193 / 065 2 289142<br><br>Can you please assist us with the following:<br><br>- estimate bill for the Sending hospital<br>- for the Receiving Hospital: we need to know the amount of money required to get patient admitted<br>- can patient be moved to the receiving hospital today?<br>- how much is the transport fee from Sending to Receiving Hospital<br>- get updated Medical Report for the patient<br>- have the patient fill in our Medical Release Form which we will send to you on a separate email<br>- monitor patient¿s care<br><br>Thank you for your assistance.<br><br>Dina Berik | | |
|---|---|---|---|---|---|
| 39 | OUTEM | AC --> AGENT | Assistance Coordinator I, USA | Dina Berik | 12/08/2014 12:57PM |
| | | | From: Mail Delivery Subsystem [mailto:MAILER-DAEMON@mailgw.allianz.de]<br>Sent: Monday, December 08, 2014 12:57 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: Undeliverable: Case #3196098<br><br>Delivery has failed to these recipients or distribution lists:<br><br>wsanchez@mok.cl<br><br>The recipient's e-mail address was not found in the recipient's e-mail system. Microsoft Exchange will not try to redeliver this message for you. Please check the e-mail address and try resending this message, or provide the following diagnostic text to your system administrator.<br><br>adonoso@mok.cl<br><br>The recipient's e-mail address was not found in the recipient's e-mail system. Microsoft Exchange will not try to redeliver this message for you. Please check the e-mail address and try resending this message, or provide the following diagnostic text to your system administrator.<br><br>The following organization rejected your message: aspmx.l.google.com. | | |
| 40 | INEM | Mailer Daemon | | Sarah Ntouskas | 12/08/2014 12:59PM |

| 41 | CASE | ***AAMED*** | sent by AC to rodrigo.urbina@grupomok.com | Dina Berik | 12/08/2014 1:03PM |
|---|---|---|---|---|---|
| | | | very difficult to translate report - 12/07 pt went in for cp- oppressive vegatative for 40 min, ecg showed SDST, thrombolysis given, killip 1, to be transferred to the Andes for poss angiography. Pt is hemodyanically stable, enzyme curvee with positive trops.

63X 124/75 36 \| FR 18X SAT 96% O2 2L / MIN VIGIL GL 15 Clote
ASYMPTOMATIC IDLE
PERFUNDICO well hydrated.
NECK JUGULAR NEGATIVE
CARDIAC RR2TSS
SRA MP + BILAT PULM
ABD BDIRHA + BLUMBERG-
TIPS WITHOUT SIN SG EDEMA OF DVT
INDICATIONS:
1 ABSOLUTE REST semisitting
2 SYSTEM ZERO
3 O2 2L / MINUTE
4 PHYSIOLOGICAL SERUM 84ML / H
5 RANITIDINE 50MG / 8H EV
6 Clopidogrel 75mg / DAY VO
7 ACIDOACETILSALICILICO 250MG / DAY VO
8 ATORVASTATIN 80MG / DAY VO
Fragmin September 7500 SC / 12H
10 CURVE ENZYME AND ECG
11 MONITORING.
CONTROL 12 SOS.

Currently awaiting transfer to clinical Andes. It was reported to appropriate insurance.

Phone hospital emergency homeport Montt: 0652652715.
UCI Phone 0652289361 Andes clinical medical resident Dr. Perez | | |
| 42 | RN | RN reviewed google translated med report | SMRN | Mangan,Shannon | 12/08/2014 1:09PM |
| | | | From: Rodrigo Urbina [mailto:rodrigo.urbina@grupomok.com]
Sent: Monday, December 08, 2014 1:10 PM

To: AssistanceGroup (Allianz Assistance USA)

Cc: medical@mok.cl; asistenciamok@mok.cl
Subject: Re: Case #3196098

Dear team:

We spoke with the Receiving Clinic and they gave us the following amounts:

-Ambulance: 60.000 Chilean pesos (=98.28 USD) | | |

|  |  |  | -Admission Day at Clinic (without drugs) 580.000 Chilean pesos (=950.04 USD)<br><br>If you approve these amounts we can place a GOP for the transportation of the patient for the total amount 1048.32 USD (=640.000 chilean pesos).<br><br><br>The patient needs a medical procedure within the next two hours. Please let us know as soon as possible if wwe can arrange the ambulance.<br><br>Regards.<br><br><br><br>Atte.,<br><br>RODRIGO URBINA BRIONES<br>Coordinador Asistencia en Viaje<br><br><br>Av. El Bosque 90, Piso 13<br>Las Condes, Santiago, Chile<br>Mesa Central: +56(2) 433 4500<br>Directo: +56(2) 433 0000 |  |  |
|  |  |  |  |  |  |
| 43 | INEM | Email from Agent | medical@grupomok.com | Sarah Ntouskas | 12/08/2014 1:13PM |
| 44 | CASE | CM Notified | Dina verbally | Sarah Ntouskas | 12/08/2014 1:13PM |
| 45 | RN | RN facility review-sending hosp | City is not on marco polo<br>Information on internet all in spanish -some sites blocked.<br><br>Unable to determine capabilites of sending hosp | Bergeron,Linda | 12/08/2014 1:13PM |
| 46 | CASE | AAMED sent one more time to Nuevo Hospital | dani_loebel@yahoo.com | Laurent Beausergent | 12/08/2014 1:34PM |
| 47 | MD | 1325. Dr. Syverud UVA>RN dept | Discussed case with him. Adv'd we only just found out name of hosp today and dr is recommending transfer to clinica Los Andes de Puerto Montt for cardiac cath.<br>Pt admitted with opressive cp yesterday.<br>Adv'd EKG reading. TMo recommending trans for angiography.<br>We have activated our agent as well, but no reply from them yet.<br>Dr. Syverud agreed pt requires ground ambulance transfer for cardiac cath. | Bergeron,Linda | 12/08/2014 1:38PM |
|  |  |  | Interpreter: Salvatore<br><br>Tried 10 different phone numbers.<br><br>"Informaciones" phone number:<br>+56.65.2.362715<br>Transfer to TMO Loebel. She said that we cannot speak with the PT. He is waiting to be transferred to the second facility. |  |  |

| | | | | | |
|---|---|---|---|---|---|
| 48 | OUTCL | AC--Interpreter--->Hosp (Nuevo Hospital) | TMO said that the direct line is +56.65.2.652.715<br><br>TMO stated that she didn't get the AAMED for the PT. AC stated that he will send it out now. | Laurent Beausergent | 12/08/2014 1:40PM |
| 49 | RN | HANDOFF FOR TRANSPORT ARRANGEMENTS | STT TO Los Andes Clinic via Ground Amb for ICU bed and cardiac cath.<br><br>Sending hosp does not have available ICU beds and wishes pt to have cath today if possible. Discussed w/UVA: Dr. Syverud who is in agreement with ground ambulance transfer. | Bergeron,Linda | 12/08/2014 1:42PM |
| 50 | RN | PT CLEARS PRE-EX | S&U-AS PER MED REPORT-NO HX. | Bergeron,Linda | 12/08/2014 1:44PM |
| 51 | GC | RN medically recommend ground amb trans to 2nd | / | Bergeron,Linda | 12/08/2014 1:45PM |
| 52 | GC | RN medically recommend cov for inpt stay 12/07-12/08 1st | / | Bergeron,Linda | 12/08/2014 1:46PM |
| 53 | GC | RN medically recommend cov for inpt stay at receiving hosp | / | Bergeron,Linda | 12/08/2014 1:46PM |
| 54 | OUTCL | AC --> RN | AC spoke to RN Debbie and then RN Linda<br><br>AC explained the Agent's request<br><br>RN Linda put CNs in the case<br><br>Both thanked and disconnected | Dina Berik | 12/08/2014 1:48PM |
| 55 | RN | RN with voiance # 661652-to sending and rec hosps | RN with voiance # 661652- RN called to all 7 #s for the hosp and Dr Loebel but all rang until hung up, RN then called to the receiving hosp- Dr Perez- the Dr comes on the line but she can't hear the interpretor. Had to abandon call. SMRN | Mangan,Shannon | 12/08/2014 1:52PM |
| 56 | INCL | Rafael -->> AGA | Calling to find out if AGA has received the emails with the rates for the hospital<br>Please email back -<br>medical@mok.cl or medical@grupomok.cl<br><br>Easier to email than to call<br><br>They are looking for GCL<br>Both thanked. | Sharon Turkelson | 12/08/2014 1:58PM |
| 57 | RN | RN requesting to be conferenced into the call with Laurent CM | RN requesting to be conferenced into the call when CM is speaking with Dr Loebel- as RN has not been successful- CM advised it is not possible as when he and interpreter and Dr are on line- A 4TH CANT be conferenced into the converstation. SMRN | Mangan,Shannon | 12/08/2014 2:04PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 08, 2014 2:05 PM<br>To: 'medical@mok.cl'<br>Subject: case 3196098<br><br>Good afternoon, | | |

| | | | | | |
|---|---|---|---|---|---|
| 58 | OUTEM | AGA email -->> | We have received your emails ¿ we will be in touch with you shortly with confirmation.<br><br>Best Regards,<br><br>Sharon Turkelson<br>Assistance Coordinator | Sharon Turkelson | 12/08/2014 2:05PM |
| 59 | CASE | CM checked the distance between CURLO and next hospital | CM checked the distance between CURLO and next hospital<br>514 km, 9 hours 31 mins by ground | Zhou,Valerie | 12/08/2014 2:08PM |
| 60 | AU | CM sr. Kim approves ground ambulance $100 USD | CM sr. Kim approves ground ambulance $100 USD | Zhou,Valerie | 12/08/2014 2:16PM |
| 61 | OUTEM | Might not be the correct hospital listed in interested parties/ emailed agent | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 08, 2014 2:20 PM<br>To: 'Rodrigo Urbina'<br><br>Cc: medical@mok.cl; asistenciamok@mok.cl<br>Subject: RE: Case #3196098<br><br>Thank you for your email. I am working on this. Could you please provide me with the receiving clinic¿s address and the amount of time that it will be to get there?<br><br>Sincerely,<br><br>Valerie Zhou | Zhou,Valerie | 12/08/2014 2:19PM |
| 62 | OUTCL | CM tried to reach sub to explain benefits | +56-652-652-715 busy signal 2xs<br>+56-652-61100 recording said that this number is not working<br>+56-652-715 does not go through<br>+56-652-652-61100 does not go through | Zhou,Valerie | 12/08/2014 2:25PM |
| 63 | CASE | #1 (ground) | audit prepared for treatment #1 (ground) | Zhou,Valerie | 12/08/2014 2:32PM |
| 64 | CASE | 2 (2nd hosp) | audit prepared for treatment # 2 (2nd hosp) | Zhou,Valerie | 12/08/2014 2:33PM |
| 65 | CASE | **reassigned case to Valerie** | / | Mary Ann Fraser | 12/08/2014 2:34PM |
| 66 | CASE | *** CM next steps *** | Confirm distance to second hospital<br>Send GCLs the agent for the transport and 2nd hospital<br>Does the first hospital need a GCL?<br>Explain benefits to sub<br><br>Obtain passport info, height, weight for later<br>Obtain existing ticket info for later<br>Confirm if he is traveling alone<br>Review for companion to bedside if he meets T&C<br>Obtain aameds<br>Confirm if there is any other insurance<br>EMTT Summary for evac | Zhou,Valerie | 12/08/2014 2:41PM |
| | | | From: Raphael Hormazabal [mailto:raphael.hormazabal@grupomok.com]<br>Sent: Monday, December 08, 2014 2:35 PM<br><br>To: AssistanceGroup (Allianz Assistance USA) | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Cc: Rodrigo Urbina; medical@mok.cl; asistenciamok@mok.cl<br>Subject: Re: Case #3196098<br><br>Dear Colleagues<br><br>The reciving clinic is in Avenida Bella Vista, 123, Puerto Montt, Los Lagos. It would take approximately 35 minutes from where Mr. Boris is right now. | | |
| 67 | INEM | Email from the agent - clarifying the address (not the one that I thought) | Best regards | Zhou,Valerie | 12/08/2014 2:50PM |
| 68 | CASE | to send GCLs | Reviewed with CM sr Kim - ok to send GCLs | Zhou,Valerie | 12/08/2014 2:51PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 08, 2014 2:55 PM<br>To: 'Raphael Hormazabal'<br>Cc: Rodrigo Urbina; medical@mok.cl; asistenciamok@mok.cl<br>Subject: RE: Case #3196098<br><br>Thank you. We accept our assistance and would like for you to tell the hospital that they can proceed with the ground ambulance. I have attached our guarantee letter for this.<br><br>We are also sending you the guarantee letter for the receiving hospital. I have attached this here. We are sending the guarantee for $2500.00 USD. We may extend for more money once we see how long the patient will be in the hospital.<br><br>Please confirm receipt of the attachments and our email. Please confirm what time will the patient be picked up and taken to the receiving hospital.<br><br>Thank you.<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | | |
| 69 | GC | Emailed the agent - this is a GO - manually attached GCL treatment 1 & 2 | Collect: 804-673-1173 | Zhou,Valerie | 12/08/2014 2:54PM |
| 70 | EMTT | Receiving Hospital Info | Bienvenidos a Clínica Los Andes Puerto Montt<br>www.clinandes.cl/¿CachedSimilar<br>Avenida Bella Vista, 123, Puerto Montt, Los Lagos, Chile<br>+56 65 228 9193 | Zhou,Valerie | 12/08/2014 2:57PM |
| | | | Called agent using phone number from CN 43<br>+56(2) 433 4500 rang without answer<br><br>+56(2) 433 0000 rang and then disconnected | | |

