UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Boris Antl, | No. 2:22-cv-00504-KJM-AC |
| Plaintiff, | ORDER |
| v. | |
| AGA Service Company, et al., | |
| Defendants. | |

Plaintiff Boris Antl alleges defendants AGA Service Company and Jefferson Insurance Company (together "AGA" for simplicity) wrongfully delayed confirming they would cover the costs of Antl's emergency heart surgery in Chile. AGA moves for summary judgment. As explained in this order, that motion is **denied** based on several genuine disputes of material fact in the current record.

**I.    BACKGROUND**

Antl had a heart attack in a small Chilean village in 2014. Antl Dep. at 45–46, 48, Luetto Decl. Ex. E, ECF No. 36-4.[1] He went to the local clinic. *Id.* at 49–50. A doctor told him to go to the hospital, and the fastest way to get there was by driving, so the doctor drove him in an ambulance. *See id.* at 53–54.

---

[1] Other portions of the same deposition are included in Exhibit D to the Declaration of Kete Barnes, filed at ECF No. 39-2.

1    On the way to the hospital, Antl called AGA. *See id.* at 59–60; Antl Decl. ¶ 2, ECF No. 39-4. He had purchased a travel plan from AGA that included "both insurance coverage and assistance services," Travel Plan at 25, Jones Decl. Ex. A, ECF No. 36-2, including help over the phone "24 hours a day," *id.* at 1, 23, 37. The insurance policy itself covered "emergency medical or dental care" for a "sudden, unexpected illness or injury during [his] trip that's either life threatening or could cause serious and irreparable harm if it isn't treated." *Id.* at 26–27 (emphasis omitted). Antl told AGA he was having a heart attack and was in an ambulance on the way to a hospital, and he asked for help to get the treatment he needed. Antl Dep. at 59–60. He does not remember AGA's response, but he believes he passed the phone to the doctor, who briefly explained what was happening. *Id.* at 60–61. Notes from an AGA employee report the phone connection was poor and the call was cut off, but AGA understood Antl was on the way to the hospital and needed coverage and help to find treatment for his heart attack. *See* Call Notes, Barnes Decl. Ex. E at 140, ECF No. 39-2.[2]

When Antl arrived at the hospital, doctors gave him an infusion of Tenecteplase, a drug that restored at least some of the blood flow to his heart. *See* Raney Decl. at 4, 10, ECF No. 39-3; Brown Decl. ¶¶ 7, 31, ECF No. 36-3. Doctors also told AGA Antl had arrived at the hospital, his chest pain had decreased and he was stable. Call Notes at 142–43. But Antl needed surgery immediately, which was possible only at a second hospital nearby, Clinica Los Andes. *See* Antl Dep. at 86; Call Notes at 142–43. After a few days and exchanges between AGA and the hospital, Antl was transferred. *See* Antl Dep. at 86; Call Notes at 144–62.

At the second hospital, doctors warned Antl he was in a dangerous condition and needed surgery as soon as possible, but the hospital required assurances from AGA that it would cover the operation. *See* Antl Decl. ¶¶ 4–5; Antl Dep. at 112, 116–18. AGA's call notes show it received the same information. *See, e.g.*, Call Notes at 142–45, 163, 172–73. The hospital did not ask Antl to pay for the surgery himself, and he did not think of it, but he did not have means to pay immediately in any event. *See* Antl Decl. ¶¶ 8–9; Antl Dep. at 105, 110–11. And although doctors waited to operate until AGA confirmed it would cover the procedure, they did reassure

---

[2] Page numbers cited in this exhibit are those applied by the CM/ECF system.

1   Antl they would begin the operation in an emergency if necessary: in his words, "if I was going to
2   be dying, they are going to do something about it." Antl Dep. at 112.  After a few days, doctors
3   still had not obtained satisfactory confirmation from AGA, so one physician prepared a letter with
4   what Antl described as an "ultimatum," which prompted AGA's confirmation.  *See* Antl Decl.
5   ¶ 7; Antl Dep. at 116–18; Call Notes at 172–73; Zhou Dep. at 92–100, Barnes Decl. Ex. A, ECF
6   No. 39-2; Fraser Dep. at 129–34, Barnes Decl. Ex. B, ECF No. 39-2.  Doctors then operated
7   successfully.  Brown Decl. ¶ 10; Raney Decl. at 7–8.