| 71 | OUTCL | CM tried to reach agent to confirm transport details | +56(2) 2433 0000 phone number does not work | Zhou,Valerie | 12/08/2014 4:26PM |
|---|---|---|---|---|---|
| 72 | OUTEM | Emailed the agent again (attached CN 69) and asked for update | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 08, 2014 4:28 PM<br>To: 'Raphael Hormazabal'<br>Cc: 'Rodrigo Urbina'; 'medical@mok.cl'<br>Subject: RE: Case #3196098<br><br>Please confirm that you received the attached email. Please let us know if you have questions and keep us updated.<br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173<br>Fax: 804-673-1510 | Zhou,Valerie | 12/08/2014 4:27PM |
| 73 | INEM | Email from the agent - email rcvd | From: Rodrigo Urbina [mailto:rodrigo.urbina@grupomok.com]<br>Sent: Monday, December 08, 2014 4:33 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: Raphael Hormazabal; medical@mok.cl; asistenciamok@mok.cl<br>Subject: Re: Case #3196098<br><br>Dear team:<br><br>We have placed the GOP at the Clinica los Andes and the y confirm the coordination of the ambulance. As soon as we get more information we will let you know.<br><br>Regards.<br><br><br>Atte.,<br><br>RODRIGO URBINA BRIONES<br>Coordinador Asistencia en Viaje<br><br><br>Av. El Bosque 90, Piso 13<br>Las Condes, Santiago, Chile<br>Mesa Central: +56(2) 433 4500<br>Directo: +56(2) 433 0000<br>medical@grupomok.com | Zhou,Valerie | 12/08/2014 4:47PM |
| | | | CSA at the 2nd hospital<br>EMTT Summary for evac<br>Does the first hospital need a GCL?<br>Explain benefits to sub once he is at the 2nd hospital<br>Confirm if he is traveling alone | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Confirm if there is any other insurance<br><br>Obtain aameds<br><br>Obtain passport info, height, weight for later<br>Obtain existing ticket info for later<br>Review for companion to bedside if he meets | | |
| 74 | CASE | ** CM next steps ** | T&C | Zhou,Valerie | 12/08/2014 4:48PM |
| 75 | CASE | Rn review case | . | Don O'Connor | 12/08/2014 7:19PM |
| 76 | OUTCL | MAS-Troy---------> Clinica Los Andes 011 56 65 228 9193 | Line rang a long time then disconnected. | Troy Wells | 12/08/2014 9:35PM |
| 77 | RN | RN NEXT STEPS | EMAIL agent for med update-pt transferred to another facility yesterday for cath/icu bed. | Bergeron,Linda | 12/09/2014 8:07AM |
| 78 | OUTCL | 8:10am CM >> Rcvng +56 65 228 9193 - 3 attempts made to | fast busy signal | Karla Muroski | 12/09/2014 8:11AM |
| 79 | OUTCL | 8:19am CM > Clinica Los Andes Puerto Montt Informaciones 065 2289132 | # found on web site :<br>http://www.clinandes.cl/index.php/servicio-hospitalizacion<br>fast busy signal | Karla Muroski | 12/09/2014 8:25AM |
| 80 | OUTCL | 8:20 am CM > Clinica Los Andes Puerto Montt Central Telefónica 065 2289142 | # found on web site :<br>http://www.clinandes.cl/index.php/servicio-hospitalizacion<br>CM sw male in ICU - who could not find sub; he transferred to ER<br><br>CM s/w Jenny who said sub is not in this department, she also checked other possible departments but did not find the patient | Karla Muroski | 12/09/2014 8:27AM |
| 81 | OUTCL | 8:42am CM BU+56(2) 433 0000 | fast busy signal<br>2 attempts made | Karla Muroski | 12/09/2014 8:42AM |
| 82 | OUTCL | 8:43 am CM >> PT's phone number is:+56.821.37.350 | fast busy signal | Karla Muroski | 12/09/2014 8:43AM |
| 83 | OUTCL | CM >> SUB 510/735-6462 | lm on vm | Karla Muroski | 12/09/2014 8:44AM |
| 84 | OUTCL | 8:46am & 8:55am CM >> Hospital Base de Puerto Montt | the code dialed does not exist | Karla Muroski | 12/09/2014 8:55AM |
| 85 | OUTEM | CM >> BU [requesting urgent update on transport / med update] | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Tuesday, December 09, 2014 9:01 AM<br>To: 'Rodrigo Urbina'<br>Cc: Raphael Hormazabal; medical@mok.cl; asistenciamok@mok.cl<br>Subject: RE: Case #3196098 * URGENT *<br>Importance: High<br><br>Dear Mr. Urbina,<br><br>Would you please be so kind to provide us with an update on this medical transport as soon as possible?<br>Was this patient transferred? Would you please provide us with a medical update?<br><br>Thank you very much for your assistance.<br><br>Karla Muroski | Karla Muroski | 12/09/2014 9:02AM |
| | | | /b # 56 821 373 50<br><br>Sub said he's still at the first hospital. Sub tried calling aga, e-mailing aga but no response. | | |

| 86 | INCL | 9am Sub->AGA | CM relayed that we did try calling your cell but it does not go thru.<br>Sub said lines are not great in Chile.<br>CM needs to review case and call sub back.<br>If sub does not receive a call within 30 min, CM asked sub to call aga. | Yoko Gary | 12/09/2014 9:17AM |
| 87 | INEM | BU >> AGA [ transport is still in process - no details ] | From: David Jara [mailto:david.jara@grupomok.com]<br>Sent: Tuesday, December 09, 2014 9:04 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: Rodrigo Urbina; Raphael Hormazabal; medical@mok.cl<br>Subject: Re: Case #3196098 * URGENT *<br><br>Dear colleagues:<br><br>The trasnfer is still in process and once done we'll let you know.<br><br>Best regards | Karla Muroski | 12/09/2014 9:18AM |
| 88 | OUTCL | 9:24am CM>> BU+56(2) 433 0000 | unable to connect<br>3 attempts made | Karla Muroski | 12/09/2014 9:29AM |
| 89 | OUTCL | 9:27am CM >> BU +56 224334734 | CM s/w David who adv will call Clínica Los Andes who is making transport arrangements to find out details. He will notify us as soon as he has info. via e-mail.<br>He also confirmed that GCL was sent to hospital already<br><br>CM adv this is an URGENT request and need to know why the patient has not been transported. | Karla Muroski | 12/09/2014 9:31AM |
| 90 | OUTCL | 373 50 | fast busy signal | Karla Muroski | 12/09/2014 9:35AM |
| | | | From: David Jara [mailto:david.jara@grupomok.com]<br>Sent: Tuesday, December 09, 2014 9:43 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: Rodrigo Urbina; Raphael Hormazabal; medical@mok.cl<br>Subject: Re: Case #3196098 * URGENT *<br><br>Estimados colegas:<br><br>Tomamos contacto con la clínica los Andes y su ambulancia ya esta retirando el cliente en estos momentos del hospital base de Puerto Montt.<br><br>Según nos informa la clínica,este traslado se debía hacer ayer, pero no existió respuesta del hospital para confirmar el traslado.<br><br>Una vez recepcionando el primer IM se lo enviaremos.<br><br>Saludos cordiales cordiales | | |

| | | | | | |
|---|---|---|---|---|---|
| 91 | INEM | BU >> AGA [ SUB is being pu from Hosp Base at this time] | 2014-12-09 11:04 GMT-03:00 David Jara <david.jara@grupomok.com>: Dear colleagues: The trasnfer is still in process and once done we'll let you know. Best regards. | Karla Muroski | 12/09/2014 10:13AM |
| 92 | PNRD | Provider Request Decision | Provider Request was Denied. The denial reason is: 11897 Reactivated | Sarah Ntouskas | 12/09/2014 10:15AM |
| 93 | PNRD | Provider Request Decision | Provider Request was approved by: SSCHMIRL, Scan date: , Document page: | Sarah Ntouskas | 12/09/2014 10:24AM |
| 94 | PNRD | Provider Request Decision | Provider Request was approved by: SSCHMIRL, Scan date: , Document page: | Sarah Ntouskas | 12/09/2014 10:28AM |
| 95 | CASE | **PCP *** | Dr. Denis Crunk 760-934-2551 Mammoth Lake Hospital | Myra Kovacs | 12/09/2014 10:39AM |
| 96 | INCL | Sub>MAUSA>arrived at 2nd hosp Clínica Los Andes Puerto Montt>3rd floor | thru tests..TMO advised sub that he will probably be staying in the hospital for up to 5 day, but depending on recovery it may only be 3days. CM advised will continue to monitor and cb soon as we have stt. Sub questioned regards his flights as he was to return in Jan 2015. CM advised the airline will need to be notified prior to original return date in order to use for future tvl. CM advised our hands our tied until we have stt from TMO. Sub question hospitals near home residence that have cardio. CM advised...if TMO feels that he will need to be readmitted then ...family is responsible to confirm bed, but advised sub all is depending on his recovery and what TMO feels is necessary. CM advised ...sub's PCP can also assist if needed. CM also went over repat w/escort and that it would be door to door, but again all depending on TMO decision. Sub understood. Sub would like for us to ctc Mammoth hospital just to check if they have a cardio unit. CM advised will do. Sub questioned cruise reimbursement. CM advised unable to confirm claim over the phone, but will conf w/TCS. Sub wanted to be conf w/TCS....conf w/TCS Ms. Joy....she pulled policy, but policy provided expired. Ms. Joy found an existing policy of #US03427363. CM thanked for information and will update existing policy attachment. Sub stated the best way to ctc him back is thru hosp or email. CM released call | Myra Kovacs | 12/09/2014 11:19AM |
| | | CM >Emailed AZGA >sub | Sent: Tuesday, December 09, 2014 11:46 AM To: 'AZGA RN' Subject: Medical Case #3196098 Morning Team, Just an FYI¿sub just called in and advised ¿just admitted about 15min ago to new hospital location (Clínica Los Andes Puerto Montt). Sub advised may be in the hospital for up to 5 days. Sub advised he is on the 3rd floor. Thanks, | | |

| 97 | OUTEM | advised at new hospital | Myra Kovacs | | Myra Kovacs | 12/09/2014 11:46AM |
|---|---|---|---|---|---|---|
| 98 | OUTCL | CM -->Mammoth Hospital, CA >per sub rqst | CM ctc hosp per sub's request and verify if they have a cardio unit. Hosp rep advised they don't, but have a doctor come from Reno, NV once a month. She stated they would normally refer clients to Renown Hospital located in Reno, NV that is 3 hours away. | | Myra Kovacs | 12/09/2014 11:54AM |
| 99 | OUTEM | CM >BU[attached AAMEDs request assistance / sub notified us he arrived to rcvgn] | From: AssistanceGroup (Allianz Assistance USA) Sent: Tuesday, December 09, 2014 2:16 PM To: 'David Jara' Cc: Rodrigo Urbina; Raphael Hormazabal; medical@mok.cl Subject: RE: Case #3196098<br><br>Hola David,<br><br>Muchas gracias por toda tu ayuda!<br><br>El paciente nos confirmó hace 3 horas que él está en la Clinica Los Andes.<br><br>Por favor podrían aydarnos a envia el documento anexo a la Clinica? El paciente debe completar estos formatos. Una vez que esten completos favor de enviarlos de regreso a nuestra oficina.<br><br>Saludos cordiales,<br><br>Karla Muroski | | Karla Muroski | 12/09/2014 2:16PM |
| 100 | RN | RN EMAILED MAG AGENT: | From: AZGA RN [mailto:azga-rn@allianz-assistance.ca] Sent: Tuesday, December 09, 2014 4:10 PM To: medical@mok.cl Cc: 'asistenciamok@mok.cl'<br><br>Subject: Case # 3196098 Your Case # 2099605 Importance: High<br><br>Greetings,<br><br>Would you be able to obtain a medical update for us now that pt has been transferred to Clinica Los Andes? Patient: Boris Antl<br><br>Sincerely,<br><br>Linda Bergeron SRRN Case Manager Medical Department | | Bergeron,Linda | 12/09/2014 4:10PM |
| 101 | RN | RN NEXT STEPS | RN emailed Agent for med update now that pt has been transferred to another facility. AW reply | | Bergeron,Linda | 12/09/2014 4:11PM |