8   　　　　The timing of Antl's treatment in Chile is pivotal in his current dispute with AGA.  His
9   heart attack began at midday on December 7, and he reached the local clinic a few minutes later.
10  *See* Antl Dep. at 45–46, 49–51.  He was admitted to the first hospital later the same night, and he
11  was transferred to the second hospital by December 9, two days later.  *See* Raney Decl. at 4–5.
12  Doctors completed surgery on December 11, and he was discharged on December 13.  *Id.* at 7–8.
13  Antl and AGA each have submitted reports by cardiologists, who have conflicting opinions about
14  the implications of this timeline.  Dr. Aidan Raney, the physician engaged by Antl, concluded
15  Antl "suffered permanent heart damage as a result of his heart attack (myocardial infarction), and
16  that the majority of the damage was caused by unnecessary additional delays caused by his
17  insurance company," i.e., by AGA.  *Id.* at 8.  Dr. C. Alan Brown, the physician engaged by AGA,
18  concluded "significant heart muscle had been irreversibly damaged prior to Tenecteplase infusion
19  and was no longer salvageable" by surgical means.  Brown Decl. ¶ 33.

20  　　　　Immediately after Antl's surgery, however, he did not believe he had suffered any
21  irreversible damage as a result of AGA's delayed confirmation.  *See* Antl Decl. ¶¶ 10, 12; Antl
22  Dep. at 163, 187.  As he saw it, he was alive, so the crisis had been averted.  *See* Antl Decl. ¶ 10.
23  The doctors in Chile did not mention any concerns about lingering damage, either.  Antl Dep. at
24  185.  Nor did Antl's doctors in the United States and Europe, at least not at first.  *See id.* at 163,
25  166–67, 172, 181, 183–84, 187.  It is unclear whether any doctor gave serious thought to the
26  possibility the delay had exacerbated the damage to Antl's heart.  On the one hand, Antl told his
27  doctors what had happened, but on the other, he did not ask specifically about the delay.  *See id.*;
28  *see also* Antl Decl. ¶¶ 11, 12.  It was not until September 2021—almost seven years after his

heart attack—that Antl heard from a cardiologist that his "life-span is going to be shortened because of the delay in the surgery and the damage caused by it." Antl Dep. at 163.

This news caused him distress. Antl. Decl. ¶ 16. He has become depressed and anxious and has had difficulty sleeping, but he has not sought the care of a psychologist or psychiatrist, as he believes that type of care would not be useful, and he does not want to take medication due to the possible side effects. Antl Dep. at 217–18. "In other words," he explains in a declaration, he does not believe "that any medical or psychiatric treatment would cause more benefit than harm." Antl Decl. ¶ 16. Despite these difficulties, however, he has continued to exercise—though more cautiously now than before—and he has continued to travel. Antl Decl. ¶ 14; Antl Dep. at 217.

Antl filed this lawsuit in October 2023, soon after his cardiologist told him the delayed surgery had shortened his lifespan. *See generally* Compl., ECF No. 1. In his current complaint, he alleges AGA breached its obligations under the insurance policy, Second Am. Compl. ¶¶ 42–46, breached its implied covenant of good faith and fair dealing, *id.* ¶¶ 47–51, delayed coverage in bad faith, *id.* ¶¶ 52–58, and caused him emotional distress, both intentionally and negligently, *id.* ¶¶ 67–79. He previously asserted fraud and unfair competition claims as well, but the court dismissed those claims because his complaint did not meet the federal pleading standards. *See generally* Order (July 13, 2022), ECF No. 15; Order (Nov. 4, 2022), ECF No. 28. AGA now moves for summary judgment, and the motion is fully briefed. *See generally* Mot., ECF No. 36; Opp'n, ECF No. 39; Reply, ECF No. 40. The court heard arguments on December 8, 2023. Mins., ECF No. 46. Ryan Abbott appeared for Antl, and Helen Luetto appeared for AGA.