| 102 | MED | Medrx in file | .NEEDS translation please | Groves,Deborah | 12/09/2014 8:42PM |
|---|---|---|---|---|---|
| 103 | MED | Rn adv Mausa medrx in file | REQ translation please dyg rn | Groves,Deborah | 12/09/2014 8:43PM |
| 104 | INEM | Email from Hosp w/att hosp invoice | From: David Jara [mailto:david.jara@grupomok.com] Sent: Tuesday, December 09, 2014 2:36 PM<br><br>To: AssistanceGroup (Allianz Assistance USA) Cc: Rodrigo Urbina; Raphael Hormazabal; medical@mok.cl Subject: Re: Case #3196098<br><br>Estimados colegas:<br><br>La clínica esta pidiendo confirmación de presupuesto por $ 5.268.666 - 8600 USD ya que necesita múltiples procedimientos según el equipo medico de la clínica.<br><br>Adjuntamos información enviada por la clínica.<br><br>Favor informar como proceder. | Troy Wells | 12/09/2014 8:45PM |
| 105 | INEM | AZGA--->AGA ** Med Report Translation request ** | From: AZGA-RN [mailto:AZGA-RN@allianz-assistance.ca] Sent: Tuesday, December 09, 2014 8:44 PM<br><br>To: AssistanceGroup (Allianz Assistance USA) Subject: FW: Case # 3196098 Your Case # 2099605 (Thread:812954)<br><br>Hello attached in case is the medrx ¿ however it should be translated thank you<br><br>Deborah Young-Groves | Walter Rebola | 12/09/2014 9:09PM |
| 106 | TRSL | CM--->SAJAN * Translation request 1 page ** | Sent to: agaassistance@sajan.com;<br><br>CC's to: assistance.group@allianzassistance.com Sent and Signed by: assistance.group@allianzassistance.com On: December 09, 2014 at: 21:21:27 (Eastern Standard Time) Subject: Case 3196098 Spanish Translation needed<br><br>- Allianz Dept: Assistance - Case Number:3196098 - Source Language: Spanish - Target Language: English - Number of Pages: 1 - Requested Delivery Date: 12/10/14 - Medical Linguist needed: _x____ Yes _____ No - Assistance Urgent Request: _____ Yes ____x__ No - Additional Notes: | Walter Rebola | 12/09/2014 9:23PM |
| | | | -----Original Message----- | | |

From: agaassistance@sajan.com
[mailto:agaassistance@sajan.com]

Sent: Wednesday, December 10, 2014 12:42 AM

To: AssistanceGroup (Allianz Assistance USA)
Subject: ZIX: RE: Case 3196098 Spanish
Translation needed

-----------------------------------------------------------

The attached file is a ZixMail message.

MS-Outlook users - click the red "Z" on the
toolbar above to open.

Lotus Notes users - click the "Read ZixMail"
button above to open.

Others - open the attached .zix file by clicking or
double clicking it.
-----------------------------------------------------------

-----Original Message-----
From: agaassistance@sajan.com
[mailto:agaassistance@sajan.com]

Sent: Wednesday, December 10, 2014 12:42 AM

To: assistance.group@allianzassistance.com
Subject:

Dear Assistance team,

We confirm safe receipt of this request and
estimate 300 words for this translation. We will
deliver by 10th Dec.

Best,
Trina

| | | | | | |
|---|---|---|---|---|---|
| 107 | TRSL | SAJAN >> AGA [ confirmed rcpt rqst - will deliver by 12/10/14] | Best, Trina | Karla Muroski | 12/10/2014 7:23AM |
| 108 | RN | RN NEXT STEPS | Med report rec'd and aw translation today. RN to review. | Bergeron,Linda | 12/10/2014 7:52AM |

From: David Jara
[mailto:david.jara@grupomok.com]

Sent: Wednesday, December 10, 2014 7:18 AM

To: AssistanceGroup (Allianz Assistance USA)
Cc: Rodrigo Urbina; Raphael Hormazabal;
medical@mok.cl
Subject: Re: Case #3196098

Estimados colegas:

La clínica Los Andes esta consultando por la
aprovacion del presupuesto enviado por
atencion de su cliente.

| | | | | | |
|---|---|---|---|---|---|
| | | | Favor informar si autorizaran el monto.<br><br>Saludos cordiales.<br><br>2014-12-09 16:35 GMT-03:00 David Jara <david.jara@grupomok.com>:<br>Estimados colegas:<br><br>La clínica esta pidiendo confirmación de presupuesto por $ 5.268.666 - 8600 USD ya que necesita múltiples procedimientos según el equipo medico de la clínica.<br><br>Adjuntamos información enviada por la clínica. | | |
| 109 | INEM | Email from HOSP requesting gcl | Favor informar como proceder. | Sarah Ntouskas | 12/10/2014 8:15AM |
| 110 | OUTEM | Emailed our agent to advise that we will review once the translation is complete | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 10, 2014 10:15 AM<br>To: 'David Jara'<br>Cc: Rodrigo Urbina; Raphael Hormazabal; medical@mok.cl<br>Subject: RE: Case #3196098<br><br>We have sent the medical report to translations; once the report is translated, we will review the report to confirm that we can extend the guarantee letter. I will keep you updated.<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 12/10/2014 10:14AM |
| 111 | OUTEM | Emailed the agent with a blank aamed form | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 10, 2014 10:18 AM<br>To: 'David Jara'<br>Cc: 'Rodrigo Urbina'; 'Raphael Hormazabal'; 'medical@mok.cl'<br>Subject: RE: Case #3196098<br><br>We also require that the patient fill out and sign the attached release form.<br>Could you assist with getting this to the hospital to give to the patient?<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/10/2014 10:18AM |

| 112 | CASE | Possible Rcvd bed for later | Renown Hospital<br>901 E 2nd St Ste 307, Reno, NV 89502<br>Phone: (775) 982-4100 | Zhou,Valerie | 12/10/2014 10:19AM |
|---|---|---|---|---|---|
| 113 | EMTT | EMTT Summary - ground | Case Number: 3196098<br>From: Puerto Montt, Chile<br>To: Puerto Montt, Chile<br>Date of Transport: 12/09/2014<br>Type: EVAC<br>Mode: GT<br><br>Pathology: Cardiology<br>Sub¿s Age: 69<br><br>Total Cost of Transport: $100.00<br>Total Covered Amount/Payer (AGA Pays): $100.00/AGA<br>Total Amount Paid by Sub/TC: 0<br><br>Mgt Approval: CN 60/Kim<br>MD Approval: CN 47/Dr. Syverud<br>CM Benefit Verification: CN 10/Dina<br>Benefit Level:<br><br>Emergency Medical Transportation: $500,000.00<br>Emergency Medical and Dental: $25,000.00<br>Trip Cancellation Protection: 0<br>Trip Interruption Protection: 0<br><br>Notes: Agent and the hospital assisted with the arrangements | Zhou,Valerie | 12/10/2014 10:26AM |
| 114 | INCL | Sub->AGA | Debra at TCS was going to transfer a call to CM but the line was disconnected. | Yoko Gary | 12/10/2014 10:40AM |
| 115 | CASE | *** CM next steps *** | GCL extension for 2nd hospital<br>Obtain aameds<br>Does the first hospital need a GCL?<br>Confirm if there is any other insurance<br>Confirm why he is traveling to country<br><br>Obtain passport info, height, weight for later<br>Obtain existing ticket info for later<br>Confirm if he is traveling alone and review for companion to bedside if he meets T&C | Zhou,Valerie | 12/10/2014 10:41AM |
| 116 | OUTCL | CM->Sub's cell: N/a | line does not go thru. got fast pitch busy signal | Yoko Gary | 12/10/2014 10:44AM |
| 117 | INCL | Sub at Hosp +56 65 228 9361 ->MAUSA | Sub questioned regards release of medical forms, as he has not yet rcvd. Sub advised to send AAmes via his email. CM advised for every new facility a new release form will need to be signed. CM sent AAmeds via his personal email boris_antl@yahoo.com. Sub did rcv and will print and fill out. | Myra Kovacs | 12/10/2014 10:56AM |
|  |  |  | From: David Jara<br>[mailto:david.jara@grupomok.com]<br><br>Sent: Wednesday, December 10, 2014 10:33 AM<br><br>To: AssistanceGroup (Allianz Assistance USA) |  |  |

| | | | | | |
|---|---|---|---|---|---|
| | | | Cc: Rodrigo Urbina; Raphael Hormazabal; medical@mok.cl<br>Subject: Re: Case #3196098<br><br>Dear colleagues:<br><br>We'll proceed to send the attached file to the clinic to forward to the client. | | |
| 118 | INEM | Email from Agent | Best regards. | Sarah Ntouskas | 12/10/2014 11:01AM |
| 119 | OUTEM | Emailed sub to introduce self | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 10, 2014 12:12 PM<br>To: 'boris_antl@yahoo.com'<br>Subject: Allianz Assistance case 3196098<br><br>Hello Mr. Antl,<br><br>I wanted to introduce myself; I am assigned to your case while you are in the hospital. I am sorry to hear what happened and I hope you make a full recovery. Are you traveling alone or there visiting someone?<br><br>When you left the first hospital, did they require any payment from you? I am just trying to confirm what assistance may be needed there. I also saw where you spoke with my co-worker Myra about the benefits on the policy and about getting home. If we do assist with helping you get home, I wanted to let you know that we will need to get your passport information (name the way it is listed, your passport number, date of birth listed, and the date issued and expired) plus your existing ticket information (the airline name, confirmation, and method of purchase such as credit or frequent flyer miles). You are welcome to email this to us when you have time.<br><br>Please let me know if you have any questions about filling out the release form. You can send back by email or fax.<br><br>Thank you!<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 12/10/2014 12:12PM |
| 120 | CASE | $499,900 | Remaining transport benefit $499,900 | Zhou,Valerie | 12/10/2014 12:13PM |
| | | | From: Allianz Global Assistance | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | To: SecureEmailReply@zixmessagecenter.com; AGAassistance; AssistanceGroup (Allianz Assistance USA) (Assistance.Group@allianzassistance.com)<br><br>Subject: RE: Case 3196098 Spanish Translation needed - Translated Delivery file<br>Attachments: INGRESO boris antl_EN.pdf<br><br><br><br>Hi,<br><br>Attached is the translated delivery file. The final word count is: 272<br><br>Thanks,<br><br>Lucas<br><br> | | |
| 121 | TRSL | Translated medical report rcvd via email from Sajan | Lucas Knutson \| Project Coordinator \| Office 715.426.9505 Ext.173 \| www.sajan.com | Zhou,Valerie | 12/10/2014 3:00PM |
| | | | From: Boris Antl [mailto:boris_antl@yahoo.com]<br><br>Sent: Wednesday, December 10, 2014 2:46 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br><br>Subject: Re: Allianz Assistance case 3196098<br><br>Hello Valery,<br>Yes, I am travelling alone but may be joined by a friend or relative, depending on the test results, the doctor's recommendations and any necessary follow-up.<br><br>I have not make any payments to the hospital where I was before this Clinic. Neither did I make any payments to the Emergency room in Hornopiren (where I had the attack) or the ambulance that took me from there to the first Puerto Montt hospital (3 hour drive plus boat). But I was in such a state that I do not remember much and payment was probably not discussed. In the meanwhile please make sure you have sent to the Clinic des Andes an AUTHORIZATION to proceed with the tests as recommended by the cardiologist here. From what they told me this morning, they have not received this authorization from you yet. And I have signed the releases you had sent this morning. I hope you got it. | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Once the tests are completed and we know what needs to be done, I will start planning the return. So PLEASE do whatever needs to be done to start the tests. I am not in a position to be under any more stress at this point, as I am sure you will appreciate.<br>Thanks and regards,<br>Boris Antl | | |
| 122 | INEM | Email from the sub asking for AGA to confirm authorization | | Zhou,Valerie | 12/10/2014 3:01PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 10, 2014 3:11 PM<br>To: 'Boris Antl'<br><br>Subject: RE: Allianz Assistance case 3196098<br><br>We sent the guarantee/authorization letter yesterday to our agent who said that they gave this to the hospital; the guarantee was for 1 day, just to get you in and give us time to get an update. We have gotten a medical report which we translated for internal purposes; this is being reviewed by our medical team now.<br><br>I have not been able to locate the release form yet; do you know if they were going to fax or email this to us? If they faxed the form, then they would need to put 001 at the beginning of our fax number for the US country code.<br><br>We are willing to extend the guarantee letter once we have finished the medical report and have gotten the release form as part of our process here. I will continue being in contact with you and our agent to get this done.<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | | |
| 123 | OUTEM | Emailed sub for follow up | Collect: 804-673-1173 | Zhou,Valerie | 12/10/2014 3:10PM |
| | | | DX: ST-segment elevation MI, Killip Class 1 thrombolysis basedon reperfusion therpay<br>Chronic HTN recently diagnosed<br>Untreated dyslipidemia<br><br>Patient reports that he does sport on a regular basis, with scarce cardiovascular risk factors. He further reports that he has been recently diagnosed with mild hypertension with indication to<br>change his habits. Dyslipidemia was also diagnosed, for which he did not receive any medication.<br>While patient was sightseeing, he reported suffering a sudden precordial pain with an | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | intensity of 6¿7/10, together with nausea and vomits. Therefore, patient went to a Family Health Center (CESFAM) and then he was referred to HBPM, where an EKG was performed, which showed ST¿segment elevation in the anterior side of the heart. Patient received thrombolytic therapy based on reperfusion criteria. Patient received standard treatment with no evidence of pump failure. Patient was referred for preventive reasons. BP 137/90 MAP 105 HR 74 T 36.4° C RR 10 per min Oxygen Sat at 97% in 1 L PLANS Secondary prevention therapy Evaluating the possibility of performing Coronary Angiography | | |
| 124 | MED | RN REVIEWED TRANSLATED MED REPORT | Echocardiogram | Bergeron,Linda | 12/10/2014 3:18PM |
| 125 | GC | RN medically recommend cov inpt stay 12/09-12/11, subj T&C | / | Bergeron,Linda | 12/10/2014 3:19PM |
| 126 | RN | RN EMAILED AGENT -->requested med update for 12/11 | From: AZGA RN [mailto:azga-rn@allianz-assistance.ca] Sent: Wednesday, December 10, 2014 3:24 PM To: 'medical@mok.cl' Cc: 'AssistanceGroup (Allianz Assistance USA)' Subject: Subject: Case # 3196098 Your Case # 2099605 Greetings from Allianz Global Assistance, Can you contact the hospital and obtain a medical update for us for Thursday 12/11? We will need to know what medical treatment the patient is currently receiving and if he has had a cardiac catheterization? If he had a catheterization, we will need the results. Is there an estimated length of stay in hospital? | Bergeron,Linda | 12/10/2014 3:23PM |
| 127 | RN | RN NEXT STEPS | AW med update from agent on 12/11 | Bergeron,Linda | 12/10/2014 3:23PM |
| | | | From: David Jara [mailto:david.jara@grupomok.com] Sent: Wednesday, December 10, 2014 3:29 PM To: AZGA RN Cc: Medical; AssistanceGroup (Allianz Assistance USA) Subject: Re: Subject: Case # 3196098 Your Case # 2099605 Dear colleagues: We'll proceed to request this detail. | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Here we have attached the release form signed by the client. | | |
| 128 | INEM | aameds rcvd via email from the agent (not witnessed) | Best regards. | Zhou,Valerie | 12/10/2014 3:34PM |
| 129 | CASE | audit prepared (treatment #2) | audit prepared (treatment #2) | Zhou,Valerie | 12/10/2014 3:35PM |
| 130 | RN | Received email reply from agent/along with AAMED | In regards to another update 12/11<br>Dear colleagues:<br><br>We'll proceed to request this detail.<br><br>Here we have attached the release form signed by the client. | Bergeron,Linda | 12/10/2014 3:48PM |
| 131 | RN | REC'D emailed AAMED | / | Bergeron,Linda | 12/10/2014 3:49PM |
| 132 | GC | Sent the GCL extension | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 10, 2014 5:17 PM<br>To: 'David Jara'<br>Cc: Rodrigo Urbina; Raphael Hormazabal; medical@mok.cl<br>Subject: RE: Case #3196098<br><br>We are authorizing for 2 days, and we can extend for more days when we get a medical update.<br>Please see the attached guarantee letter and please confirm once you have sent this to the hospital.<br><br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 12/10/2014 5:30PM |
| 133 | OUTEM | Emailed the patient too | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 10, 2014 5:32 PM<br>To: 'Boris Antl'<br><br>Subject: RE: Allianz Assistance case 3196098<br><br>we did get the release form and have sent a guarantee for 2 days (12/09/2014 ¿ 12/11/2014); we will extend this as we get an additional medical report from the agent who is helping us. Thank you!<br><br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/10/2014 5:31PM |
| | | | Does the first hospital need a GCL? | | |