## II.     EVIDENTIARY OBJECTIONS

It is first necessary to address AGA's evidentiary objections, which are many—eighty-nine in total—but terse. *See generally* Evid. Objs., ECF No. 41. The judges in this district, including the undersigned, often have cautioned attorneys against the urge to submit long lists of reflexive evidentiary objections in connection with summary judgment motions. *See, e.g.*, *City of Lincoln v. County of Placer*, 668 F. Supp. 3d 1079, 1086–87 (E.D. Cal. 2023); *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006). The court encourages counsel to review these orders to avoid unnecessary and unpersuasive objections in the future.

Generally, the admissibility of evidence at summary judgment is governed by different rules and different motivations than at trial. At summary judgment, Rule 56 allows objections to evidence when "the material cited . . . cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). As this language suggests, at this stage, the propriety of evidence depends not on its form, but on its content. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001).

An objection's import also depends on the objector's identity. "Because '[v]erdicts cannot rest on inadmissible evidence' and a *grant* of summary judgment is a determination on the merits of the case," a moving party's evidence must be admissible. *Burch*, 433 F. Supp. 2d at 1121 (alterations and emphasis in original) (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)). But a party who opposes summary judgment can prevail by demonstrating "a question of fact remains for trial," so courts have commonly "treat[ed] the opposing party's papers more indulgently than the moving party's papers." *Id.* (quoting *Lew v. Kona Hosp.*, 754 F.2d 1420, 1423 (9th Cir. 1985)). District courts have discretion "to be somewhat lenient" if the opposing party's evidence falls short of the "formalities of Rule 56." *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993); *see also Scharf v. U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979). For example, on review of summary judgment, the Ninth Circuit has considered the hearsay contents of a diary whose substance would have been admissible in another form at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003). Authenticity problems might also be excused if those problems could likely be cured. *See, e.g.*, *Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1163–64 (E.D. Cal. 2015).

Some evidentiary objections are also a mismatch for summary judgment in general. That is true first and foremost of form objections and objections based on relevance, vagueness and speculation. To the extent these objections attack the content of the evidence rather than its form, they duplicate Rule 56 itself. Courts disregard irrelevant, indecipherable or speculative evidence, *see, e.g.*, *Burch*, 433 F. Supp. 2d at 1119, and a party cannot avoid summary judgment with vague assertions or speculation, *see* Fed. R. Civ. P. 56(c)(1). Likewise, an objection that testimony is

5

argumentative or mischaracterizes the record either calls for a credibility determination unsuited for summary judgment or would be better directed at the underlying evidence itself. *City of Lincoln*, 668 F. Supp. 3d at 1087.

AGA's objections fall within these categories. Because this order rests on only relevant and concrete evidence, AGA's objections based on arguments about irrelevance, vagueness and speculation are moot. Nor will the court attempt to discern the reasoning behind AGA's cursory citations to the Federal Rules. It offers no explanation for its objections except for a citation and a word or two. *See, e.g.*, Evid. Objs. No. 1 (objecting without elaboration that evidence is inadmissible hearsay). The court has reviewed all documents and records cited in this order and for each has determined the evidence either would be admissible for the specified purpose or could likely be reduced to an admissible form at trial.

### III. SUMMARY JUDGMENT

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* The parties must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). The court then views the record in the light most favorable to the nonmoving party—Antl in this case—and draws reasonable inferences in that party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

#### A. Statute of Limitations

AGA argues first that Antl's claims are barred by the statute of limitations. *See* Mot. at 5–9. In general, California law requires plaintiffs to file their lawsuits within the limitations period, which begins to run when the claim accrues. *See* Cal. Civ. Proc. Code § 312. A claim accrues when it is "complete with all its elements," that is, when there has been some "wrongdoing or wrongful conduct, cause or causation, and harm or injury." *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (1999) (quotation marks and citations omitted). The "discovery rule" is an exception to

6

this general bar. *Id.* Under the discovery rule, the limitations period clock does not start running until a person actually discovers or has reason to discover the potential claim. *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005). California courts "do not take a hypertechnical approach" to enforcing this rule. *Id.* They consider whether the plaintiff had "reason to at least suspect that a type of wrongdoing has injured them." *Id.* (quoting *Norgart*, 21 Cal. 4th at 398). The plaintiff must exercise "reasonable diligence." *Sylve v. Riley*, 15 Cal. App. 4th 23, 26 (1993).