| | | | Confirm why he is traveling to country | | |
| | | | Obtain passport info, height, weight for later | | |
| | | | Obtain existing ticket info for later | | |
| | | | Review for companion to bedside if he meets T&C | | |
| 134 | CASE | ** CM next steps ** | | Zhou,Valerie | 12/10/2014 5:31PM |
| | | | From: MAYRA VALENZUELA [mailto:mlvalenz@uc.cl] | | |
| | | | Sent: Wednesday, December 10, 2014 7:20 PM | | |
| | | | To: AssistanceGroup (Allianz Assistance USA); boris_antl@yahoo.com | | |
| | | | Subject: Patient Mr Boris Antl | | |
| | | | Dear Valerie: | | |
| | | | I¿m Dr. Mayra Valenzuela, the physician on charge of Mr. Boris Antl. He is in the Intensive Care Unit of Clinica Los Andes de Puerto Montt , Chile. | | |
| | | | His case number is 3196098. | | |
| | | | He suffered a heart attack and he needs a coronariography, an intravascular procedure absolutely necesary to precise how are the coronary arteries and open the guilty blood vessel. | | |
| | | | His electrocardiogram and cardiac ultrasonography reveals a high risk of new heart attack, with an extense lesion and decreased contractility of the heart. | | |
| | | | If the blood vessel that is not completily open suffer a new lesion he probably will die, because we are talking of a lesion in the anterior descendent artery in it proximal part. | | |
| | | | I hope you understand how serious is the situation. In case of emergency (pain and new myocardial infarction) I will call the cardiologist for an emergency procedure. | | |
| | | | Please send soon the Insurance confirmation for do what we have to do for the patient. | | |
| | | | Regars | | |
| | | | Dr. Mayra Valenzuela Fuentes | | |
| | | | Medico Unidad de Cuidados Intensivos | | |
| | | | Clinica Los Andes Puerto Montt | | |
| | | | Chile | | |
| 135 | INEM | EML FROM MD | Cell Phone: 56-9-98886387 | Teresa Faber | 12/10/2014 7:56PM |
| | | | From: Boris Antl [mailto:boris_antl@yahoo.com] | | |
| | | | Sent: Wednesday, December 10, 2014 7:39 PM | | |

| | | | | | |
|---|---|---|---|---|---|
| 136 | INEM | EML from SUB | To: AssistanceGroup (Allianz Assistance USA)<br>Subject: Case # 3196098 - Boris Antl<br><br>See below.<br>Sent from Yahoo Mail on Android<br><br>From:"MAYRA VALENZUELA" <mlvalenz@uc.cl><br>Date:Wed, Dec 10, 2014 at 21:19<br>Subject:Patient Mr Boris Antl | Teresa Faber | 12/10/2014 8:04PM |
| 137 | OUTEM | EML TO RN AND CM | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 10, 2014 8:07 PM<br>To: AZGA-RN@ALLIANZ-ASSISTANCE.CA<br>Cc: Zhou, Valerie (Allianz Global Assistance)<br>Subject: AGA US Case 3196098<br><br>Greetings,<br><br>Please see CN 135 for email from TMO.<br><br>Regards,<br><br>Teresa Faber | Teresa Faber | 12/10/2014 8:07PM |
| 138 | RN | 135 | sgrn | Gabriel,Susan | 12/10/2014 8:16PM |
| 139 | RN | 0832. RN Dept>MAUSA CM Myra. | Adv'd that I just read last notes and concerned that cardiac cath not done--TMO sent email last evening stating pt requires this and has risk of death if not done--they are holding off until hear from insurance.<br><br>Myra stated she will look into this and the billing. | Bergeron,Linda | 12/11/2014 8:38AM |
| 140 | INCL | RN/Linda -->MAUSA | Concern regards sub treatment. CM advised will move forward and verify w/agent if hosp rcvd gcl for sub procedure. | Myra Kovacs | 12/11/2014 8:53AM |
| | | CM ->Emailed Agent >verify if | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Thursday, December 11, 2014 8:53 AM<br>To: 'david.jara@grupomok.com'<br>Cc: 'medical@mok.cl'; Zhou, Valerie (Allianz Global Assistance)<br>Subject: ***URGENT ***Subject: Case # 3196098<br>Your Case # 2099605<br>Importance: High<br>Hello from USA,<br>URGENT Assistance.<br><br>We wanted to make sure the hospital did receive the guarantee of coverage regarding our patient Mr. Boris Antl, as we have been informed that he is going to need a procedure done right away, and we do not want this to be held.<br>Please let us know if they have received it, and if they are going to proceed with the treatment our client is desperately needing?<br>I look forward to hearing back from you? | | |

| | | | | | |
|---|---|---|---|---|---|
| 141 | OUTEM | hosp rcvd gc and will proceed w/sub treatment | Sincerely,<br>Myra Kovacs | Myra Kovacs | 12/11/2014 8:56AM |
| 142 | INEM | Inbound email from agent | From: David Jara [mailto:david.jara@grupomok.com]<br>Sent: Thursday, December 11, 2014 8:57 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: medical@mok.cl; Zhou, Valerie (Allianz Global Assistance)<br>Subject: Re: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br>Dear colleagues:<br>We sent to you the estimate cost and we haven't received any response from you.<br>Please let us know if you cover the cost requeted by the clinic.<br>Best regards. | Myra Kovacs | 12/11/2014 9:07AM |
| 143 | OUTEM | CM >outbound email to agent | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Thursday, December 11, 2014 9:24 AM<br>To: 'David Jara'; AssistanceGroup (Allianz Assistance USA)<br>Cc: medical@mok.cl; Zhou, Valerie (Allianz Global Assistance)<br>Subject: RE: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Dear colleagues,<br><br>Yes¿we are covering the patient. Mr. Boris Antl¿s maximum medical benefit is $25,000.00. We have already sent you the guarantee of coverage for $12,500.00 (via email: medical@mok.cl). Anything above maximum benefit would be the patient¿s responsibility.<br><br>Inform the hospital this is a legal document, stating we would cover his medical expense while he is admitted.<br><br>I look forward to hearing back from you.<br><br>Sincerely,<br><br>Myra Kovacs | Myra Kovacs | 12/11/2014 9:26AM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Thursday, December 11, 2014 9:26 AM<br>To: 'David Jara'<br>Cc: medical@mok.cl<br>Subject: RE: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>We have sent the guarantee letter twice yesterday to your email address. I will resend to you in a separate email. | | |

| | | | | | |
|---|---|---|---|---|---|
| 144 | OUTEM | Emailed agent about the GCL | Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/11/2014 9:40AM |
| 145 | OUTEM | Emailed the agent again - CN 132 attached | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Thursday, December 11, 2014 9:39 AM<br>To: 'David Jara'<br>Cc: medical@mok.cl<br>Subject: RE: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Please see the attached email that I sent last night with the cost guarantee.<br>Please urgently confirm receipt of the guarantee letter as soon as possible. We want our customer to get treatment.<br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/11/2014 9:40AM |
| 146 | INEM | Email from the agent asking for instructions | From: David Jara<br>[mailto:david.jara@grupomok.com]<br>Sent: Thursday, December 11, 2014 9:33 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: medical@mok.cl; Zhou, Valerie (Allianz Global Assistance)<br>Subject: Re: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Dear colleagues.<br><br>Do you need from us to send your GOP form to the clinic? Are you going to pay directly?<br><br>Best regards. | Zhou,Valerie | 12/11/2014 9:41AM |
| | | | From: Zhou, Valerie (Allianz Global Assistance)<br>Sent: Thursday, December 11, 2014 9:40 AM<br>To: 'David Jara'<br>Cc: medical@mok.cl<br>Subject: RE: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Please place our guarantee letter to the hospital for up to $10,000 USD. We will extend for more days and more funds once we have gotten additional medical updates. Please help with this urgently. | | |

| | | | | | |
|---|---|---|---|---|---|
| 147 | OUTEM | Emailed the agent to confirm they should send GCL to hospital | Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/11/2014 9:41AM |
| 148 | INCL | Hosp billing Mr. Juan Avila +56 65 22 89 112 w/trans >MAUSA | Hosp billing rep advised still not have yet rcvd the gte for sub. Mr. Avila sated they do not work with Allianz, but working with Multi Assit. CM obtained email and phone (ravila@clinanes.cl) , so Multi Assist can give them a call or email. Mr. Avila stated the bill is a little bit more. CM advised to just send updated invoice w/new amount and we can adjust as needed. CM thanked for he update. Mr. Avial will wait to hear from Multi Assist. | Myra Kovacs | 12/11/2014 9:45AM |
| 149 | OUTEM | Emailed the agent again with urgent info | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Thursday, December 11, 2014 9:45 AM<br>To: 'David Jara'<br>Cc: medical@mok.cl<br>Subject: RE: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>The hospital will not work with us directly, they only want to work through you.<br>Once we get the final invoice, we can pay directly to your agency or to the hospital, whichever is best. At this point, we can guarantee payment up to $10,000 USD but may be able to guarantee for more once we get another medical update. As our agent, we want you to help us with this case.<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 12/11/2014 9:46AM |
| 150 | INEM | Email from the agent - GOP placed | From: David Jara<br>[mailto:david.jara@grupomok.com]<br><br>Sent: Thursday, December 11, 2014 10:12 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: medical@mok.cl; Zhou, Valerie (Allianz Global Assistance)<br>Subject: Re: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Dear colleagues:<br><br>We just placed GOP at the clinic.<br><br>Best regards. | Zhou,Valerie | 12/11/2014 10:48AM |
| 151 | OUTCL | CM ---> hospital billing | Called with translator +56 65 22 89 112 s/w billing office who confirmed that they have rcvd the GCL about 1 hour ago, patient is getting the surgery this afternoon | Zhou,Valerie | 12/11/2014 11:14AM |