A defendant who argues a claim is barred is asserting an affirmative defense, so it is that defendant's ultimate burden to prove at trial the plaintiff filed the lawsuit too late. *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995) (applying California law). But a plaintiff who relies on the discovery rule is the one who ultimately must "prove the facts necessary to toll the limitations period once it is established that it would have otherwise commenced." *Id.* So when defendants move for summary judgment based on the statute of limitations, plaintiffs who plan to rely on the discovery rule at trial must cite evidence that places the statute of limitations in dispute. *See, e.g.*, *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1157–58 (9th Cir. 2002) (applying California law). That is, they must cite evidence to show "a reasonable jury could return a verdict" in their favor. *Anderson*, 477 U.S. at 248. California courts have said, however, that a plaintiff's "reasonable diligence" is "generally a question of fact" for the jury, not the court, *Sylve*, 15 Cal. App. 4th at 26–27, so even if the evidence is undisputed, the diligence decision might necessitate a trial.

There is no dispute in this case that Antl's claims are barred by the statute of limitations unless he proves at trial he did not discover and did not have reason to discover he had a potential claim against AGA. *See* Mot. at 5–6; Opp'n at 7. To withstand AGA's motion, then, Antl must cite evidence a reasonable jury could rely on to find he did not discover and did not have reason to discover he had a potential contract claim against AGA until March 2018 or later and potential

claims for emotional distress and breach of the implied covenant of good faith and fair dealing until March 2020 or later.[3]

Antl has cited the necessary evidence. As summarized above, he could testify at trial that he did not understand in 2014 a delayed surgery would cause permanent harm, but rather that he faced a greater risk of death until the surgery was complete. Doctors in Chile did not warn him about permanent harm. When he returned from Chile and visited cardiologists in the United States and Europe, none raised concerns about the delay until the Fall of 2021. It is unclear whether and how diligently Antl investigated the potential effects of that delay. He claims both that he "thoroughly researched the subject of heart attacks," Antl Decl. ¶ 11, and that he did not investigate "whether the delay in the placement of the stent caused further damage to [his] heart," Antl. Dep. at 186. But a jury could find in a case like this one, which turns on the interpretation of complex medical evidence, that a diligent person in Antl's situation would be justified in relying on his doctors' expertise and advice. He told doctors about "what occurred in Chile, including the delay"; in response, until 2021, they told him he "should be able to lead a normal life"; nor did any doctors request records or reports from the Chilean hospitals. Antl Decl. ¶ 12. AGA is not entitled to summary judgment based on the statute of limitations.

**B.     Causation**

AGA next argues Antl cannot prove a delay in confirmation of coverage caused Antl any harm. *See* Mot. at 9–13. First, AGA contends the injuries to Antl's heart occurred within a few hours, not during his wait for surgery. *See id.* at 10–11. This argument rests on the opinions of AGA's retained cardiologist, Dr. Brown. *See id.* at 11. In response, Antl has offered the opinions of Dr. Raney, who would testify at trial that "Anti suffered permanent heart damage as a result of his heart attack (myocardial infarction), and that the majority of the damage was caused by unnecessary additional delays caused by [AGA]." Raney Decl. at 8. In Raney's assessment, contrary to that of Brown, "[t]he delays will likely result in a reduction of Mr. Antl's lifespan by

---

[3] Antl filed this action in March 2022. The parties agree Antl's contract claim is subject to a four-year statute of limitations and his other claims are each subject to two-year statutes of limitations. *See* Mot. at 5–6; Opp'n at 7.

8

approximately five years as well as a reduction in his qualify of life." *Id.* Dr. Brown's and Dr. Raney's opinions are, in short, the subject of a genuine dispute of fact this court cannot now resolve. AGA is not entitled to summary judgment based on Brown's opinions.