| | | | | | |
|---|---|---|---|---|---|
| 152 | RN | RN NEXT STEPS | as per info from agent, pt going for heart cath this afternoon.<br><br>RN to email agent 12/12 if no update from them-- need cath results, current status and tx/plans. | Bergeron,Linda | 12/11/2014 3:20PM |
| 153 | GC | RN medically recommend cov inpt stay to 12/12, subj T&C of | / | Bergeron,Linda | 12/11/2014 3:21PM |
| 154 | CASE | Email from hosp w/att med report | From: Rodrigo Avila [mailto:ravila@clinandes.cl]<br>Sent: Thursday, December 11, 2014 6:37 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: Caso Nº 3196098- BORIS ANTL<br><br>Estimados:<br><br>Adjunto informe de procedimiento realizado al Sr. Boris Antl, póliza Nº US03427363<br><br>Atte,<br><br>Rodrigo Ávila Díaz<br>Jefe Administrativo Admisión Central<br><br>Coordinación GES/CAEC.<br>Clinica Los Andes de Puerto Montt S.A.<br>Avda. Bellavista 123, Puerto Montt.<br>Fono:652289112<br>Mail: ravila@clinandes.cl<br>Web: www.clinandes.cl | Troy Wells | 12/11/2014 8:14PM |
| 155 | INEM | Email from agent w/ Med report | From: Carol Ynés Flores Muñoz [mailto:carol.flores@grupomok.com]<br>Sent: Friday, December 12, 2014 7:56 AM<br>To: David Jara<br>Cc: AssistanceGroup (Allianz Assistance USA); medical@mok.cl; Zhou, Valerie (Allianz Global Assistance)<br>Subject: Re: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Dear Colleagues,<br><br>Please see attached medical report of your patient.<br>Best Regards, | Sarah Ntouskas | 12/12/2014 8:20AM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Friday, December 12, 2014 8:23 AM<br>To: 'Carol Ynés Flores Muñoz'<br>Subject: RE: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Good day,<br><br>We received the medical report. It is in Spanish. Do you have an English version of the report we could review? | | |

| | | | | | |
|---|---|---|---|---|---|
| 156 | OUTEM | Email to Agent | Thank you,<br><br>Sarah S. Ntouskas | Sarah Ntouskas | 12/12/2014 8:22AM |
| 157 | MED | RN REVIEWED CATH REPORT-USED GOOGLE TRANSLATOR | coronary angiography:<br>left main coronary artery: good development, no injuries<br><br>anterior descending artery: good development, and reaches around the apex. Long lesion presents 90% who committed the middle third. Ramos diagonals without injury.<br><br>Circumflex artery: good development, not dominant. No obstructive lesions. Obtuse marginal branches without injury.<br><br>right coronary afteria: good development, dominant. No obstructive lesions. Poster or without descending artery obstructive lesions.<br><br>Ventriculography: not performed<br><br>Conclusion: leson critique of middle third of the left anterior descending artery.<br><br>Note: You will proceed PTCA with DES half ADA<br><br>antioplastia successful coronary stenting with medicated injury criticizes the middle third of the left anterior descending artery<br><br>Note: It is suggested 0.9% SF 60 cc / hr for 12 hrs, aspirin 100 mg and clopidogrel 75 mg for 1 year and regular secondary prevention. | Bergeron,Linda | 12/12/2014 11:49AM |
| 158 | RN | RN NEXT STEPS | RN email agent on Sat if no med update rec'd Friday<br><br>Cath report rec'd and translated using google.<br>Need med update/elos/dc plans<br>Original DOR not until 01/21-? pt staying or wish to return early<br><br>If wish to return early, we need stt/travel needs. | Bergeron,Linda | 12/12/2014 11:54AM |
| | | | From: Carol Ynés Flores Muñoz [mailto:carol.flores@grupomok.com]<br>Sent: Friday, December 12, 2014 4:13 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: medical<br>Subject: Re: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Dear Colleagues, | | |

| 159 | INEM | Email reply from Agent | Sorry about the delay. Please to other responses, forward your emails to medical@mok.cl, so different shifts will help you.<br><br>We only have a medical report in spanish, if you prefer we can do a brief translation of it.<br>We will wait for your comments.<br>Kind Regards, | Troy Wells | 12/12/2014 7:32PM |
| 160 | OUTEM | Email reply to Agent | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Friday, December 12, 2014 7:32 PM<br>To: 'Carol Ynés Flores Muñoz'<br>Subject: RE: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Greetings from Allianz,<br><br>Thank you for your email. If you could translate the report that would be helpful and appreciated.<br><br>Kind regards,<br><br>Troy Wells<br>Assistance Coordinator II | Troy Wells | 12/12/2014 7:39PM |
| 161 | OUTEM | Emailed the agent to see if they can give brief translation | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Saturday, December 13, 2014 2:04 PM<br>To: medical@mok.cl<br>Cc: 'Carol Ynés Flores Muñoz'<br>Subject: RE: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>We would like for you to do a brief translation of the medical report, that would be helpful.<br>Could you please send this over as soon as you can?<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/13/2014 2:03PM |
|  |  |  | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Saturday, December 13, 2014 2:06 PM<br>To: boris_antl@yahoo.com<br>Subject: Allianz Assistance case 3196098<br><br>Hello Mr. Antl, |  |  |

| | | | | | |
|---|---|---|---|---|---|
| | | | I just wanted to check in with you and see how you are doing. I hope everything went well with your surgery. Our local agent is helping us get a medical update and then we can extend our guarantee letter for more days and more funds. Please keep in mind the total limit for medical expenses on this policy is $25,000.00 USD.<br><br>I also wanted to check if you know when you may discharge? If you are still alone and admitted to the hospital, we could look at sending someone to your bedside. Please let me know!<br><br>Thank you.<br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | | |
| 162 | OUTEM | Emailed sub to check in | Collect: 804-673-1173 | Zhou,Valerie | 12/13/2014 2:05PM |
| 163 | CASE | *** CM Next steps **** | See if GCL extension needed<br><br>See if sub needs companion to bedside (he has been admitted since 12/07 but not sure when he is discharging and if he needs someone to come there or already has done that | Zhou,Valerie | 12/13/2014 2:06PM |
| 164 | OUTEM | Cm att to reach sub @ hosp (follow) w/intrepreter assist. (D/C yesterday) | Was told sub discharged yesterday to hotel. Cm asked if facility had a follow-up no# to reach sub; told no. | Trijay Vincent | 12/14/2014 8:56AM |
| 165 | OUTCL | Cm lvm for sub @ 510/735-6462 | Advise I understand sub was d/c as of yesterday from facility. Ask sub to please give assistance a call when convenient to discuss; if sub was told stt, what was discharge orders given etc. | Trijay Vincent | 12/14/2014 9:02AM |
| | | | From: Vincent, Trijay (Allianz Global Assistance)<br>Sent: Sunday, December 14, 2014 10:42 AM<br>To: AZGA-RN@allianz-assistance.ca<br>Subject: Case#3196098<br><br>Received translated medical report for patient Boris Antl. Thanks<br><br><br><br>From: Carol Ynés Flores Muñoz [mailto:carol.flores@grupomok.com]<br>Sent: Sunday, December 14, 2014 9:16 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: medical<br>Subject: Re: ***URGENT ***Subject: Case # 3196098 Your Case # 2099605<br><br>Dear Colleagues, | | |

| | | | | | |
|---|---|---|---|---|---|
| 166 | CASE | Recvd translated medical repot | Sorry about the delay for a response, yesterday was my free day. Please to other responses, forward your emails to medical@mok.cl so differents shifts will help you.<br>See attached the medical report translated.<br>Best Regards, | Trijay Vincent | 12/14/2014 10:41AM |
| 167 | RN | Reviewed translated medical report | Dates Dec 11 2014<br>Dr Victor Asseff -Cardiologist<br>Summary<br><br>Presented with crushing substernal chest pain<br>EKG showed ST elevation anterior leads<br>Given tPA<br>Transferred for heart cath<br>Successful stenting of mid LAD on 09/12<br>Rozalie RN | Mielcarek,Rozalie | 12/14/2014 12:40PM |
| 168 | GC | Rn recommends extension of GC until 12/13/2014 | Sunject to terms of the policy<br>Rozalie RN | Mielcarek,Rozalie | 12/14/2014 12:46PM |
| 169 | RN | RN NEXT STEPS | Monitor<br>pt d/c'd 12/13 as per hospital.<br>AW pt to contaact MAUSA to advise if any further assistance needed.<br>Original DOR 1/21/2015 | Bergeron,Linda | 12/15/2014 8:25AM |
| | | | From: Boris Antl [mailto:boris_antl@yahoo.com]<br>Sent: Monday, December 15, 2014 9:49 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br><br>Subject: Re: Allianz Assistance case 3196098<br><br>Hello Valerie,<br>Thanks for your note and wishes!<br><br>I have been released from the Clinica Los Andes on Saturday, following what seems to have been a successful 'coronariografia' intervention. Have now to rest for a week and go for check-ups as required at the Clinic, starting today.<br>Two questions:<br>1. Does my policy cover the stay and related expenses at a moderately priced hotel during this one-week recovery period? | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | 2. Following my heart attack on December 7, and while in transit from the hotel in Hornopiren, through the Emergency Room at Hornopiren's clinic, the Emergency Room at Puerto Montt's hospital, and the Clinica Los Andes, including two ambulances and one ferry transfers, some of my belongings are missing. Nothing of great value, as my main piece of luggage with valuables was locked throughout the period, but a number of loose items that were collected in my hotel room in Hornopiren and put in several plastic bags by someone before being transported by ambulance to the Emergency room at Puerto Montt hospital. I had no control over these bags much of the time, they were unsealed, went on a long bumpy ride in the ambulance from Hornopiren, and were handled by dozens of people over the 6-day period. How do I make a claim for the lost items under my Baggage policy? And thanks for your offer to send me company; I am OK now. | | |
| 170 | INEM | Email from sub asking about benefits for baggage and hotel | Boris Antl | Zhou,Valerie | 12/15/2014 10:04AM |
| | | | From: AssistanceGroup (Allianz Assistance USA) Sent: Monday, December 15, 2014 10:04 AM To: 'Boris Antl' Subject: RE: Allianz Assistance case 3196098 Hello Mr. Antl, I am glad to hear that you were able to be discharged! I do hope you continue to heal quickly! Please let us know how your check ups go so that we can see how to assist you. I see that you were planning to be traveling until January 21, 2015; is that still the case? In regards to your two questions, those would both be better answered by our travel customer service department who can go over the terms and conditions and send you the appropriate claim form(s). Could I call you at the hotel and conference you with them? You are welcome to call us at anytime as well. Please let me know! Thank you for writing me and checking in! Sincerely, Valerie Zhou Assistance Coordinator II, USA | | |
| 171 | OUTEM | Emailed sub in reply | Collect: 804-673-1173 | Zhou,Valerie | 12/15/2014 10:05AM |
| | | | From: AssistanceGroup (Allianz Assistance USA) Sent: Monday, December 15, 2014 10:07 AM To: medical@mok.cl | | |

| | | | | | |
|---|---|---|---|---|---|
| 172 | OUTEM | Emailed the agent about bill amount | Subject: Allianz Assistance case 3196098<br><br>I am trying to see if I need to send you an extended guarantee letter for Boris Antl.<br><br>He discharged over the weekend and I wanted to see what was the final bill estimate?<br>Could you check with the hospital for the bill amount and let me know?<br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/15/2014 10:07AM |
| 173 | CASE | ** CM next steps ** | see about GCL extension<br>check on sub by email (he has f/u next week) | Zhou,Valerie | 12/15/2014 12:24PM |
| 174 | OUTCL | CM tried to reach billing office (to get final total) | Called with translator +56 65 22 89 112 to s/w billing office, rang without answer | Zhou,Valerie | 12/16/2014 12:57PM |
| 175 | RN | RN NEXT STEPS-UNCHANGED | Monitor<br>pt d/c'd 12/13 as per hospital.<br>AW pt to contaact MAUSA to advise if any further assistance needed--appears pt has some f/u appts next week-dates unknown.<br>Original DOR 1/21/2015 | Bergeron,Linda | 12/17/2014 8:20AM |
| | | | From: Boris Antl [mailto:boris_antl@yahoo.com]<br><br>Sent: Wednesday, December 17, 2014 12:19 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br><br>Subject: Re: RE: Allianz Assistance case 3196098<br><br>Hello Valerie,<br><br>I have had two follow-up exams at the Clinica Los Andes, one on Monday and one on Tuesday. It seems that everything is OK and I have another -- possibly the last -- appointment at the Clinica on Friday. Please ENSURE that I can undergo any and all tests and exams if and as REQUIRED by the doctor, under my policy. Yesterday, when I had to undergo a test the nurse at the Clinica -- though very friendly and helpful -- gave me very hard time and I had to go all the way to the head of the Admin to be admitted!!! Can you or your agent make sure this does not happen again. The name and contact for the head of the Admin for these issues is:<br>Rodrigo Avila<br>Email: ravila@clinandes.cl<br>Phone: 65-2289112 | | |

To answer your other question, I do not think I am in a position to continue my travel as originally planned, and would like to return home or join my family as soon as the doctors allow me. Please let me know if my expenses during the recovery and follow-up tests and exams period (one week of lodging at a moderately priced hotel, food, and transport to and from hospital thus far) are covered under my policy.
Thanks and regards,
Boris Antl

From:"AssistanceGroup (Allianz Assistance USA)" <Assistance.Group@allianzassistance.com>
Date:Mon, Dec 15, 2014 at 12:04
Subject:RE: Allianz Assistance case 3196098
Hello Mr. Antl,

I am glad to hear that you were able to be discharged! I do hope you continue to heal quickly! Please let us know how your check ups go so that we can see how to assist you. I see that you were planning to be traveling until January 21, 2015; is that still the case?