Second, regardless of the doctors' conflicting opinions, AGA argues Antl cannot prove doctors delayed his surgery because they were awaiting AGA's confirmation of coverage. *See Mot. at* Reply at 4–6. But Antl has cited evidence that could likely be reduced to admissible form and that could allow a jury to find doctors in Chile did in fact wait to begin surgery until AGA confirmed it would cover the expense. This evidence includes Antl's own first-hand observations and the records of AGA's correspondence with doctors and hospital staff in Chile. Although some of the statements in these records might be inadmissible at trial as hearsay, as AGA contends, *see* Reply at 4–5, other statements could be admissible. For example, some statements would probably not be admitted to prove the truth of the matter asserted, so they would not be hearsay. *See, e.g.*, Call Notes at 172 (recording doctor's request to "[p]lease send soon the Insurance confirmation for do [sic] what we have to do for the patient."). Others could likely be admitted under an exception or exclusion to the hearsay rule. *See, e.g.*, Fed. R. Evid. 801(c), 801(d)(2), 803(1), (3), (4), (6), 807.

Third, AGA argues Antl could have avoided delays by agreeing to pay for the surgery himself. Mot. at 12; Reply at 6. It is unclear whether Antl could have ensured faster treatment by offering to pay directly. *See, e.g.*, Antl Decl. ¶ 9 ("I did possess financial investments at that time that I could have liquidated and which would have exceeded the cost of treatment. However, I did not have the ability to convert those investments to local currency from my hospital bed and to make payment to Clinica los Andes on short timeframes."). That dispute must be resolved at trial.

In sum, AGA has not shown it is entitled to summary judgment based on the absence of evidence to prove causation.

### C. Contract Claims

AGA next contends Antl cannot prove the specific elements of his contract claims, starting with his claim for breach of contract. To risk stating the obvious, one element of a claim

9

for breach of contract is breach. *See, e.g.*, *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011) (listing elements). Antl does not dispute AGA paid for his care in Chile. *See* Opp'n at 7. Nor does he dispute AGA ultimately provided the confirmation the hospital required. *Id.* at 4. He cites no policy term requiring treatment or confirmation on a specific timeline. Instead he argues AGA did not act with the speed his emergency demanded. *See* Opp'n at 12. That argument does not show AGA breached any particular contract obligation. But it could show AGA prevented Antl from receiving "the benefits of the agreement," and for that reason, it could demonstrate AGA breached its implied covenant of good faith and fair dealing. *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000) (quoting *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958)). California courts have held insurers can be liable for breaching their implied covenant of good faith and fair dealing even if, as in this case, they have paid the full limits of a policy. *See, e.g.*, *Brehm v. 21st Century Ins. Co.*, 166 Cal. App. 4th 1225, 1236 (2008) (collecting authority).

A reasonable jury could find in an unusual situation like this one—an insurer has promised to cover a traveler's emergency healthcare, doctors believe the traveler needs emergency surgery, and the insurer knows these doctors will not operate without confirmation of coverage—delayed confirmation is tantamount to the denial of coverage for emergency care. The promise of emergency coverage might otherwise not be "effective," which would support Antl's claim. *Kransco*, 23 Cal. 4th at 400 (quoting *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683 (1988)). And because "a breach of the implied covenant of good faith and fair dealing is a breach of the contract," *Schwartz v. State Farm Fire & Cas. Co.*, 88 Cal. App. 4th 1329, 1339 (2001), AGA is not entitled to summary judgment on Antl's breach of contract claim.

This is true no matter whether the insurance policy is distinct from the assistance agreement, as AGA contends. *See* Reply at 7–8. AGA does not dispute that both the policy and the assistance agreement with Antl impose contractual obligations, including the implied covenant of good faith and fair dealing. Nor is it necessary to resolve the parties' dispute about whether Antl is entitled to fees under *Brandt v. Superior Court*, 37 Cal. 3d 813, 817 (1985) ("When an insurer's tortious conduct reasonably compels the insured to retain an attorney to

obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense."). He alleges his lifespan was reduced as a result of a breach of the implied covenant of good faith and fair dealing, and if he proves that allegation at trial, he would have established damages regardless of whether he can also show he was required to engage an attorney.