In regards to your two questions, those would both be better answered by our travel customer service department who can go over the terms and conditions and send you the appropriate claim form(s). Could I call you at the hotel and conference you with them? You are welcome to call us at anytime as well. Please let me know!

Thank you for writing me and checking in!

Sincerely,

Valerie Zhou
Assistance Coordinator II, USA
Collect: 804-673-1173
Fax: 804-673-1510
assistance.Group@allianzassistance.com

9950 Mayland Drive
Richmond, Virginia 23233
www.allianzassistance.com

NOTICE OF CONFIDENTIALITY - This material is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable laws.

CONTAIN PROTECTED HEALTH INFORMATION
(PHI). BY ACCEPTING THIS MESSAGE, YOU
ACKNOWLEDGE THE FOREGOING, AND AGREE AS
FOLLOWS: YOU AGREE TO NOT DISCLOSE TO ANY
THIRD PARTY ANY PHI CONTAINED HEREIN,
EXCEPT AS EXPRESSLY PERMITTED AND ONLY TO
THE EXTENT NECESSARY TO PERFORM YOUR
OBLIGATIONS RELATING TO THE RECEIPT OF THIS
MESSAGE.


If the reader of this email (and attachments) is
not the intended recipient, you are hereby
notified that any dissemination, distribution or
copying of this communication is strictly
prohibited. Please notify the sender of the error
and delete the e-mail you received. Thank you.


From: Boris Antl [mailto:boris_antl@yahoo.com]
Sent: Monday, December 15, 2014 9:49 AM

To: AssistanceGroup (Allianz Assistance USA)

Subject: Re: Allianz Assistance case 3196098

Hello Valerie,
Thanks for your note and wishes!

I have been released from the Clinica Los Andes
on Saturday, following what seems to have been
a successful 'coronariografia' intervention. Have
now to rest for a week and go for check-ups as
required at the Clinic, starting today.
Two questions:
1. Does my policy cover the stay and related
expenses at a moderately priced hotel during
this one-week recovery period?
2. Following my heart attack on December 7, and
while in transit from the hotel in Hornopiren,
through the Emergency Room at Hornopiren's
clinic, the Emergency Room at Puerto Mont's
hospital, and the Clinica Los Andes, including two
ambulances and one ferry transfers, some of my
belongings are missing. Nothing of great value,
as my main piece of luggage with valuables was
locked throughout the period, but a number of
loose items that were collected in my hotel room
in Hornopiren and put in several plastic bags by
someone before being transported by
ambulance to the Emergency room at Puerto
Montt hospital. I had no control over these bags
much of the time, they were unsealed, went on a
long bumpy ride in the ambulance from
Hornopiren, and were handled by dozens of
people over the 6-day period. How do I make a
claim for the lost items under my Baggage
policy?
And thanks for your offer to send me company; I
am OK now.

| 176 | INEM | Email from Sub | Boris Antl | Sarah Ntouskas | 12/17/2014 12:24PM |
|-----|------|----------------|------------|----------------|--------------------|
| 177 | CASE | CM Notified | CM adv CM Valerie verbally | Sarah Ntouskas | 12/17/2014 12:25PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 17, 2014 3:01 PM<br>To: boris_antl@yahoo.com<br><br>Subject: RE: RE: Allianz Assistance case 3196098<br><br>I am sorry to hear about the issues you had with your follow up visit. I did not realize that you were having those follow ups.<br><br>I see where we sent a guarantee letter for your inpatient expenses at Clínica Los Andes Puerto Montt. Any follow ups or outpatient services are handled differently. Please pay for those services and save any itemized bills, receipts, medical reports from those visits. The way that this insurance works for those type of visits is that you would pay upfront and then you can submit a claim for review by the claims department.<br><br>I know that you have questions about the additional expenses for the food/lodging; those types of benefit questions are handled by our customer service area. May I have a phone number for your hotel where you are staying so that I can conference you with them to get that answered?<br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | | |
| 178 | OUTEM | Emailed sub for follow up | Collect: 804-673-1173 | Zhou,Valerie | 12/17/2014 3:00PM |
| | | | From: Boris Antl [mailto:boris_antl@yahoo.com]<br><br>Sent: Wednesday, December 17, 2014 4:34 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: Re: RE: RE: Allianz Assistance case 3196098 | | |

| | | | | | |
|---|---|---|---|---|---|
| 179 | INEM | Email from sub asking for GCL for OPs | I do not have enough cash left to pay for potentially expensive tests related to my heart attack, and do not wish to negotiate with your adjusters to have my blood pressure to go up again, especially following so many mishandelings of my case already, i.e. having me wait for 2 days in an emergency room and another 2 days in intensive care before authorizing an urgent treatment following a heart attack, among other. Either authorize any treatment and/or tests as requested by a doctor here or send me the name of your supervisor. Boris Antl | Zhou,Valerie | 12/17/2014 4:57PM |
| 180 | OUTEM | Emailed sub asking for the OP dates | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 17, 2014 4:58 PM<br>To: 'Boris Antl'<br>Subject: RE: RE: RE: Allianz Assistance case 3196098<br><br>Could you please send me a list of the follow up appointments that you have scheduled. I will review this and update you.<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 12/17/2014 4:58PM |
| | | | Email found in the quarantine summary<br><br>From: Boris Antl [mailto:boris_antl@yahoo.com]<br><br>Sent: Wednesday, December 17, 2014 5:40 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: Re: RE: RE: RE: Allianz Assistance case 3196098<br><br>Hi Valerie,<br>Regarding my appointments at Clinica Los Andes this week:<br>1. Had an appointment on Monday with Dr. Tenorio to check on my healing progress. Some irregularities/problems were found in my left arm during the exam and was sent for an "ray/scan" test the following day.<br>2. On Tuesday had the "ray/scan" test of my left arm done by Dr. Andrade.<br><br>3. Appointment scheduled with. Dr. Tenorio for Friday to assess the "ray/scan" test and my overall condition. It is my understanding that if everything -- including possible new tests/exams -- is OK, will be allowed to leave and go home. | | |

It goes without saying that you should allow the
doctors to make decisions instead of some
adjuster sitting 5000 miles away from here, with
limited cardiology knowledge, if any, while
taking days and days to authorize urgent medical
procedures to save a life! Or cannot someone
pick up the phone and speak with the doctor,
instead of the endless email exchanges.
Boris Antl

From:"AssistanceGroup (Allianz Assistance USA)"
<Assistance.Group@allianzassistance.com>
Date:Wed, Dec 17, 2014 at 18:58
Subject:RE: RE: RE: Allianz Assistance case
3196098

Could you please send me a list of the follow up
appointments that you have scheduled. I will
review this and update you.

Sincerely,

Valerie Zhou

Assistance Coordinator II, USA

Collect: 804-673-1173

Fax: 804-673-1510

assistance.Group@allianzassistance.com

9950 Mayland Drive
Richmond, Virginia 23233
www.allianzassistance.com

NOTICE OF CONFIDENTIALITY - This material is
intended for the use of the individual or entity to
which it is addressed, and may contain
information that is privileged, confidential and
exempt from disclosure under applicable laws.

THIS MESSAGE (AND ITS ATTACHMENTS) MAY
CONTAIN PROTECTED HEALTH INFORMATION
(PHI). BY ACCEPTING THIS MESSAGE, YOU
ACKNOWLEDGE THE FOREGOING, AND AGREE AS
FOLLOWS: YOU AGREE TO NOT DISCLOSE TO ANY
THIRD PARTY ANY PHI CONTAINED HEREIN,
EXCEPT AS EXPRESSLY PERMITTED AND ONLY TO
THE EXTENT NECESSARY TO PERFORM YOUR
OBLIGATIONS RELATING TO THE RECEIPT OF THIS
MESSAGE.

If the reader of this email (and attachments) is
not the intended recipient, you are hereby
notified that any dissemination, distribution or
copying of this communication is strictly
prohibited. Please notify the sender of the error
and delete the e-mail you received. Thank you.

| | | | | | |
|---|---|---|---|---|---|
| 181 | INEM | Email from SUB | From: Boris Antl [mailto:boris_antl@yahoo.com]<br><br>Sent: Wednesday, December 17, 2014 4:34 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: Re: RE: RE: Allianz Assistance case 3196098<br><br>I do not have enough cash left to pay for potentially expensive tests related to my heart attack, and do not wish to negotiate with your adjusters to have my blood pressure to go up again, especially following so many mishandelings of my case already, i.e. having me wait for 2 days in an emergency room and another 2 days in intensive care before authorizing an urgent treatment following a heart attack, among other. Either authorize any treatment and/or tests as requested by a doctor here or send me the name of your supervisor.<br>Boris Antl | Laurent Beausergent | 12/18/2014 9:16AM |
| 182 | OUTEM | Email sent to sub; reply to email | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Thursday, December 18, 2014 12:12 PM<br>To: 'boris_antl@yahoo.com'<br>Subject: Case#3196098<br><br>Thank you for your recent email. In determining if we can send a Guarantee Coverage letter to doctor¿s for your outpatient visits. Can you be so kind in sending any supporting medical documentation based on your visit thus far? Or can you please relay treating (outpatient) doctors contact numbers. This way our medical team can review medical information for outpatient visits. Once reviewed or discuss with doctor by our medical team. We¿ll review coverage to determine if we can send an Guarantee Coverage letter for outpatient visits. Also, providing Doctors agrees to bill Allianz for outpatient services. Usually, outpatient visit is generally an out of pocket expense. It would our pleasure to review to determine if we can direct bill given circumstance.<br><br>Kind Regards | Trijay Vincent | 12/18/2014 12:12PM |
| | | | From: Boris Antl [mailto:boris_antl@yahoo.com]<br>Sent: Thursday, December 18, 2014 6:13 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: Re: Case#3196098 | | |

Thanks for your note but I do not understand it.

The information you request has been provided to Ms. Valerie Zhou, including the names of the doctors currently treating me and the main phone number at the Clinica Los Andes where I am being treated. All other important info has been provided to you (or your agent) over the last twelve days.

I am not feeling well, am going to the hospital tomorrow, and am not in a position to correspond with you at this point. You have all the names, contact and medical information that I have. Anything else I can provide you with? Please take care of things, or if you cannot, send me the name and contact info for your supervisor.
Boris Antl

From:"AssistanceGroup (Allianz Assistance USA)"
<Assistance.Group@allianzassistance.com>
Date:Thu, Dec 18, 2014 at 14:12
Subject:Case#3196098

Thank you for your recent email. In determining if we can send a Guarantee Coverage letter to doctor¿s for your outpatient visits. Can you be so kind in sending any supporting medical documentation based on your visit thus far? Or can you please relay treating (outpatient) doctors contact numbers. This way our medical team can review medical information for outpatient visits. Once reviewed or discuss with doctor by our medical team. We¿ll review coverage to determine if we can send an Guarantee Coverage letter for outpatient visits. Also, providing Doctors agrees to bill Allianz for outpatient services. Usually, outpatient visit is generally an out of pocket expense. It would our pleasure to review to determine if we can direct bill given circumstance.