Antl also asserts a claim for "bad faith." Second Am. Compl. ¶¶ 52–58. The court construes this claim as a request for tort damages. Ordinarily, compensation for a breach of contract "is limited to contract rather than tort remedies," *Kransco*, 23 Cal. 4th at 400, "[b]ut 'an exception to this general rule has developed in the context of insurance contracts where, for a variety of policy reasons, courts have held that an insurer's breach of the implied covenant will provide the basis for an action in tort," *id.* (alterations omitted) (quoting *Foley*, 47 Cal. 3d at 684). An insurer can be liable for tort damages if it "delayed payment based on inadequate or tardy investigations" when benefits are due, among other reasons. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 36 (1995) (quoting *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1153 (1990)). But "negligence" or "bad judgment" is not bad faith. *Chateau Chamberay Homeowners Ass'n v. Assoc. Int'l Ins. Co.*, 90 Cal. App. 4th 335, 346 (2001) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990)). The insurer must instead have taken some "conscious and deliberate act." *Id.* (quoting *Careau*, 222 Cal. App. 3d at 1395). It must have acted "unreasonably or without proper cause." *Id.* at 347 (emphasis omitted). This question is "ordinarily a question of fact," but "becomes a question of law when the evidence is undisputed and only one reasonable inference can be drawn from the evidence." *Id.* at 346.

So in all, to withstand AGA's motion for summary judgment of Antl's claim for tort damages based on AGA's alleged bad faith, Antl must show either there is a genuine dispute about what occurred or that a jury could draw more than one reasonable inference from the evidence. On the record before the court, he has shown a jury could find AGA acted unreasonably in the circumstances. For example, AGA does not deny the policy covered emergency care for Antl's heart attack; an AGA representative testified on AGA's behalf that the company ordinarily relies on doctors' diagnoses and recommendations, including for surgery to

11

treat a heart attack, *see* Castro Dep. at 47–56, Barnes Decl. Ex. C, ECF No. 39-2; and AGA's notes show doctors had said they were awaiting its confirmation of coverage before performing a necessary surgery, *see, e.g.*, Call Notes at 173.

For these reasons, AGA is not entitled to summary judgment on Antl's request for tort damages based on his allegation that AGA delayed in bad faith.

### D. Emotional Distress

AGA also seeks summary judgment on Antl's tort claims for intentional and negligent infliction of emotional distress. Mot. at 16–18.

First, to prevail in a claim for intentional infliction of emotional distress, a plaintiff must ultimately prove three things: (1) the defendant acted extremely and outrageously, either with an intent to cause emotional distress or with reckless disregard for the probability that its actions would cause emotional distress; (2) the plaintiff suffered "severe or extreme emotional distress"; and (3) the outrageous conduct was the "actual and proximate" cause of that distress. *Christensen v. Superior Ct.*, 54 Cal. 3d 868, 903 (1991) (quoting *Davidson v. City of Westminster*, 32 Cal. 3d 197, 209 (1982)). "A defendant's conduct is 'outrageous' when it is so 'extreme as to exceed all bounds of that usually tolerated in a civilized community.'" *Hughes v. Pair*, 46 Cal. 4th 1035, 1050–51 (2009) (quoting *Potter v. Firestone Tire & Rubber Co.*, 6 Cal. 4th 965, 1001 (1993)). "It is for the court to determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1265 (2017).

Although it is a close call, Antl has cited evidence a jury could rely on to find AGA recklessly disregarded the probability that delaying confirmation of coverage put Antl at risk of serious injury and resulting emotional distress. A jury could reasonably find that a "civilized society" expects insurers offering emergency coverage and assistance to foreign travelers not to delay confirmation of coverage when the delay could cause death or permanent injury. *Hughes*, 46 Cal. 4th at 1050–51 (quoting *Potter*, 6 Cal. 4th at 1001). The jury could also conclude AGA delayed, for the reasons above. At this stage, the court must resolve these uncertainties in Antl's favor. *See Matsushita*, 475 U.S. at 587–88.

Second, the elements of a claim for negligent infliction of emotional distress are the elements of a generic negligence claim: "duty, breach of duty, causation, and damages." *Burgess v. Superior Ct.*, 2 Cal. 4th 1064, 1072 (1992). The plaintiff must show "serious" emotional distress. *Id.* at 1073 n.6 (quoting *Molien v. Kaiser Found. Hosps.*, 27 Cal. 3d 916, 928 (1980)).