Kind Regards

| 183 | INEM | inbound email from sub | Tri¿jay Vincent | Cole,Carey | 12/18/2014 10:11PM |

From: Rodrigo Avila [mailto:ravila@clinandes.cl]
Sent: Thursday, December 18, 2014 6:16 PM

To: AssistanceGroup (Allianz Assistance USA)
Subject: Re: Caso Nº 3196098- BORIS ANTL
Importance: High

Estimados:

| | | | | | |
|---|---|---|---|---|---|
| 184 | INEM | Email from Hosp>>.AGA total bill ** | Adjunto detalle de cuenta del paciente BORIS ANTL favor enviar a su corresponsal en Chile la carta por el valor correspondiente.<br><br>Atte,<br><br>Rodrigo Ávila Díaz | Jimenez,Leo | 12/18/2014 10:33PM |
| 185 | RN | RN NEXT STEPS UNCHANGED | Monitor<br>pt d/c'd 12/13 as per hospital.<br>AW pt to contaact MAUSA to advise if any further assistance needed--appears pt has some f/u appts next week-dates unknown.<br>Original DOR 1/21/2015 | Bergeron,Linda | 12/19/2014 8:29AM |
| 186 | CASE | Bill total $9,027,901 Chile pesos = $14,588.40 USD | Bill total $9,027,901 Chile pesos = $14,588.40 USD | Zhou,Valerie | 12/19/2014 3:00PM |
| 187 | CASE | audit prepared | audit prepared | Zhou,Valerie | 12/19/2014 3:01PM |
| 188 | CASE | audit reviewed | audit reviewed | Sarah Ntouskas | 12/19/2014 3:21PM |
| 189 | GC | the agent | Sent GCL for $15,500 USD to the agent | Zhou,Valerie | 12/19/2014 4:32PM |
| 190 | OUTEM | Emailed the agent to confirm receipt of the GCL | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Friday, December 19, 2014 4:33 PM<br>To: medical@mok.cl<br>Subject: Allianz Assistance case 3196098<br><br>I have sent you our final guarantee letter, in a separate email. Please confirm receipt of this and place to the hospital<br>Thank you.<br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 12/19/2014 4:34PM |
| 191 | OUTEM | Emailed CN 184 to claims | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Friday, December 19, 2014 5:08 PM<br>To: MedicalCases (Allianz Assistance USA); HCBackend (Allianz Assistance USA)<br>Subject: 0003238870 - 2014-12-07<br>Importance: High<br><br>Please see the attached bill where we sent the GCL<br>0003238870 | Zhou,Valerie | 12/19/2014 5:07PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Friday, December 19, 2014 5:21 PM<br>To: 'Rodrigo Avila'<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br>Gracias por su correo electrónico. Podria usted hacerme el favor de avisarme de las citas ambulatorias que ha tenido y tendrá en el futuro el paciente?? | | |

| | | | | | |
|---|---|---|---|---|---|
| 192 | OUTEM | Emailed the hospital to see what OP dates sub was referring | Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/19/2014 5:20PM |
| 193 | CASE | ** CM next steps ** | check on sub by email<br>see if we can send GCL for outpatient treatments? | Zhou,Valerie | 12/21/2014 3:52PM |
| 194 | RN | RN NEXT STEPS-UNCHANGED | Monitor<br>pt d/c'd 12/13 as per hospital.<br>AW pt to contaact MAUSA to advise if any further assistance needed--appears pt has some f/u appts this week-dates unknown.<br>Original DOR 1/21/2015 | Bergeron,Linda | 12/22/2014 9:25AM |
| 195 | RN | RN NEXT STEPS-UNCHANGED | Monitor<br>pt d/c'd 12/13 as per hospital.<br>AW pt to contaact MAUSA to advise if any further assistance needed--appears pt has some f/u appts this week-dates unknown.<br>Original DOR 1/21/2015 | Bergeron,Linda | 12/24/2014 9:00AM |
| 196 | CASE | ** CM next steps ** | Confirm why he is traveling to this country<br>Obtain outpatient treatment dates (already requested by email to sub & hosp contact)<br>Obtain passport info and existing tix info<br>a/w STT | Zhou,Valerie | 12/25/2014 4:33PM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Friday, December 26, 2014 4:24 PM<br>To: Zhou, Valerie (Allianz Global Assistance)<br>Subject: FW: Caso Nº 3196098- BORIS ANTL<br>Importance: High<br><br>Valerie,<br><br>This email has been added to the case.<br><br>Teresa Faber<br>Assistance Case Manager, USA<br>Tel: 804 673 1173<br>Fax: 804 673 1510<br>assistance.group@allianzassistance.com<br><br><br>9950 Mayland Drive<br>Richmond, VA 23233 USA<br>www.allianzassistance.com<br><br><br>NOTICE OF CONFIDENTIALITY - This material is intended for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable laws. | | |

CONTAIN PROTECTED HEALTH INFORMATION (PHI). BY ACCEPTING THIS MESSAGE, YOU ACKNOWLEDGE THE FOREGOING, AND AGREE AS FOLLOWS: YOU AGREE TO NOT DISCLOSE TO ANY THIRD PARTY ANY PHI CONTAINED HEREIN, EXCEPT AS EXPRESSLY PERMITTED AND ONLY TO THE EXTENT NECESSARY TO PERFORM YOUR OBLIGATIONS RELATING TO THE RECEIPT OF THIS MESSAGE.

If the reader of this email (and attachments) is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. Please notify the sender of the error and delete the e-mail you received. Thank you.

From: Rodrigo Avila [mailto:ravila@clinandes.cl]
Sent: Friday, December 26, 2014 7:52 AM

To: AssistanceGroup (Allianz Assistance USA)
Subject: RE: Caso Nº 3196098- BORIS ANTL
Importance: High

Estimada:
Buenos dias, el Sr. ANTL tuvo dos consultas de ambulatorio despues del alta.
Favor enviar la carta por el valor correspondiente, gracias.

Atte,

Rodrigo Ávila Díaz
CLAPM

Enviado desde Samsung Mobile

-------- Mensaje original --------

De: "AssistanceGroup (Allianz Assistance USA)" <Assistance.Group@allianzassistance.com>
Fecha:
A: Rodrigo Avila <ravila@clinandes.cl>
Asunto: RE: Caso Nº 3196098- BORIS ANTL
Gracias por su correo electronico. Podria usted hacerme el favor de avisarme de las citas ambulatorias que ha tenido y tendrá en el futuro el paciente??

Sincerely,

| 197 | INEM | EML RESPONSE | Valerie Zhou | Teresa Faber | 12/26/2014 4:23PM |

| | | | | | |
|---|---|---|---|---|---|
| 198 | CASE | Translation of the previous email | ----------------GOOGLE TRANSLATE------------<br>Dear:<br>Good morning, Mr. Antl had two outpatient visits after discharge.<br>Please send the letter by the corresponding value, thanks. | Laurent Beausergent | 12/26/2014 4:26PM |
| 199 | INEM | Email received | From: Rodrigo Avila [mailto:ravila@clinandes.cl]<br>Sent: Sunday, December 28, 2014 9:58 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br>Estimada:<br><br>Aun estamos a la espera de la carta por el valor total de la hospitalizacion, favor enviar a la brevedad, gracias.<br><br>Rodrigo Avila Diaz<br>CLAPM | Katrina Gray | 12/29/2014 12:56AM |
| 200 | OUTEM | Emailed provider contact - trying to get OP treatment dates | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 29, 2014 8:12 AM<br>To: 'ravila@clinandes.cl'<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br>What are the dates of the outpatient treatments?<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 12/29/2014 8:23AM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, December 29, 2014 8:26 AM<br>To: boris_antl@yahoo.com<br>Subject: Assistance case 3196098<br><br>Hello Mr. Antl,<br><br>I am just following up to see how you are doing. I have emailed the hospital contact that you gave me, but I have not heard back in regards to the outpatient treatment dates. May I have the past outpatient treatment dates that you had plus any upcoming ones?<br><br>I also wanted to check and see if you have a phone number where I could call you and conference you with our customer service department; I know that you had questions about your baggage benefits.<br><br>Thank you! | | |

| | | | | | |
|---|---|---|---|---|---|
| 201 | OUTEM | Emailed customer for follow up | Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 12/29/2014 8:26AM |
| 202 | RN | RN NEXT STEPS-UNCHANGED | Monitor<br>pt d/c'd 12/13 as per hospital.<br>AW pt to contaact MAUSA to advise if any further assistance needed--appears pt has some f/u appts last week-dates unknown.<br>Original DOR 1/21/2015<br>MAUSA emailed client for update-aw reply | Bergeron,Linda | 12/29/2014 8:45AM |
| 203 | RN | RN REVIEW-TAKE OFF RN/IN | Confirmed with cm Valerie that I will take case off RN/IN for now as pt not due to return until end of Jan and he has not returned calls re: f/u | Bergeron,Linda | 12/30/2014 10:31AM |
| 204 | OUTCL | CM tried another way to reach sub | 510/735-6462 from the front screen<br>Went straight to vm ¿ did not leave msg b/c does not appear that sub has access to this number right now | Zhou,Valerie | 12/31/2014 9:40AM |
| 205 | OUTEM | Emailed hospital contact - requested OP treatment dates (2nd time) | From: AssistanceGroup (Allianz Assistance USA)<br><br>Sent: Wednesday, December 31, 2014 9:46 AM<br>To: Rodrigo Avila (ravila@clinandes.cl)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br>Gracias por su correo electronico. Podria usted hacerme el favor de avisarme de las citas ambulatorias que ha tenido y tendrá en el futuro el paciente??<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173<br>Fax: 804-673-1510 | Zhou,Valerie | 12/31/2014 9:46AM |
| 206 | CASE | CN 183 - email from sub review | CM has asked for a phone number to where he is staying (we dont even know who or where he is staying) and has asked for the specfic dates of the OP treatments he referenced. IN CN 183 he did not provide answers to either question and implies that he wont be providing this info in the future | Zhou,Valerie | 12/31/2014 9:51AM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, January 05, 2015 8:38 AM<br>To: Zhou, Valerie (Allianz Global Assistance)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br><br><br>Sarah S. Ntouskas<br>Medical Assistance Specialist, USA<br>Tel: 1.804.285.3300 extension 28192 | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Fax: 1.804.673.1510<br><br>From: Rodrigo Avila [mailto:ravila@clinandes.cl]<br>Sent: Monday, January 05, 2015 9:14 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br>Importance: High<br><br>Estimada Valerie:<br><br>El paciente Boris ANTL tuvo dos citas ambulatorias que fueron el 15 y 19 de diciembre, actualmente se encuentra de alta, favor enviar carta de garantía, gracias<br><br>Atte,<br><br>Rodrigo Ávila Díaz<br>Jefe Administrativo Admisión Central<br><br>Coordinación GES/CAEC.<br>Clinica Los Andes de Puerto Montt S.A.<br>Avda. Bellavista 123, Puerto Montt.<br>Fono:652289112<br>Mail: ravila@clinandes.cl | | |
| 207 | OUTCL | Email from HOSP requesting gcl for Follow up visits | Web: www.clinandes.cl | Sarah Ntouskas | 01/05/2015 8:37AM |
| 208 | INEM | EMail from the provider | From: Rodrigo Avila [mailto:ravila@clinandes.cl]<br>Sent: Tuesday, January 06, 2015 3:57 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br>Importance: High<br><br>Estimada:<br><br>Favor enviar carta de respaldo a la brevedad, gracias.<br>Atte<br><br>Rodrigo Ávila Díaz<br>Jefe Administrativo Admisión Central<br><br>Coordinación GES/CAEC.<br>Clinica Los Andes de Puerto Montt S.A.<br>Avda. Bellavista 123, Puerto Montt.<br>Fono:652289112<br>Mail: ravila@clinandes.cl<br>Web: www.clinandes.cl | Zhou,Valerie | 01/06/2015 4:47PM |
| | | | Rodrigo Ávila Díaz<br>Jefe Administrativo Admisión Central<br><br>Coordinación GES/CAEC.<br>Clinica Los Andes de Puerto Montt S.A.<br>Avda. Bellavista 123, Puerto Montt. | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | Fono:652289112<br>Mail: ravila@clinandes.cl<br>Web: www.clinandes.cl<br><br>AC spoke to Mr. Avila with the interpreter Donovan and Mr. Avila would like CM Valerie to call him back tomorrow on the payment issue as there is still a remaining balance and Mr Avila is asking if we are going to send the GCL for it - AC told Mr Avila we will review the case but if the max amount of the policy is reached then it's the responsibility of the SUB to pay it | | | |
| 209 | CASE | RODRIGO AVILA --> AGA | All thanked | | Dina Berik | 01/07/2015 3:47PM |
| 210 | CASE | Internal communication | Sent: Wednesday, January 07, 2015 3:50 PM<br>To: Zhou, Valerie (Allianz Global Assistance)<br>Subject: Case #3196098<br><br>Hello Valerie,<br><br>Please see CN209.<br><br>Thank you.<br><br>Dina Berik<br>Assistance Coordinator I, USA | | Dina Berik | 01/07/2015 3:49PM |
| 211 | OUTEM | Emailed provider / asked for med report & bill | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Thursday, January 08, 2015 2:22 PM<br>To: 'ravila@clinandes.cl'<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br><br>Gracias por su correspondencia electrónica. Me podría proporcionar una copia de la factura y del reporte médico de sus dos citas?<br>Tiene el otras citas programadas este mes?<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | | Zhou,Valerie | 01/08/2015 2:21PM |
| | | | From: Boris Antl [mailto:boris_antl@yahoo.com]<br>Sent: Friday, January 09, 2015 7:15 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: Re: Assistance case 3196098<br><br>Hello Valerie,<br><br>Thanks for your email. I am now in Prague, Czech Republic, where I have joined my family and am recovering from the event. | | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | To answer your questions:<br><br>1. I had three outpatient examinations/treatments at the Clinica Los Andes: on Dec 15, 16, and 19.<br><br>2. As regards my my missing/lost luggage items, I have made a list and would appreciate if you could email me the appropriate form to file a claim.<br><br>Thank you, | | |
| 212 | INEM | Email from sub | Boris Antl | Zhou,Valerie | 01/09/2015 1:44PM |
| | | | From: Rodrigo Avila [mailto:ravila@clinandes.cl]<br>Sent: Friday, January 09, 2015 2:56 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br>Importance: High<br><br>Valerie:<br><br>Buenas tardes, adjunto reporte medico de las dos citas medicas después del alta, el paciente no tiene mas citas programadas en nuestra clínica.<br><br>La boleta o factura no la puedo emitir mientras no tenga la carta de pago correspondiente, te adjunto el detalle de la cuenta cuyo valor es de CLP $9.027.901 (pesos chilenos) ó US$15.047(dolares americanos).<br>Quedo a la espera de la carta de pago para proceder a facturar la atención,<br><br>Atento a tus comentarios,<br><br>Rodrigo Ávila Díaz<br>Jefe Administrativo Admisión Central<br><br>Coordinación GES/CAEC.<br>Clinica Los Andes de Puerto Montt S.A.<br>Avda. Bellavista 123, Puerto Montt.<br>Fono:652289112<br>Mail: ravila@clinandes.cl<br>Web: www.clinandes.cl | | |
| 213 | INEM | eml from hosp admin//medrx/<br>no more appts/estimate for gcl | | Taylor Robb | 01/09/2015 2:02PM |
| 214 | CASE | Bill estimate is 9,027,901CLP | 14,718.30USD the date of dc | Taylor Robb | 01/09/2015 2:18PM |
| | | | From: Zhou, Valerie (Allianz Global Assistance)<br>Sent: Friday, January 09, 2015 2:46 PM<br>To: 'Boris Antl'<br>Subject: RE: Assistance case 3196098 | | |