AGA argues Antl cannot prove his distress was "serious." Mot. at 17–18. It emphasizes he has not sought out psychiatric care and relies on his own assessment of his condition. *See id.* But reports of lost sleep, anxiety and depression can support a claim for negligent infliction of emotional distress. *See, e.g.*, *Acinelli v. Torres*, No. 13-1371, 2019 WL 6825767, at *8 (C.D. Cal. Apr. 22, 2019) (discussing *P.S. v. Scripps Media, Inc.*, No. D070266, 2017 WL 1534624, at *9–10 (Cal. Ct. App. Apr. 28, 2017));[4] *see also, e.g.*, *Fletcher v. W. Nat'l Life Ins. Co.*, 10 Cal. App. 3d 376, 397 (1970) ("It is true that plaintiff's testimony did not indicate that he suffered any traumatic emotional distress of the character of shock, horror or nausea, but the requisite emotional distress may consist of any highly unpleasant mental reaction such as fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment or worry."). AGA has not cited authority to show Antl cannot prevail unless he sought medical treatment for his distress, and the court is aware of none.

The court acknowledges again this is a close case. In addition, a fact-finder might ultimately conclude at trial that Antl's reports of distress are not credible, or he might not ultimately prove his distress was as severe as he now asserts, but the court cannot grant summary judgment based on that potential finding. *See Acinelli*, 2019 WL 6825767, at *8 ("The court determines whether, on the evidence, severe emotional distress can be found; the jury determines 'whether, on the evidence, it has in fact existed.'" (quoting *Fletcher*, 10 Cal. app. 3d at 89). Nor can AGA prevail at this stage by pointing out that Antl believed at the time that his treatment in Chile was successful or adequate. The distress that is the subject of his complaint is the distress

---

[4] Although the California Rules of Court would prohibit the citation of this unpublished decision in a state court, those rules do not apply in federal courts, which may review and consider unpublished appellate decisions for their persuasive value. *See Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 942 n.4 (9th Cir. 1997); *Inland Concrete Enters., Inc. v. Kraft*, 318 F.R.D. 383, 405–06 (C.D. Cal. 2016).

he claims to have suffered after learning from his doctor that the delays in his treatment had shortened his life expectancy. The record does not permit the court to conclude Antl's distress would have been different if he had learned this news much earlier. And as summarized in the separate section above, Antl has cited evidence to show AGA's actions are a cause of that distress, despite the passage of time.

AGA is not entitled to summary judgment on Antl's claim of negligent infliction of emotional distress.

**IV.    CONCLUSION**

The motion for summary judgment is **denied**.

A Final Pretrial Conference is **set for September 13, 2024 at 10:00 a.m.** in Courtroom 3 before Chief District Judge Kimberly J. Mueller. The parties should be prepared to confirm a trial date within 60 to 120 days from the date of the Final Pretrial Conference, and should be available for trial accordingly. The parties shall meet and confer and file a joint Pretrial Statement **no less than three weeks prior** to the Final Pretrial Conference. *See* E.D. Cal. L.R. 282. The provisions of Local Rule 281 shall apply with respect to the matters to be included in the joint pretrial statement. At least one of the attorneys who will conduct the trial for each of the parties shall attend the Final Pretrial Conference. All motions in limine must be filed in conjunction with the joint pretrial statement. In most cases, motions in limine are addressed and resolved on the morning of the first day of trial. The parties may alert the court at the Final Pretrial Conference and in their final Joint Pretrial Statement that a particular motion or motions should be resolved earlier. At the Final Pretrial Conference, the court will set a briefing and hearing schedule on the motions in limine as necessary. The parties are reminded that a motion in limine is a pretrial procedural device designed to address the admissibility of evidence. The court looks with disfavor upon dispositional motions presented at the Final Pretrial Conference or at Trial in the guise of motions in limine.

/////

/////

/////

1    This order resolves ECF No. 36.

2    IT IS SO ORDERED.

3    DATED: July 31, 2024.

   _____
   CHIEF UNITED STATES DISTRICT JUDGE