| | | | | | |
|---|---|---|---|---|---|
| 215 | OUTEM | late note / emailed sub | Thank you for your email. I am glad to hear that you are with your family.<br><br>I have requested from the provider, the information about your outpatient visits and am waiting for them to send that over (the medical report, itemized bill).<br>I will have customer service send out the claim form (not done by my department) along with a medical claim form in case you end up needing this too.<br><br>Thank you.<br><br><br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 01/09/2015 2:47PM |
| 216 | OUTCL | CM --> TSC | she will send out claim form to the customer | Zhou,Valerie | 01/09/2015 2:50PM |
| 217 | INEM | Inbound email from Rodrigo Diaz Hosp Admision | From: Rodrigo Avila [mailto:ravila@clinandes.cl]<br>Sent: Monday, January 12, 2015 9:51 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br>Estimada:<br><br>Favor enviar carta a la brevedad, gracias.<br><br>Atte<br><br>Rodrigo Ávila Díaz<br>Jefe Administrativo Admisión Central<br><br>Coordinación GES/CAEC.<br>Clinica Los Andes de Puerto Montt S.A.<br>Avda. Bellavista 123, Puerto Montt.<br>Fono:652289112<br>Mail: ravila@clinandes.cl<br>Web: www.clinandes.cl | Myra Kovacs | 01/12/2015 11:15AM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, January 12, 2015 12:33 PM<br>To: 'medical@grupomok.com'<br>Cc: 'rodrigo.urbina@grupomok.com'<br>Subject: 3196098<br><br>We sent a guarantee letter for Boris Antl¿s medical expenses at Clínica Los Andes Puerto Montt. Did you pay the hospital already or should we pay them directly? | | |

| | | | | | |
|---|---|---|---|---|---|
| 218 | OUTEM | Emailed the agent on behalf of the claims department | Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 01/12/2015 12:32PM |
| 219 | CASE | $9500 USD | remaining medical benefit $9500 USD | Zhou,Valerie | 01/12/2015 12:35PM |
| 220 | GC | Rn recommends coverage for op visits | dates<br>12/15 12/16 12/19 2014<br><br>med nec<br>tcvc<br><br>SDRN | Demonte,Shelley | 01/12/2015 1:23PM |
| 221 | CASE | From Carol Ynés Flores Muñoz-->AGA | From: Carol Ynés Flores Muñoz [mailto:carol.flores@grupomok.com]<br>Sent: Monday, January 12, 2015 3:02 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: medical@grupomok.com;<br>rodrigo.urbina@grupomok.com<br>Subject: Re: 3196098<br><br>Dear Colleagues,<br><br>We cover the estimated costs at first, they were $5.268.666 chilean pesos. Now, we have received the total costs and there's a pending balance for $3.759.235 chilean pesos.<br>Please let us know if you will cover the total amount, in order to send an advance of fund document. See attached medical report and costs.<br>Awaiting your soonest response.<br>Kind Regards, | Shanks,David | 01/12/2015 3:06PM |
| 222 | INEM | notified CM Valerie | inbound email | Shanks,David | 01/12/2015 3:07PM |
| | | | From: Rodrigo Avila [mailto:ravila@clinandes.cl]<br>Sent: Monday, January 12, 2015 2:34 PM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br>Valerie:<br><br>Medical appointments were no cost, only included in the income hospitalization vascular doppler ultrasound one for the value of CLP $ 107,360.<br>Please send the letter of payment, thanks.<br>Best regards,<br><br><br><br><br>Rodrigo Ávila Díaz | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Jefe Administrativo Admisión Central<br><br>Coordinación GES/CAEC.<br>Clinica Los Andes de Puerto Montt S.A.<br>Avda. Bellavista 123, Puerto Montt.<br>Fono:652289112<br>Mail: ravila@clinandes.cl | | |
| 223 | INEM | Email from provider | Web: www.clinandes.cl | Zhou,Valerie | 01/12/2015 4:29PM |
| 224 | OUTEM | Emailed the provider - GCL already established via the agent | From: Zhou, Valerie (Allianz Global Assistance)<br>Sent: Tuesday, January 13, 2015 10:29 AM<br>To: 'Rodrigo Avila'<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br>We already sent our guarantee letter through our agent Grupo Mok. I will let them know again so that they can resolve things with you.<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 01/13/2015 10:33AM |
| 225 | OUTEM | Emailed the agent - manually resent the GCL | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Tuesday, January 13, 2015 10:32 AM<br>To: 'Carol Ynés Flores Muñoz'<br>Cc: medical@grupomok.com;<br>rodrigo.urbina@grupomok.com<br>Subject: RE: 3196098<br><br>We had already sent you a guarantee letter advising that we could cover the costs. Please see the attached guarantee letter again and please resolve things with the hospital. I will let the claims department know about the bill.<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA<br>Collect: 804-673-1173 | Zhou,Valerie | 01/13/2015 10:33AM |
| | | | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Tuesday, January 13, 2015 10:37 AM<br>To: boris_antl@yahoo.com<br>Subject: RE: Assistance case 3196098<br><br>Mr. Antl,<br><br>I believe that I have worked out your medical expenses at Clínica Los Andes Puerto Montt using our local agent. Please let me know if you hear otherwise. | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | I would like to follow up with you to offer our over-the-phone survey; is there a phone number where I could reach you or maybe I should wait until you arrive back in the US?<br><br>Sincerely,<br><br>Valerie Zhou | | |
| 226 | OUTEM | Emailed customer - follow up / survey | Assistance Coordinator II, USA | Zhou,Valerie | 01/13/2015 10:36AM |
| 227 | INEM | Email from the provider | From: Rodrigo Avila [mailto:ravila@clinandes.cl]<br>Sent: Tuesday, January 13, 2015 1:05 PM<br>To: Zhou, Valerie (Allianz Global Assistance)<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br>Importance: High<br><br>Valerie:<br><br>The amount authorized by you is for the total bill? corresponding to CLP $ 9,027,901 or US $ 15,047.<br><br>Attentive to your comments,<br><br><br>Rodrigo Ávila Díaz<br>Jefe Administrativo Admisión Central<br><br>Coordinación GES/CAEC.<br>Clinica Los Andes de Puerto Montt S.A.<br>Avda. Bellavista 123, Puerto Montt.<br>Fono:652289112<br>Mail: ravila@clinandes.cl<br>Web: www.clinandes.cl | Zhou,Valerie | 01/13/2015 12:26PM |
| 228 | OUTEM | Emailed the provider | From: Zhou, Valerie (Allianz Global Assistance)<br>Sent: Tuesday, January 13, 2015 12:27 PM<br>To: 'Rodrigo Avila'<br>Subject: RE: Caso Nº 3196098- BORIS ANTL<br><br>Yes that is correct.<br><br>Sincerely,<br><br>Valerie Zhou<br>Assistance Coordinator II, USA | Zhou,Valerie | 01/13/2015 12:26PM |
| 229 | CASE | *** CM Next steps *** | CSA with customer 01/22 | Zhou,Valerie | 01/15/2015 10:09AM |
| | | | From: José Lagos Ponce<br>[mailto:jose.lagos@grupomok.com] | | |

| | | | | | |
|---|---|---|---|---|---|
| | | | Sent: Monday, January 19, 2015 10:30 AM<br><br>To: AssistanceGroup (Allianz Assistance USA)<br>Cc: medical@grupomok.com; Juan Tejos Fernandez<br>Subject: Re: 3196098<br><br>Dear colleagues,<br><br>Concerning your wire transfer, please find enclosed copy of our banking information in order to proceed with payment.<br><br>Looking forward to hearing from you soon. Regards, | | |
| 230 | INEM | Email from Agent w/ Banking info | José Lagos | Sarah Ntouskas | 01/19/2015 10:37AM |
| 231 | OUTEM | CN 230 Sent to CEX | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Monday, January 19, 2015 10:39 AM<br>To: MedicalCases (Allianz Assistance USA)<br>Subject: FW: 3196098<br><br>Wire xfer info for provider 319870<br><br>Sarah S. Ntouskas | Sarah Ntouskas | 01/19/2015 10:40AM |
| 232 | OUTCL | CM tried to reach sub | 510/735-6462 went straight to vm<br>Left msg asking if sub was home yet and offered survey | Zhou,Valerie | 01/22/2015 1:47PM |
| 233 | CASE | Closing note | sub continued his trip, have offered survey by email and phone | Zhou,Valerie | 01/23/2015 10:54AM |
| | | | From: Liubov Yartseva [mailto:Luba@bnsklaw.com]<br>Sent: Tuesday, November 23, 2021 8:02 PM<br><br>To: AssistanceGroup (Allianz Assistance USA) <Assistance.Group@allianzassistance.com><br>Cc: Ryan Abbott <ryan@bnsklaw.com><br>Subject: [EXT] Re: Letter of Representation \| Insured¿s Name: Boris Anti \| Insured¿s ID # US03173366<br><br>To Whom It May Concern:<br><br>Attached please find letter of representation and demand for documents. This letter is also notice that Allianz should preserve all documents and evidence related to this matter.<br><br>Thank you,<br><br><br><br>Luba Yartseva<br>Litigation Paralegal | | |

| | | | Brown, Neri, Smith & Khan<br>11601 Wilshire Blvd., Ste. 2080<br>Los Angeles, CA 90025<br>Phone No.: (310) 593-9890<br>Cell Phone.: (424) 757-3099 | | |
|---|---|---|---|---|---|
| 234 | CASE | Attorney >>> AGA | Direct No.: (310) 935-3948 | Linda Holloway | 11/23/2021 8:25PM |
| 235 | OUTEM | Notice to Mgmt -- Forwarded email | From: AssistanceGroup (Allianz Assistance USA)<br>Sent: Tuesday, November 23, 2021 8:28 PM<br>To: Fraser, Maryann (Allianz Partners USA) <MaryAnn.Fraser@allianz.com>; Sullivan, Lashanta (Allianz Partners USA) <Lashanta.Sullivan@allianz.com><br>Subject: FW: Re: Letter of Representation \| Insured¿s Name: Boris Anti \| Insured¿s ID # US03173366<br>Importance: High<br><br><br>Hi MaryAnn and LaShanta,<br><br>Thought you should have this¿..<br><br><br>Linda H.<br><br>Associate Coordinator I, Assistance Dept. USA | Linda Holloway | 11/23/2021 8:28PM |